1  MARCO QUAZZO (SBN 142182)
   MBV LAW LLP
2  855 Front Street
   San Francisco, CA 94111
3  Telephone:    (415) 781-4400
   Facsimile:    (415) 989-5143
4
   Attorneys for Cross-Defendant
5  CLIFTON WARREN

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  FLUKE ELECTRONICS CORPORATION,          Case No.  C08-01188 JW
    a Washington corporation,
12                                          DECLARATION OF CLIFTON
13              Plaintiff,                   WARREN IN SUPPORT OF MOTION
                                            TO COMPEL ARBITRATION
14       v.

15  STEPHEN MANGELSEN,

16              Defendant.

17  _____

18  STEPHEN MANGELSEN,                      Hearing Date:    November 3, 2008
                                            Hearing Time:    9:00 a.m
19              Cross-Complainant,          Department:      8
                                            Judge:           Hon. James Ware
20       v.

21  CLIFTON WARREN, an individual; FLUKE
22  ELECTRONICS CORPORATION, a Delaware
    corporation; inclusive,
23
24              Cross-Defendants.

25

26

27

28

_____
    DECLARATION OF CLIFTON WARREN IN SUPPORT OF MOTION TO COMPEL ARBITRATION
                          -- CASE NO. C08-01188 JW

I, CLIFTON WARREN, declare:

1. I am a cross-defendant in this action and the former Chief Executive Officer of Raytek Corporation. ("Raytek"). I have personal knowledge of the following matters and, if called as a witness herein, I could and would competently testify to the following.

2. Raytek merged with Fluke Electronics Corporation ("Fluke")in 2002. Attached to this declaration as Exhibit 1 is a true and correct copy (except for exhibits) of the Agreement and Plan of Merger dated as of August 22, 2002, between Raytek, Fluke, and myself as the Representative of the Common Equityholders. The Merger Agreement includes an arbitration at section 10.13.

3. The Merger Agreement included as Exhibit C a "Form of Transmittal Agreement", a true and correct copy of which is attached to this declaration as Exhibit 2. Each Raytek shareholder was required to sign this form of Transmittal Agreement in order to receive compensation for his Raytek shares. The Transmittal Agreement discusses the arbitration provision contained in the Merger Agreement at pages 3 and 4.

4. At the time of the merger Stephen Mangelsen owned approximately 5.92% of the total Raytek shares outstanding. In return for signing the Transmittal Agreement and surrendering his shares, Mr. Mangelsen received $3,748,128.95 in cash from Fluke.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26 th day of August, 2008 at San Francisco, California.

_____
CLIFTON WARREN

# Exhibit 1

---

# AGREEMENT AND PLAN OF MERGER

---

By and Among

RAYTEK CORPORATION, a California corporation (the "Company"),

FLUKE ELECTRONICS CORPORATION, a Delaware corporation ("Parent"),

RAYTEK ACQUISITION CORP., a California corporation and a
wholly owned subsidiary of Parent ("Acquisition Sub"),

Clifton Warren, and

Raytop, Inc., a California corporation

Dated as of August 22, 2002

45039526_5.DOC

W05714

# AGREEMENT AND PLAN OF MERGER

## TABLE OF CONTENTS

Page

1. CLOSING ..................................................................................................... 2

2. THE MERGER ............................................................................................. 2
    2.1     Board of Directors' and Shareholders' Approval. ................................ 2
    2.2     The Merger. ...................................................................................... 2
    2.3     Consummation of the Merger; Effects of Merger. ............................. 2
    2.4     Articles of Incorporation; Bylaws; Directors and Officers of the
            Surviving Corporation. ...................................................................... 3
    2.5     Conversion of Outstanding Capital Stock .......................................... 3
    2.6     Closing Shareholders' Equity Adjustment ......................................... 4
    2.7     Appraisal Rights. ............................................................................... 7
    2.8     Exchange of Certificates ................................................................... 7

3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............... 9
    3.1     Corporate Status ............................................................................... 9
    3.2     Capitalization .................................................................................... 9
    3.3     Authority ........................................................................................ 10
    3.4     No Conflict ..................................................................................... 11
    3.5     Financial Statements ....................................................................... 11
    3.6     Real Property .................................................................................. 12
    3.7     Assets ............................................................................................. 13
    3.8     Material Contracts ........................................................................... 13
    3.9     Intellectual Property ........................................................................ 15
    3.10    Litigation, Claims and Proceedings ................................................. 18
    3.11    Environmental and Safety and Health Matters ................................. 18
    3.12    Permits and Licenses ...................................................................... 19
    3.13    Compliance with Law ...................................................................... 19
    3.14    Consents ......................................................................................... 20
    3.15    Labor .............................................................................................. 20
    3.16    Employee Benefits .......................................................................... 21
    3.17    Insurance ........................................................................................ 23
    3.18    Intercompany Services .................................................................... 23
    3.19    Taxes .............................................................................................. 23
    3.20    Undisclosed Liabilities .................................................................... 25
    3.21    Absence of Certain Changes; Conduct in the Ordinary Course ....... 25
    3.22    Finder's Fee .................................................................................... 25
    3.23    Accounts Receivable ....................................................................... 25
    3.24    Inventories ...................................................................................... 26
    3.25    Suppliers and Customers ................................................................. 26
    3.26    Books and Records ......................................................................... 27
    3.27    Warranties; Products ....................................................................... 27
    3.28    Bank Accounts ............................................................................... 28

45039526_5.DOC

3.29    Certain Business Practices ...............................................................28
3.30    Backlog .............................................................................................28
3.31    Invoices for MX and ST Products ....................................................28

4. REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION
SUB................................................................................................................28
4.1    Due Organization...............................................................................29
4.2    Authority.............................................................................................29
4.3    Compliance with Law.........................................................................29
4.4    No Conflict.........................................................................................29
4.5    Finder's Fee........................................................................................30
4.6    Consents.............................................................................................30
4.7    Financing............................................................................................30

5. COVENANTS AND AGREEMENTS..........................................................30
5.1    Conduct of Business Prior to Closing................................................30
5.2    Access to Records and Properties......................................................33
5.3    Consents.............................................................................................33
5.4    Public Announcements.......................................................................34
5.5    No Solicitation or Negotiation...........................................................35
5.6    Further Action....................................................................................35
5.7    Indemnification..................................................................................36
5.8    Benefit Plans......................................................................................36
5.9    State Takeover Statutes......................................................................37
5.10   Taxes..................................................................................................37
5.11   No Improper Payment........................................................................39
5.12   Fees and Expenses.............................................................................39
5.13   Additions to and Modification of Disclosure Schedule.....................40
5.14   Required Consents.............................................................................40
5.15   Shareholder Notification....................................................................40
5.16   Newport Claims.................................................................................40

6. CONDITIONS TO OBLIGATIONS OF PARENT AND ACQUISITION SUB.....40
6.1    Legality of Merger.............................................................................41
6.2    Continuation and Truth of Representations and Warranties...............41
6.3    Fulfillment of Covenants...................................................................41
6.4    Certified Resolutions.........................................................................41
6.5    Documents..........................................................................................41
6.6    Third-Party Consents and Approvals.................................................42
6.7    Opinion of Counsel to the Company..................................................42
6.8    Governmental Consents and Approvals.............................................42
6.9    No Material Adverse Effect................................................................42
6.10   Noncompetition Agreements..............................................................42
6.11   Required Consents.............................................................................42
6.12   Raytek GmbH.....................................................................................42
6.13   Evidence of Insurance........................................................................43
6.14   Closing Payments...............................................................................43

45039526_5.DOC

W05716

6.15    Other Documents ..................................................................................44

7.CONDITIONS TO OBLIGATIONS OF THE COMPANY ......................................44
7.1    Legality of Merger ..............................................................................44
7.2    Continuation and Truth of Representations and Warranties.............44
7.3    Fulfillment of Covenants ....................................................................44
7.4    Certified Resolutions ..........................................................................44
7.5    Opinion of Counsel to Parent and Acquisition Sub..........................45
7.6    Governmental Consents and Approvals .............................................45
7.7    Other Documents ...............................................................................45

8.TERMINATION; EFFECT OF TERMINATION .................................................45
8.1    Termination.........................................................................................45
8.2    Effect of Termination ........................................................................46

9.SURVIVAL OF REPRESENTATIONS AND WARRANTIES; LIABILITY .......................47
9.1    Survival of Representations and Warranties.......................................47
9.2    Indemnification by the Common Equityholders..................................47
9.3    Limitations on Indemnification by the Common Equityholders .........48
9.5    Limitations on Indemnification by the Parent ...................................50
9.6    Procedures...........................................................................................51
9.7    Indemnification and Procedure with Respect to Newport Claims......53
9.8    Tax Treatment.....................................................................................56
9.9    Assignment of Claims..........................................................................56
9.10   Appointment of the Representative ....................................................56
9.11   Common Equityholders Acknowledgment...........................................58
9.12   Materiality...........................................................................................58
9.12   Exclusivity...........................................................................................58

10.MISCELLANEOUS ..........................................................................................58
10.1    Assignability.......................................................................................58
10.2    Binding Effect.....................................................................................59
10.3    Notices.................................................................................................59
10.4    Counterparts........................................................................................60
10.5    Disclosure Schedule and Exhibits .....................................................60
10.6    Governing Law and Forum..................................................................61
10.7    Headings ..............................................................................................61
10.8    Amendment..........................................................................................61
10.9    Entire Agreement................................................................................61
10.10   Waivers................................................................................................61
10.11   Third-Party Rights .............................................................................61
10.12   Severability.........................................................................................62
10.13   Arbitration...........................................................................................62
10.14   Knowledge...........................................................................................62

11.DEFINITIONS ................................................................................................62
11.1    Defined Terms.....................................................................................62

45039526_5.DOC

11.2    Index of Other Defined Terms........................................................................69
11.3    Construction..................................................................................................71

45039526_5.DOC

W05718

## EXHIBITS

A.    Noncompetition Agreement
B.    Shareholder Agreement
C.    Form of Transmittal Agreement
D.    Indebtedness
E.    Form of Opinion of Counsel to the Company
F.    Form of Opinion of Counsel to Parent and Acquisition Sub
G.    Knowledge Group
H.    Form of Escrow Agreement
I.    Guaranty

W05719

# DISCLOSURE SCHEDULE

| | |
|---|---|
| 2.6 | Closing Shareholders' Equity Adjustment |
| 3.1 | Corporate Status |
| 3.2 | Capitalization |
| 3.4 | No Conflict |
| 3.5 | Financial Statements |
| 3.6 | Real Property |
| 3.7 | Assets |
| 3.8 | Material Contracts |
| 3.9 | Intellectual Property |
| 3.10 | Litigation, Claims and Proceedings |
| 3.11 | Environmental and Health and Safety Matters |
| 3.12 | Permits and Licenses |
| 3.13 | Compliance With Law |
| 3.14 | Governmental Consents |
| 3.15 | Bonus Payments |
| 3.16 | Employee Benefits |
| 3.17 | Insurance |
| 3.18 | Intercompany Services |
| 3.21 | Absence of Certain Changes; Conduct in the Ordinary Course |
| 3.22 | Finder's Fee |
| 3.23 | Accounts Receivable |
| 3.25 | Suppliers and Customers |
| 3.27 | Warranties; Products |
| 3.28 | Bank Accounts |
| 3.30 | Backlog |
| 3.31 | Invoices for MX and ST Products |
| 5.1(a) | Conduct of Business Prior to the Closing |
| 6.11 | Required Consents |
| 6.13 | Directors and Officers |

45039526_5.DOC

W05720

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER is made this 22nd day of August, 2002 by and among RAYTEK CORPORATION, a California corporation (the "Company"), FLUKE ELECTRONICS CORPORATION, a Delaware corporation ("Parent"), RAYTEK ACQUISITION CORP., a California corporation and a wholly owned subsidiary of Parent ("Acquisition Sub"), and with respect to his obligations as representative of the Common Equityholders of the Company as set forth in Section 9.10 and the indemnification obligations set forth in Article 9, Clifton Warren (the "Representative"), and solely with respect to the indemnification obligations set forth in Article 9, Raytop, Inc., a California corporation ("Raytop"). A capitalized term not otherwise defined herein shall have the meaning given to such term in Section 11.1 hereof.

## WITNESSETH

WHEREAS, Parent has formed Acquisition Sub for the purposes of merging with and into the Company (the "Merger") and acquiring the Company as a wholly owned subsidiary;

WHEREAS, the Boards of Directors of Acquisition Sub, Parent and the Company, and Parent as the sole shareholder of Acquisition Sub, have each approved the terms of the Merger;

WHEREAS, concurrently with the execution of this Agreement and as an inducement to Parent to enter into this Agreement, certain holders of outstanding capital stock of the Company have entered into noncompetition agreements (collectively, the "Noncompetition Agreements"), attached hereto as Exhibit A, in each case effective upon consummation of the Merger, as an inducement to Parent to enter into this Agreement;

WHEREAS, in order to induce Parent and Acquisition Sub to enter into this Agreement and to satisfy a condition to Parent and Acquisition Sub entering into this Agreement and incurring the obligations set forth herein, concurrently with the execution and delivery of the Agreement, Clifton Warren, Peter King, Steven Mangelsen and Raytop are entering into a Shareholder Agreement dated as of the date hereof (the "Shareholder Agreement") in the form of the attached Exhibit B with Parent and Acquisition Sub pursuant to which they have agreed to vote for the Merger and grant an irrevocable proxy to officers of Parent with respect to the voting for the Merger; and

WHEREAS, concurrently with the execution of this Agreement and as an inducement to Parent to enter into this Agreement, Hörmann GmbH & Co. Beteiligungs KG has delivered the Guaranty (the "Guaranty"), attached hereto as Exhibit L effective upon the consummation of the Merger.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

W05721

1.    <u>CLOSING</u>.

Upon the terms and subject to the conditions of this Agreement, the closing of the transactions contemplated under this Agreement (the "<u>Closing</u>") shall take place at the offices of Gibson, Dunn & Crutcher LLP, located at 1530 Page Mill Road, Palo Alto, California, effective at the commencement of business on the second Business Day following the satisfaction or waiver of all other conditions to the obligations of the parties set forth herein (other than conditions that by their terms are to be satisfied on the Closing Date), or at such other place and on such other date and time as the parties may mutually agree in writing (the time and date on which the Closing occurs hereinafter is referred to as the "<u>Closing Date</u>").

2.    <u>THE MERGER</u>.

2.1    <u>Board of Directors' and Shareholders' Approval</u>.

Acquisition Sub and the Company shall, to the extent any such action may not have been taken prior to execution and delivery of this Agreement promptly following execution of this Agreement, submit this Agreement and the terms of the Merger to their respective shareholders for approval in accordance with the applicable provisions of the CGCL.

2.2    <u>The Merger</u>.

Subject to the terms and conditions of this Agreement and the Agreement of Merger, and in accordance with the CGCL, at the Effective Time, Acquisition Sub shall be merged with and into the Company pursuant to the Agreement of Merger, with the Company as the surviving corporation (in such capacity, the "<u>Surviving Corporation</u>"), the separate existence of Acquisition Sub shall thereupon cease and the Company, as the Surviving Corporation in the Merger, shall continue its corporate existence under the laws of the State of California.

2.3    <u>Consummation of the Merger; Effects of Merger</u>.

Pursuant to the CGCL, the parties hereto shall cause the Agreement of Merger to be filed, as promptly as practicable after the satisfaction, or if permissible, waiver of the conditions set forth in Articles 6 and 7, in the office of the Secretary of State for the State of California. The Merger shall become effective immediately upon the filing of the Agreement of Merger and related certificates with the office of the Secretary of State for the State of California in accordance with the CGCL (the date and time of such filing being the "<u>Effective Time</u>"). At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the CGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time all the property, rights, privileges, powers and franchises of the Company and Acquisition Sub shall vest in the Surviving Corporation, and except as expressly specified in this Agreement, all debts, liabilities, obligations, restrictions, disabilities and duties of the Company and Acquisition Sub shall become the debts, liabilities, obligations, restrictions, disabilities and duties of the Surviving Corporation.

W05722

2.4    Articles of Incorporation: Bylaws: Directors and Officers of the Surviving Corporation.

(a)    The articles of incorporation and bylaws of the Company shall be amended to read the same as the articles of incorporation and bylaws of Acquisition Sub, as in effect on the Effective Date and shall be the articles of incorporation and bylaws of the Surviving Corporation as of the Effective Time (until amended or repealed as provided by law), except that the name of the Surviving Corporation shall be Raytek Corporation.

(b)    The directors of the Surviving Corporation as of the Effective Time shall be the directors of Acquisition Sub immediately prior to the Effective Time until their successors are elected or appointed and qualified in accordance with the articles of incorporation and bylaws of the Surviving Corporation. The officers of the Surviving Corporation as of the Effective Time shall be the officers of the Company immediately prior to the Effective Time, except as otherwise designated by Parent prior to the Effective Time, in each case until their successors are elected or appointed and qualified in accordance with the articles of incorporation and bylaws of the Surviving Corporation.

2.5    Conversion of Outstanding Capital Stock.

At the Effective Time, by virtue of the Merger and without any action on the part of Parent, Acquisition Sub, the Company or the holder of any of the following securities:

(a)    Each share of Common Stock that is issued and outstanding immediately prior to the Effective Time (other than shares as to which appraisal rights are perfected under Chapter 13 of the CGCL and any shares of Common Stock that are owned by the Company or any direct or indirect Subsidiary) shall be canceled and extinguished and be converted automatically into and become a right to receive an amount, payable without interest at the Closing, in cash equal to the quotient of (x) (i) the Merger Consideration, minus (iii) the Total Closing Payments, divided by (y) the number of Fully Diluted Shares (the "Per Share Merger Consideration"). All amounts payable hereunder shall be subject to applicable tax withholding; to the extent that taxes are withheld, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the holder of the shares of Common Stock, options to purchase shares of Common Stock, or a phantom stock unit in respect of whom such deduction and withholding were made.

(b)    Except as otherwise agreed in writing among the Parent, the Company and any holder of a phantom stock unit, each vested phantom stock unit that is issued and outstanding immediately prior to the Effective Time shall be canceled and extinguished and be converted automatically into and become a right to receive an amount, without interest and less applicable tax withholding, in cash equal to the fair market value of such phantom stock unit, as determined by the Company's board of directors in accordance with the terms of the plan and agreements governing such phantom stock unit.

(c)    Each share of Common Stock that is owned by the Company or by any direct or indirect subsidiary of the Company issued and outstanding immediately prior to the

W05723

Effective Time shall be canceled and retired and shall cease to exist without any conversion thereof, and no payment shall be made with respect thereto.

(d)    Each share of the common stock, no par value per share, of Acquisition Sub that is issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of common stock, no par value per share, of the Surviving Corporation, so that after the Effective Time Parent shall be the holder of all of the issued and outstanding shares of the Surviving Corporation's common stock.

(e)    Other than as set forth herein, no other shares of capital stock of the Company shall be issued in, or outstanding immediately after, the Merger. No shares of stock of Acquisition Sub shall be issued in, or outstanding after, the Merger.

(f)    Notwithstanding Section 2.5(a), at the Closing, $5,000,000 of the Merger Consideration (the "Escrow Amount"), consisting of five percent (5%) of the Merger Consideration (the "General Escrow Amount") and an amount equal to five million dollars ($5,000,000) less the General Escrow Amount (the "Additional Escrow Amount"), shall be deposited into an interest-bearing escrow account (the "Escrow") with a third party mutually acceptable to Parent and the Company, as escrow agent (the "Escrow Agent"), for a period commencing on the Closing Date and ending on March 31, 2004, pursuant to an escrow agreement in the form attached hereto as Exhibit H; provided, however, that notwithstanding the foregoing, and subject to any pending indemnification claim(s) of any Parent Party pursuant to Section 9 hereof, portions of the General Escrow Amount shall be released and delivered to the Representative for distribution to the former Company Equityholders of the Company in accordance with the following schedule: (i) twenty-five percent (25%) on December 31, 2002; (ii) twenty-five percent (25%) on June 30, 2003; (iii) twenty-five percent (25%) on December 31, 2003; and (iv) twenty-five percent (25%) on March 31, 2004, in each case at 5:00 p.m. (Pacific Time) on the applicable date, provided, however, that in no event shall any of such amounts in clauses (i) through (iv) above be released from escrow prior to the tenth (10th) day following the decision by the European Patent Office in the EPO Proceeding (the "EPO Decision"); and the Additional Escrow Amount shall be released in accordance with the escrow agreement upon a final settlement, or final, non-appealable judgment or dismissal of the Newport Claims by all domestic and foreign Governmental Authorities having jurisdiction over the Newport Claims. The parties intend for the Escrow Amount to be treated as an installment obligation under Section 453 of the Code. The parties agree to share equally the costs and expenses associated with the Escrow Agent.

2.6    Closing Shareholders' Equity Adjustment.

(a)    As soon as practicable after the Effective Time, and in any event no later than forty-five (45) days thereafter, the Surviving Corporation shall prepare a balance sheet of the Company as of the Closing Date (the "Closing Date Balance Sheet") and a statement of the Shareholders' Equity (as defined below) of the Company (the "Statement of Closing Shareholders' Equity") as of the Closing Date ("Closing Shareholders' Equity"). The Statement of Closing Shareholders' Equity shall be based upon the books and records of the Company and the Closing Date Balance Sheet and (except as otherwise provided in the last three sentences of this section or in Section 2.6 of the Disclosure Schedule) both the Closing Date Balance Sheet

W05724

and the Statement of Closing Shareholders' Equity shall be prepared in accordance with GAAP and consistent with the accounting principles used in preparing the June 30 Balance Sheet. For purposes of this Agreement, the term "Shareholders' Equity" means the total assets of the Company that would be required to be included on a balance sheet prepared in accordance with GAAP, *minus* the total liabilities of the Company that would be required to be included on a balance sheet prepared in accordance with GAAP. Notwithstanding any contrary accounting policies under GAAP and/or any contrary accounting policies set forth in Section 2.6 of the Disclosure Schedule, the Statement of Closing Shareholders' Equity shall be prepared as of a moment in time prior to the Effective Time and shall not give effect to any purchase accounting principles which might otherwise apply as a result of the consummation of the transactions contemplated hereby and there shall be no reduction of the Closing Shareholders' Equity as a result of any of the Total Closing Payments. The reserve for accrued but unpaid Taxes (rather than the reserve for deferred Taxes established to reflect differences between book and Tax items) on the Closing Date Balance Sheet will be sufficient for the payment of all accrued but unpaid Taxes for which the Company or any of its Subsidiaries is liable at the Closing Date in respect of all periods up to the Closing Date. A reserve of $200,000 shall be established on the Closing Date Balance Sheet with respect to the pension promises described in Section 3.16(h) of the Disclosure Schedule.

(b) As soon as practicable after the preparation of the Statement of Closing Shareholders' Equity, the Surviving Corporation shall deliver, or cause to be delivered, to the Representative and Parent the Closing Date Balance Sheet and the Statement of Closing Shareholders' Equity. The Representative and Parent may review the Closing Date Balance Sheet and the Statement of Closing Shareholders' Equity and may dispute or disagree with the Statement of Closing Shareholders' Equity. The Statement of Closing Shareholders' Equity shall become final and binding for purposes of this Agreement unless, within forty-five (45) days of the receipt of the Statement of Closing Shareholders' Equity (or such longer period as the Representative and Parent shall agree), the Representative or Parent furnishes written notice to the other party, of any dispute or disagreement. Such written notice shall specify, in reasonable detail, the nature and extent of such dispute or disagreement (including any specific items in dispute).

(c) If the Representative or Parent timely notifies the other party of any dispute or disagreement with the Statement of Closing Shareholders' Equity or the Closing Date Balance Sheet (including any specific items included therein), the Representative and Parent shall promptly meet to resolve such dispute or disagreement in good faith. If the Representative and Parent are unable to resolve such dispute or disagreement within fifteen (15) days after receipt by a party of written notice of a dispute or disagreement pursuant to Section 2.6(b) (or such longer period as the Representative and Parent shall agree), such dispute or disagreement shall be submitted to the San Jose, California office of KPMG LLP ("KPMG") for a preliminary evaluation by a written notice from Representative and Parent; *provided, however,* the Parent and Representative agree that KPMG's evaluation is nonbinding and shall not be considered by the Neutral Accountant in its final determination pursuant to Section 2.6(d). Following notification to KPMG, Parent and Representative agree to work with KPMG for thirty (30) days to resolve any dispute or disagreement.

W05725

(d)    If the Representative and Parent are unable to resolve such dispute or disagreement within such thirty (30) day period (or such longer period as the Representative and Parent shall agree), either the Representative or Parent shall be entitled to submit such dispute or disagreement, together with its presentation and evidence, for final determination to the San Francisco, California office of PricewaterhouseCoopers LLP (unless another accounting firm is mutually agreed upon by the Representative and Parent) (the "Neutral Accountant"); *provided, however,* that the party notifying the Neutral Accountant of a dispute shall also notify the other non-notifying party.    If neither the Parent nor the Representative submits such dispute or disagreement to the Neutral Accountant within fifteen (15) days following the expiration of thirty (30) day consultation period with KPMG provided in section 2.6(c) (or such later date as has been mutually agreed to by the Parent and the Representative), the Statement of Closing Shareholders' Equity shall become final and binding.    The Neutral Accountant shall act as an arbitrator to determine and resolve such dispute or disagreement, based solely on the presentations by the Representative and Parent and the principles for the preparation of the Statement of Closing Shareholders' Equity contained in Section 2.6(a) and not by independent audit.    Upon notice that either Parent of the Representative has notified the Neutral Accountant of a dispute, and sent its presentations and evidence regarding such dispute to the Neutral Accountant, whichever party has not submitted the dispute to the Neutral Accountant shall have fifteen (15) days to submit its presentations and evidence to the Neutral Accountant for consideration.    The Neutral Accountant shall make its determination regarding such dispute or disagreement within thirty (30) days after the date upon which it receives the presentations and evidence from the non-notifying party, and in that undertaking shall not be required to follow any particular procedure but shall be bound by the principles for the preparation of the Statement of Closing Shareholders' Equity set forth in this Agreement and shall proceed in a manner designed to achieve a speedy and economic resolution of the dispute.    The Neutral Accountant shall set forth its determination, which shall be final, binding and conclusive, absent a showing of fraud, in a written statement delivered to Parent and the Representative, stating its reasons therefor.    The Neutral Accountant's determination shall not be subject to review through Section 10.13, absent a showing of fraud.

(e)    On such date as the Statement of Closing Shareholders' Equity is finally determined pursuant to paragraphs (b), (c) or (d) of this Section 2.6, if the Closing Shareholders' Equity is less than the shareholders' equity as reflected on the June 30 Balance Sheet, which is $14,123,000 (the "Baseline Shareholder's Equity), minus $200,000, then the Common Equityholders shall severally (and not jointly), based on their Pro Rata Portion, be liable for payment of the difference between the Baseline Shareholders' Equity and Closing Shareholders' Equity; *provided, however,* that Parent shall deduct any claim under this Section 2.6(e) from the Escrow prior to seeking indemnification from the Securityholders.

(f)    Each of the Representative and Parent shall be responsible for its own costs and expenses incurred in connection with the matters set forth in this Section 2.6, including the fees and expenses of its accountants, *provided* that the Representative and Parent shall share equally the fees and expenses, if any, of KPMG and the Neutral Accountant.

W05726

### 2.7   Appraisal Rights.

Holders of shares of Common Stock who have complied with all requirements for demanding and perfecting appraisal rights as set forth in Chapter 13 of the CGCL ("Dissenting Shareholders") are entitled to their rights under such laws. Each share of Common Stock held by Dissenting Shareholders shall not be converted into or represent the right to receive the merger consideration set forth above. Dissenting Shareholders shall be entitled to receive payment of the appraised value of such shares held by them in accordance with the provisions of Chapter 13 of the CGCL. Each share of Common Stock held by holders who shall have failed to perfect or who effectively shall have withdrawn or lost their rights to appraisal of such shares under Chapter 13 of the CGCL shall thereupon be deemed to have been converted into and to have become exchangeable for, as of the Effective Time, the right to receive the merger consideration set forth above, without any interest thereon, upon surrender, in the manner provided in Section 2.7, of the certificate or certificates that formerly evidenced such shares. The Company shall give Parent prompt written notice of any assertions of appraisal rights or withdrawals of assertions of appraisal rights, and any other instrument in respect thereof received by the Company and the opportunity to direct all negotiations and proceedings with respect to demands for appraisal under the CGCL.

### 2.8   Exchange of Certificates.

(a)   Paying Agent.  Parent designates SunTrust Bank, Atlanta to act as paying agent in the Merger (the "Paying Agent"), and at or prior to the Effective Time, Parent shall deposit or cause to be deposited with the Paying Agent, cash in the amount necessary for the payment of the Merger Consideration (less the Total Closing Payments) upon surrender of certificates representing shares of Common Stock as part of the Merger. Any and all interest earned on funds while in the custody of the Paying Agent pursuant to this Agreement shall be for the account of Parent.

(b)   Upon the surrender to the Paying Agent of each certificate representing shares of Common Stock and a duly executed Transmittal Agreement, substantially in the form of Exhibit C hereto (each, a "Transmittal Agreement"), related thereto, the holder of such certificate shall be entitled to receive in exchange therefor by check, or by wire transfer at Parent's discretion, an amount in cash equal to the product of (i) the number of shares of Common Stock evidenced by such certificate and (ii) the Per Share Merger Consideration, and such certificate shall, after such surrender, be marked as canceled.

(c)   Upon the surrender to the Paying Agent of each option to purchase shares of Common Stock and a duly executed Transmittal Agreement related thereto, the holder of such option shall be entitled to receive in exchange therefor by check or wire transfer (as selected by such holder), the consideration described in Section 2.5(c), and such option shall, after such surrender, be marked as canceled.

(d)   If any consideration is to be paid to a Person other than the Person in which the certificate or option surrendered in exchange therefor is registered, it shall be a condition to such exchange that the Person requesting such exchange shall pay to the Paying Agent any transfer or other taxes required by reason of the payment of such consideration to a

W05727

Person other than that of the registered holder of the certificate or option so surrendered, or such Person shall establish to the reasonable satisfaction of the Paying Agent that such tax has been paid or is not applicable.

(e)    At the close of business on the day of the Effective Time, the stock transfer books of the Company shall be closed and thereafter there shall be no transfers of any shares of Common Stock. If, after the Effective Time, certificates previously representing the Common Stock are presented to the Surviving Corporation, they shall be canceled, delivered to the Paying Agent and exchanged for the merger consideration, as provided in this Article 2, subject to Chapter 13 of the CGCL with respect to appraisal rights. None of Parent, Acquisition Sub, Surviving Corporation or Paying Agent shall be liable to any Person in respect of any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. If any certificates shall not have been surrendered prior to nine (9) months after the Effective Time (or immediately prior to such earlier date on which any payment pursuant to this Section 2.8 would otherwise escheat to or become the property of any Governmental Authority), the cash payment in respect of such certificate shall, to the extent permitted by applicable law, become the property of the Surviving Corporation, free and clear of all claims or interests of any Person previously entitled thereto.

(f)    The Company shall instruct each Common Equityholder to execute and deliver to the Company, not later than three (3) Business Days prior to Closing, a Transmittal Agreement, which shall include instructions for delivery of the applicable merger consideration. The Company shall also request each such Common Equityholder to tender all certificates or agreements representing shares of Common Stock and options to purchase shares of Common Stock held by such holder, and, concurrently with the Merger, all such certificates and agreements shall be marked as canceled and surrendered to the Company. The Company shall forward to the Paying Agent all Transmittal Agreements, certificates and agreements that the Company has received pursuant to Section 2.8.

(g)    No later than two (2) Business Days prior to the Closing the Company shall deliver to Parent and the Paying Agent a certificate setting forth (i) the Per Share Merger Consideration and (ii) a schedule setting forth how such Per Share Merger Consideration will be distributed, including wire instructions in the case of payments to be made at Closing by wire transfer. At the Closing, and upon the surrender by each Common Equityholder of all of such Common Equityholder's certificates and agreements representing shares of Common Stock and options to purchase shares of Common Stock in accordance with this Section 2.7(g), along with a duly executed and delivered Transmittal Agreement related thereto, Parent shall cause the Paying Agent to pay the Per Share Merger Consideration to the respective Common Equityholders (after deduction, in the case of each Common Equityholder who holds options to purchase shares of Common Stock, of the aggregate exercise price of all such options held by such Common Equityholder), in each case in accordance with the payment instructions delivered to Parent and the Paying Agent by the Company (and the respective Common Equityholder) prior to the Effective Time.

(h)    If any certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate to be lost, stolen or

W05728

destroyed, the Paying Agent will pay in exchange for such lost, stolen or destroyed, certificate the amount of cash to which the holders thereof are entitled pursuant to Section 2.8.

3.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to Parent and the Acquisition Sub as follows:

3.1    Corporate Status.

Except as set forth in Section 3.1 of the Disclosure Schedule, each of the Company and each Subsidiary is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation; and each of the Company and the Subsidiaries (i) has all requisite corporate power and authority to own, operate or lease all of its properties and assets and to carry on its business as it is now being conducted, and (ii) is duly qualified to do business and is in good standing in each of the jurisdictions in which the ownership, operation or leasing of its properties and assets and the conduct of its business requires it to be so qualified, licensed or authorized, except where the failure to be so qualified, licensed or authorized would not result in a Material Adverse Effect; all such jurisdictions in which the Company or any Subsidiary is qualified to do business are set forth in Section 3.1 of the Disclosure Schedule. The Company has delivered to Parent a true and complete copy of the articles of incorporation or similar charter documents and all amendments thereto of the Company and each Subsidiary and a true and complete copy of each such corporation's by-laws or similar documents and all amendments thereto, each as in effect on the date hereof.

3.2    Capitalization.

(a)    The Company's authorized and outstanding capital stock (including shares reserved for issuance upon the exercise of options granted under the Stock Option Plan) is as set forth in Section 3.2(a) of the Disclosure Schedule. All of the Company's issued and outstanding capital stock is validly issued, fully paid and nonassessable and, to the Company's knowledge, all capital stock is owned free and clear of any Encumbrances. Except as set forth in Section 3.2(a) of the Disclosure Schedule, the Company has no treasury shares or any shares it has reacquired from its shareholders. The issued and outstanding Common Stock constitutes all of the issued and outstanding capital stock of the Company. No shares of capital stock or other equity interests of any Subsidiary are subject to, nor have any been issued in violation of, preemptive or similar rights. Except for the options granted under the Stock Option Plan and evidenced by the Stock Option Agreements set forth in Section 3.2(a) of the Disclosure Schedule, there are no outstanding obligations, options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any kind relating to the capital stock of the Company or obligating the Company to issue or sell any shares of capital stock of, or any other interest in, the Company. Except as set forth in Section 3.2(a) of the Disclosure Schedule, there are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any shares of Common Stock or to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person. Except as set forth in Section 3.2(a) of the Disclosure Schedule, there are no voting trusts, shareholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Common Stock. The transactions proposed in this Agreement are consistent with the terms of

W05729

any outstanding options of the Company and the Stock Option Plan. Except as set forth on Sections 3.2(a) or 3.2(b) of the Disclosure Schedule, neither the Company nor any of its Subsidiaries owns, of record or beneficially, controls or holds the right to acquire any shares of capital stock, securities convertible into capital stock, or any other security or interest in any other Person, nor is the Company nor any of its Subsidiaries, directly or indirectly, a participant in any joint venture, partnership, limited liability company, trust, association or other noncorporate entity.

(b)    Section 3.2(b) of the Disclosure Schedule sets forth a true and complete list of all Subsidiaries, listing for each Subsidiary its name, its jurisdiction of organization, its authorized capital stock, the number and type of its issued and outstanding shares of capital stock and the current ownership of such shares. Other than the Subsidiaries, there are no other corporations, partnerships, limited liability companies, joint ventures, associations or other similar entities in which the Company owns, of record or beneficially, any direct or indirect equity or other similar interest or any right (contingent or otherwise) to acquire the same. Except as set forth in Section 3.2(b) of the Disclosure Schedule, the Company is not a member of, nor is any of its business conducted through, any partnership. All of the issued and outstanding shares of each of the Subsidiaries are duly authorized, validly issued, fully paid and nonassessable. Except as set forth in Section 3.2(b) of the Disclosure Schedule, (i) the Company owns directly or indirectly all of the outstanding shares of capital stock of each class of each Subsidiary free and clear of any Encumbrances, (ii) there are no outstanding obligations, options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any kind relating to the capital stock of any Subsidiary or obligating the Company or any Subsidiary to issue or sell any shares of capital stock of, or any interest in, any Subsidiary, (iii) no Subsidiary is a member of, nor is any of its business conducted through, any partnership nor is any Subsidiary a participant in any joint venture or similar arrangement, and (iv) there are no voting trusts, shareholder arrangements, proxies or other arrangements or understandings in effect with respect to the voting or transfer of any shares of capital stock of or any other interests in any Subsidiary. The Company holds 99.43% of the issued and outstanding capital stock of Raytek GmbH and the nominal value of this stock is Eight Hundred Thirty Eight Thousand Eight Hundred Twenty Five Euros and Forty Six Cents (€838,825.46). The other 0.57% of the issued and outstanding capital stock of Raytek GmbH, with a nominal value of Four Thousand Eight Hundred Six Euros and Fourteen Cents (€4,806.14), is held as described in Section 3.2(b) of the Disclosure Schedule. As of the Closing, the Company will own one hundred percent (100%) of the issued and outstanding capital stock of Raytek GmbH, and the nominal value of such shares will be Eight Hundred Forty Three Thousand Six Hundred Thirty One Euros and Sixty Cents (€843,631.60).

3.3    <u>Authority.</u>

The execution, delivery and performance of this Agreement and all other agreements, instruments and documents to be delivered hereunder have been duly and validly authorized by the Board of Directors of the Company. The Company has all requisite corporate and other power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by the Company and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of the Company, other than a vote of the shareholders of the

W05730

Company (the "Shareholders"). This Agreement has been duly executed and delivered by the Company, and (assuming due authorization and delivery by the other parties hereto) this Agreement constitutes a legal, valid and binding obligation of the Company enforceable against it in accordance with its terms, subject to general principles of equity and except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws of general application relating to creditors' rights.

3.4    No Conflict.

The consummation by the Company of the transactions contemplated by this Agreement and all other agreements, instruments and documents to be delivered hereunder will not, assuming the affirmative vote of the holders of a majority of the outstanding Common Stock in favor of the Merger, (a) violate, conflict with or result in the breach of any term or provision of the articles of incorporation or by-laws (or similar organizational documents) of the Company or any of the Subsidiaries, (b) conflict with or violate, in any material respect, any Law applicable to the Company or any Subsidiary or any of their respective assets, properties or businesses, (c) except as set forth in Section 3.4 of the Disclosure Schedule, conflict with or violate, result in the breach of any term or provision of, or constitute a default under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrances on any of the Common Stock or on any of the assets or properties of the Company or any Subsidiary pursuant to, any Material Contract, except, with respect to each of Section 3.4(c), for any conflict, violation, breach, default or other event the occurrence or existence of which would not, individually or in the aggregate, result in a Material Adverse Effect, (d) result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) on the Business or any of the assets or properties of the Company or any of its Subsidiaries; (e) result in termination of, or require any consent, approval or authorization under any Material Permit; or (f) constitute an event which, after notice or lapse of time or both, would result in any conflict, breach, violation, default, requirement, loss, creation or imposition of any Encumbrance, termination or impairment or similar event described in Section 3.4(a)-(e).

3.5    Financial Statements.

(a)    The Company has provided to Parent or its representatives, true, correct and complete copies of (i) an unaudited consolidated balance sheet as of July 31, 2002 and the unaudited related statement of income for the Company and its Subsidiaries for the seven (7) month period ended July 31, 2002 and (ii) the consolidated balance sheet as of December 31, 2001 and the related consolidated statement of income for the Company and its Subsidiaries for the two (2) year period ended December 31, 2001, in the case of clause (ii) audited by KPMG LLP (collectively, with the financial statements referenced in clause (i), the "Financial Statements"), copies of which are attached hereto in Section 3.5(a) of the Disclosure Schedule. The July 31, 2002 balance sheet is referred to herein as the "Reference Balance Sheet."

(b)    Each of the Financial Statements (i) has been prepared based on the books and records of the Company and its Subsidiaries and in accordance with GAAP applied on a consistent basis with past practice, except as set forth in Section 2.6 of the Disclosure Schedule, and (ii) presents fairly, in all material respects, the consolidated financial condition, consolidated

W05731

results of operations and consolidated statements of cash flow of the Company and its Subsidiaries as of the dates indicated or for the periods indicated. Since the date of the Reference Balance Sheet, there has been no change in any of the significant accounting (including Tax accounting) policies, practices or procedures of the Company or any Subsidiary, except changes to comply with changes in accounting pronouncements of the Financial Accounting Standards Board or changes in applicable laws or rules or regulations thereunder as disclosed on Section 3.5(b) of the Disclosure Schedule.

(c)    The Baseline Shareholders' Equity has been calculated based on the books and records of the Company and its Subsidiaries and in accordance with GAAP applied on a consistent basis with past practice, except as set forth in Section 2.6 of the Disclosure Schedule.

3.6    Real Property.

(a)    Section 3.6(a) of the Disclosure Schedule sets forth a list of all of the Real Property used in the Business or owned or leased by the Company or any Subsidiary, including:

(i)    with respect to the Owned Real Property, (a) the street address of each parcel of Owned Real Property, and (b) the current owner of each such parcel of Owned Real Property; and

(ii)    with respect to the Leased Real Property, (a) the street address of each parcel of Leased Real Property, (b) the identity of the lessor and lessee of each such parcel of Leased Real Property, and (c) the term (referencing applicable renewal periods) and rental payment terms of the leases pertaining to each such parcel of Leased Real Property.

(b)    Except as otherwise set forth in Sections 3.6(b) and 3.7 of the Disclosure Schedule, (i) the Company and each of the Subsidiaries has good and marketable fee simple title to all of the Owned Real Property owned by it, free and clear of all Encumbrances, except Permitted Encumbrances, (ii) there are no leases, subleases, licenses, concessions or other agreements (written or oral) granting to any Person the right to use or occupy the Owned Real Property, and (iii) there are no outstanding options, right of first offer or rights of first refusal to purchase the Owned Real Property or any portion thereof or interest therein, and there are no parties (other than the Company or a Subsidiary) in possession of any Owned Real Property.

(c)    Except as otherwise set forth in Sections 3.6(c) and 3.7 of the Disclosure Schedule, all Leased Real Property is held by the Company and the Subsidiaries under valid and extant leases or subleases (as the same may have been amended or modified) which are in full force and effect and neither the Company nor any Subsidiary has received notice of any material breach or default, or cancellation or termination thereunder, or has knowledge of any condition, event or circumstance which with notice or lapse of time, or both, would constitute a material breach or default under any such lease or sublease.

(d)    There are no pending or, to the knowledge of the Company, threatened condemnation proceedings, lawsuits or administrative actions relating to the Real Property or other matters materially affecting the current use, occupancy or value thereof.

W05732

(e)    All facilities located on the Real Property are supplied with utilities and other services necessary for the operation of such facilities, including gas, electricity, water, telephone, sanitary sewer and storm sewer, all of which services are adequate in accordance with all applicable laws, ordinances, rules and regulations and, to the Company's knowledge, are provided via public roads or via permanent, irrevocable, appurtenant easements benefiting the relevant parcel of Real Property.

### 3.7    Assets.

Except as disclosed in Section 3.7 of the Disclosure Schedule, either the Company or a Subsidiary, as the case may be, owns, leases or has the legal right to use all the properties and assets, including, without limitation, the Intellectual Property, the Real Property and personal property, used or intended to be used in the conduct of the Business or otherwise owned, leased or used by the Company or any Subsidiary and, with respect to contract rights, is a party to and enjoys the right to the benefits of all contracts, agreements and other arrangements used or intended to be used by the Company or any Subsidiary or in or relating to the conduct of the Business (all such properties, assets and contract rights being the "Assets"). Attached to Section 3.7 of the Disclosure Schedule is a complete and accurate list of the assets of the Company and its Subsidiaries reflected on the Reference Balance Sheet. Either the Company or a Subsidiary, as the case may be, has good, marketable and valid title to, or in the case of leased or subleased Assets, valid and subsisting leasehold interests in, all the Assets, free and clear of all Encumbrances, except (i) as disclosed in Section 3.7 of the Disclosure Schedule and (ii) for Permitted Encumbrances. Except for the Assets and other immaterial assets and properties (which either the Company or a Subsidiary owns or leases or has the legal right to use), there are no other assets or properties necessary to conduct the Business as currently being conducted and as contemplated to be conducted. All of the tangible Assets have been maintained in a reasonably prudent manner, are in good operating condition and repair (ordinary wear and tear excepted), and no maintenance with respect thereto has been unreasonably deferred or delayed.

### 3.8    Material Contracts.

(a)    Section 3.8(a) of the Disclosure Schedule sets forth a true and complete list of all the Material Contracts of the Company and the Subsidiaries that are currently in effect. As used herein, "Material Contracts" means all of the following:

(i)    any agreement for the purchase of any machinery or capital assets, or the incurrence of any capital expenditure (including, but not limited to, expenditures for the construction or material modification of any structure) involving in excess of fifty thousand dollars ($50,000) per agreement;

(ii)    any purchase order or other agreement for the purchase of materials, supplies or services in excess of fifty thousand dollars ($50,000) per order;

(iii)    any agreement granting to any Person an Encumbrance upon any of the Assets, other than Permitted Encumbrances, including, but not limited to, agreements for the factoring or assignment of accounts or inventory;

W05733

(iv)    any confidentiality agreement or nondisclosure agreement not made in the ordinary course of business or not entered into in connection with any proposed or contemplated sale of the Company or a sale of all or substantially all of the Company's assets;

(v)    any other contract, not entered into in the ordinary course of the business, which provides for payments in excess of fifty thousand dollars ($50,000) in the aggregate;

(vi)    any contract giving any party the right to renegotiate or require a reduction in price or refund of payments previously made other than in the operation of the Business in the ordinary course consistent with past practice;

(vii)    contracts with any Governmental Authority or, to the Company's knowledge, with any Person in connection with such Person's contract with any Governmental Authority;

(ix)    any agreement for the sale of products or services containing warranty or guarantee obligations which materially deviates from those which are included in the Company's standard terms and conditions;

(x)    all contracts relating to the cleanup, abatement or other actions in connection with any Hazardous Substance, the remediation of any existing environmental liabilities, violation of any Environmental Laws or relating to the performance of any environmental study or audit;

(xi)    all contracts relating to, or evidences of, or guarantees of, or providing security for, Indebtedness or the deferred purchase price of property (whether incurred, assumed, guaranteed or secured by any Asset);

(xii)    all material license, sale, distribution, commission, marketing, agent, franchise, technical assistance or similar agreements relating to or providing for the marketing and/or sale of the products or services to which the Company or any Subsidiary of the Company is a party or by which any of them is otherwise bound;

(xiii)    all acquisition, partnership, joint venture, cooperative, teaming arrangements or other similar material contracts, arrangements or agreements entered into by the Company or any Subsidiary;

(xiv)    each agreement, arrangement, contract, commitment or obligation of the Company or any Subsidiary restricting or otherwise affecting the ability of the Company or any Subsidiary to compete in the Business or otherwise in any jurisdiction;

(xiv)    all leases or subleases of Leased Real Property;

(xvi)    all leases or agreements under which the Company or any Subsidiary is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by the Company or any Subsidiary;

W05734

(xvii)   each Employee Benefit Plan and Benefit Arrangement;

(xviii)  each contract for the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis, or contract relating to loans to officers, directors or Affiliates;

(xix)    all licenses or other agreements relating to the use of Intellectual Property, except for any of the foregoing related to the use of generally available computer software; and

(xx)     all other existing agreements or contracts, not otherwise covered by clauses (i) through (xix), which is material to the Company or any Subsidiary or the loss of which would result in a Material Adverse Effect.

Complete and correct copies of each Material Contract have been previously provided to Parent or its representatives.

(b)     Except as disclosed in Section 3.8(b) of the Disclosure Schedule:

(i)      Each Material Contract is in full force and effect and is a legal, valid, binding and enforceable obligation of the Company or a Subsidiary, as the case may be, and to the knowledge of the Company, each respective counter party thereto, subject to general principles of equity and except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws of general application relating to creditor's rights. Neither the Company nor any Subsidiary party to any Material Contract, nor, to the Company's knowledge, any other party thereto, is currently in breach of or in default under, or has given notice of any beach or default, or has improperly terminated, revoked or accelerated all or a portion of any Material Contract, and to the Company's knowledge, there exists no condition or event which, after notice or lapse of time or both, would constitute any such breach, default or termination, except for such breaches or defaults that individually and in the aggregate would not have a Material Adverse Effect on the Company taken as a whole. There are no Material Contracts that were not negotiated at arm's length.

(ii)     Within the past two (2) years, the Company has not been a party to any Material Contract with any of the current or former officers, directors, shareholders or employees of the Company or its Subsidiaries or, to the Company's knowledge, any current or former Affiliate of such Persons, except as provided in Section 3.8(a) of the Disclosure Schedule. The outstanding balance on all loans, credit agreements and guarantees between the Company and its Subsidiaries, on the one hand, and any current or former officer, director, shareholder or employee of the Company and its Subsidiaries or any current or former Affiliate of any such Person, on the other hand, is set forth in Section 3.8(b) of the Disclosure Schedule.

3.9     Intellectual Property.

(a)     Company's Intellectual Property includes all Intellectual Property (i) owned by, registered in the name of or used or held for use by the Company or the Subsidiaries

W05735

in connection with the Business or the Assets as of the date of this Agreement, or (ii) necessary for the conduct of the Business after the Closing Date substantially in the same manner as conducted prior to the Closing Date, excluding software and databases licensed to the Company or a Subsidiary under standard, non-exclusive licenses granted to the Company or any Subsidiary as an end-user by third parties in the ordinary course of such third parties' business (the "Company's Intellectual Property").

(b)    Section 3.9 of the Disclosure Schedule sets forth a complete and correct list of all domestic and foreign Patents, Trademarks, Copyrights, Domain Names, and each license agreement for any of the foregoing to which either the Company or Subsidiary is a party or by which either is bound (including (i) for each Patent, the number, normal expiration date and subject matter for each country in which such Patent has issued, or, if applicable, the application number, date of filing and subject matter for each country; (ii) for each Trademark, the application serial number or registration number, and the expiration date for each country in which a Trademark has been registered; and (iii) for each Copyright, the number and date of filing for each country in which a Copyright has been filed) (the "Company's Listed Intellectual Property").

(c)    To the knowledge of the Company, each material item of the Company's Listed Intellectual Property is valid, all necessary registration, maintenance and renewal fees currently due in connection with such Company's Listed Intellectual Property have been made and all necessary documents, recordations and certificates in connection with such Company's Listed Intellectual Property have been filed with the relevant patent, copyright or trademark authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Company's Listed Intellectual Property.  None of the material Company's Listed Intellectual Property has been cancelled, adjudicated invalid, lapsed, or is subject to any outstanding judgment, order, decree, ruling, injunction, writ or consent restricting its use or adversely affecting the Company's or Subsidiaries' rights thereto.  Except as set forth in Section 3.9(c) of the Disclosure Schedule, there are no pending or, to the Company's knowledge, threatened, interferences, re-examinations, oppositions, cancellation proceedings, or the foreign equivalent thereof involving any patents or trademarks in the Company's Listed Intellectual Property.

(d)    The Company or a Subsidiary either owns the entire right, title and interest in, to and under, or possesses legally enforceable and transferable (subject to obtaining any needed consents as set forth in Section 3.9(d) of the Disclosure Schedule) rights to use under valid and existing written license agreements, any and all Intellectual Property which is material to the conduct of the Business in the manner that the Business is currently being conducted, in each case free and clear of any Encumbrances (excluding licenses and related restrictions), and such title and rights will, subject to obtaining any needed consents as set forth in Section 3.9(d) of the Disclosure Schedule, continue to be valid title and rights following the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.  With respect to each item of Company's Intellectual Property not owned by the Company or any Subsidiary: (i) the license, sublicense or other agreement covering such item is legal, valid, binding, enforceable and in full force and effect with respect to the Company or Subsidiaries and, to the Company's knowledge, each other party thereto, subject to general principles of equity and except as the enforceability thereof may be limited by applicable

W05736

bankruptcy, insolvency, reorganization or other similar laws of general application relating to creditor's rights; (ii) neither the Company nor the Subsidiaries, as the case may be, nor to the Company's knowledge, any other party thereto is in material breach or default thereunder and, to the Company's knowledge, no event has occurred which with notice or lapse of time would constitute a material breach or default thereunder or permit termination, thereunder by the other party thereto; (iii) such item is not subject to any Encumbrance that materially and adversely interferes with or may reasonably be expected to materially and adversely interfere with the rights granted to the Company or the Subsidiaries with respect to such item; and (iv) the rights granted to the Company or the Subsidiaries with respect to such item are not, other than pursuant to the applicable Licenses-In therefor, which are set forth in Section 3.9(d) of the Disclosure Schedules, subject to any royalty, commission or other executory payment agreements, arrangements or understanding.

(e)    The Company and Subsidiaries have not transferred ownership of, or granted any exclusive license with respect to, any Intellectual Property that is material Company's Intellectual Property, to any third party, or knowingly permitted the rights of the Company or Subsidiaries in such material Company's Intellectual Property to lapse or enter the public domain in such a manner as to materially impair the Company's or its Subsidiaries' ownership thereof.

(f)    Except as set forth in Section 3.9(f) of the Disclosure Schedule, to the Company's knowledge, none of the operations of the Company nor any Subsidiary in conducting the Business with respect to the Assets, as now conducted, or performance of any contract as it has been, or as is currently being, conducted does as of the Closing Date (i) infringe upon any Intellectual Property owned by another Person, (ii) constitute a misuse or misappropriation of any Intellectual Property of any other Person, or (iii) other than pursuant to any Licenses-In or Licenses-Out, entitle any other Person to any interest therein, or right to compensation from the Company, any Subsidiary or any of its successors or assigns, by reason thereof. Neither the Company nor any Subsidiary has received any written complaint, assertion, threat or allegation of any claim, litigation or proceeding involving matters of the type contemplated by the immediately preceding sentence or has knowledge of any facts or circumstances that would reasonably give rise to any such claim, litigation or proceeding.

(g)    The Company and its Subsidiaries have taken reasonable steps to protect, maintain and safeguard Company's and Subsidiaries' rights in the Company's Intellectual Property and has executed and required nondisclosure agreements with third parties who have had access to the Company's Intellectual Property in consideration thereof. Except as set forth in Section 3.9(g) of the Disclosure Schedule, all of Company's and Subsidiaries' employees employed in the Business have executed nondisclosure agreements substantially in the forms provided to Parent.

(h)    Neither this Agreement nor the transactions contemplated by this Agreement will result in, subject to obtaining any needed consents, (i) the loss or impairment of any of the Company's Intellectual Property, (ii) the Company or any Subsidiaries granting to any Person (other than Parent or its Affiliates) any right to or with respect to any Company's Intellectual Property right owned by, or licensed to, it, (iii) the prevention or impediment of the continued use by the Company or any Subsidiary of the right, title, and interest of any of the

W05737

Company's Intellectual Property subject to the terms of this Agreement, (iv) the Company or Subsidiaries being bound by, or subject to, any non-compete or other material restriction on the operation or scope of their respective businesses, or (v) the Company or Subsidiaries being obligated to pay any royalties or other material amounts to compensate any third party for any of the Company's Intellectual Property, other than any royalties paid or payable consistent with past practice or pursuant to any Licenses-In as set forth in Section 3.9(h) of the Disclosure Schedule.

(i)    Except as set forth in Section 3.9(i) of the Disclosure Schedule, to the Company's knowledge, no Person has infringed or misappropriated or is infringing or misappropriating any Company's Intellectual Property, and no claim, litigation or proceeding brought by Company or any Subsidiary with respect to any of the Company's Intellectual Property is pending against any Person. Neither the Company nor any Subsidiary has agreed to indemnify any person for or against any interference, infringement, misappropriation, or other violation with respect to any of the Company's Intellectual Property other than pursuant to any License-In or License-Out in the ordinary course of business.

3.10    Litigation, Claims and Proceedings.

Except as set forth in Section 3.10 of the Disclosure Schedule, (a) there are no Actions or arbitrations pending or, to the knowledge of the Company, threatened against or affecting the Company, or any of its Subsidiaries or any of their respective assets or properties (i) that would, individually or in the aggregate, have a Material Adverse Effect or (ii) seeking to prevent or delay any of the transactions contemplated hereby, and (b) there are no Governmental Orders outstanding against or affecting the Company or any Subsidiary thereof. No Common Equityholder has made any claims against the Company or any Subsidiary thereof (not including any dissenters' rights claims made in connection with the Merger).

3.11    Environmental and Safety and Health Matters.

(a)    Except as disclosed in Section 3.11(a) of the Disclosure Schedule and except for any Permits the absence of which would not, individually or in the aggregate, be reasonably likely to result in a Material Adverse Effect, the Company and its Subsidiaries have obtained all Material Permits that are required under any Environmental Law for the operation of the Business. All Material Permits that are required under any Environmental Law for the operation of the Business are disclosed in Section 3.11(a) of the Disclosure Schedule.

(b)    Except as set forth in Section 3.11(b) of the Disclosure Schedule and except for any non-compliance, the existence of which would not, individually or in the aggregate, be reasonably likely to result in a Material Adverse Effect, the Company and its Subsidiaries are in material compliance with all Permits required under all Environmental Laws that are used in the operation of the Business and the Real Property and are in material compliance with all Environmental Laws.

(c)    Except as set forth in Section 3.11(c) of the Disclosure Schedule, the Company and its Subsidiaries have not received:  (i) notice of any Governmental Order, Action or Remediation arising under any Environmental Law in connection with the operations of the

W05738

Company or its Subsidiaries or (ii) any written notice alleging any violation of or any liability under any Environmental Law by the Company or its Subsidiaries.

(d)    Except as set forth in Section 3.11 of the Disclosure Schedule, to the Company's knowledge, there are no events, circumstances or conditions that may give rise to liability under any Environmental Law of the Company or its Subsidiaries.

(e)    There is no asbestos contained in or forming part of any products currently or previously manufactured or sold by the Company or a Subsidiary (or by any person or entity whose liability for any Claim the Company or its Subsidiaries have retained or assumed either contractually or by operation of law) and, to the knowledge of the Company, there is no asbestos contained in or forming part of any building or structure owned or leased by the Company or its Subsidiaries.

3.12    Permits and Licenses.

Except as disclosed in Sections 3.11(a) and 3.12 of the Disclosure Schedule and except for any Permit the absence of which would not, individually or in the aggregate, be reasonably likely to result in a Material Adverse Effect (the "Material Permits"), the Company and the Subsidiaries have all Permits that are necessary to own and operate the Assets and to conduct the Business as it is presently being conducted, and the Company and the Subsidiaries are currently and have been in compliance with all Material Permits applicable to the Company or any Subsidiary or any of the Assets or the Business. The Material Permits are valid, and to the knowledge of the Company, no Governmental Authority intends to modify, cancel, terminate or not renew any of the Material Permits, whether as a result of the transactions contemplated hereby or otherwise.

3.13    Compliance with Law.

(a)    Except as disclosed in Section 3.13 of the Disclosure Schedule and except for any non-compliance the existence of which would not, individually or in the aggregate, result in a Material Adverse Effect, the Company and the Subsidiaries are currently and have been in compliance with all Laws and Governmental Orders applicable to the Company or any Subsidiary or any of the Assets or the Business. Except as disclosed in Section 3.13 of the Disclosure Schedule, neither the Company nor any of its Subsidiaries has received any outstanding or uncured written notice alleging any default or violation of any Law or Governmental Order, or, except where any such default or violation would not, individually or in the aggregate, result in a Material Adverse Effect, has knowledge of any events or conditions which may constitute potential defaults or violations.

(b)    Section 3.13(b) of the Disclosure Schedule sets forth a brief description of each material Governmental Order applicable to the Company or any Subsidiary including the terms and conditions of any subsidies granted to Raytek GmbH by any Governmental Authority in Germany.

W05739

3.14    Consents.

(a)    Except for the notification requirements of the HSR Act and as disclosed in Section 3.14(a) of the Disclosure Schedule, no action, approval, consent or authorization by, or any other order of, action by, filing with or notification to any U.S., state, foreign governmental or quasi-governmental agency, including without limitation, administrative and regulatory, commission, board, court, bureau or instrumentality (collectively, "Governmental Authority"), is or will be necessary to make this Agreement or any of the agreements or instruments to be executed, performed and delivered pursuant hereto a legal, valid, binding and enforceable obligation of the Company, subject to general principles of equity and except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws of general application relating to creditors' rights, or to consummate the transactions contemplated hereunder.

(b)    Except as set forth on Section 3.14(b) of the Disclosure Schedule, no consents, waivers or approvals of any other party to any Material Contract are (i) required in connection with the execution, delivery or performance of this Agreement or any Related Document or the consummation by the Company of the transactions contemplated herein or therein, in each case without giving rise to a Material Adverse Effect on the Company and its Subsidiaries taken as a whole, or (ii) necessary in order that any Material Contract remains in effect without modification after the consummation of the transactions contemplated hereby or thereby, and not give rise to any right to termination, cancellation, revocation, amendment or acceleration or loss of any right or benefit of the Company or any Subsidiary.

(c)    The Company has obtained, or will obtain prior to the Closing Date, the consents identified on Section 6.11 of the Disclosure Schedule (the "Required Consents").

3.15    Labor.

(a)    Section 3.15(a) of the Disclosure Schedule sets forth a true and complete list of all employment, consulting, severance pay, continuation pay or other similar agreements (collectively, the "Employment Agreements") between the Company or a Subsidiary of the Company, on the one hand, and any current or former shareholder, officer, director, employee, consultant or Affiliate of the Company or a Subsidiary of the Company, on the other hand, that are currently in effect and under which the Company or any Subsidiary of the Company is obligated for an annual amount in excess of One Hundred Thousand Dollars ($100,000) other than any such agreement that can be terminated by the Company within ninety (90) days without the payment of severance or similar penalties, salary and accrued bonuses. Except as set forth in Section 3.15(a) of the Disclosure Schedule, there are no Employment Agreements or any other similar agreements to which the Company or any Subsidiary of the Company is a party under which the transactions contemplated by this Agreement (i) will require any payment by the Company, a Subsidiary of the Company, Parent or Acquisition Sub, or any consent or waiver from any other Person or (ii) will result in any change in the nature of any rights under any such Employment Agreement or other similar agreement of any of the parties thereto. Except as set forth in Section 3.15(a) of the Disclosure Schedule, no officer or key employee of the Company or any Subsidiary, within the preceding twelve (12) months, has terminated his or her

W05740

employment with the Company or any Subsidiary or to the Company's knowledge, has expressly stated his or her intention to terminate employment with the Company or any Subsidiary.

(b)    The Company and any Subsidiary comply and have complied in all material respects with all applicable domestic and foreign laws respecting employment and employment practices, terms and conditions of employment and wages and hours and employee classification and have complied with all employment agreements, and no claims, controversies, investigations, or suits are pending or, to the Company's knowledge, threatened with respect to such laws or agreements, either by private individuals or by governmental agencies.

(c)    No collective bargaining agreement covers or has ever covered the Company or any Subsidiary of the Company and, to the knowledge of the Company, (i) no petition has been filed or proceedings instituted by an employee or group of employees with any labor relations board seeking recognition of a bargaining representative and (ii) no organizational effort is currently being made or threatened by or on behalf of any labor union to organize any employees of the Company or any Subsidiary of the Company.

(d)    Except as set forth in Section 3.15(d) of the Disclosure Schedule (i) there is no labor strike, slow down or stoppage pending or, to the Company's knowledge, threatened, against or directly affecting the Company or any Subsidiary of the Company, (ii) no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending, and (iii) neither the Company nor any Subsidiary of the Company has received any notice of any threatened labor or civil rights dispute, controversy or grievance or any other unfair labor practice proceeding or breach of contract claim or action with respect to claims of, or obligations to, any employee or group of employees of the Company or any Subsidiary of the Company.

3.16    Employee Benefits.

(a)    Section 3.16(a) of the Disclosure Schedule sets forth all Benefit Plans of the Company and each of its Subsidiaries. With respect to each such Benefit Plan, the Company has provided to Parent or its representatives copies of (i) all Benefit Plan documents, including all governing instruments and related material agreements and any written descriptions of any Benefit Plan not set forth in writing, (ii) the three (3) most recently filed Federal Form 5500 series and accountant's opinion, if applicable, for each Employee Benefit Plan, (iii) the most recent IRS determination letter obtained or application for an IRS determination letter submitted with respect to each Employee Benefit Plan intended to be qualified under Section 401(a) of the Code or exempt under Section 501(a) of the Code and (iv) if applicable, the most recently prepared financial statements of each Employee Benefit Plan.

(b)    Except as set forth in Section 3.16(b) of the Disclosure Schedule, neither the Company nor any Subsidiary of the Company sponsors or, within the last five (5) years, has sponsored, maintained, contributed to, or incurred an obligation to contribute to, any Employee Pension Benefit Plan.

(c)    Except as set forth in Section 3.16(c) of the Disclosure Schedule, no individual shall accrue or receive additional benefits, service, or accelerated rights to payments of benefits under any Benefit Plan (or otherwise), including the right to receive any parachute

W05741

payments, as defined in Section 280G of the Code or become entitled to severance, termination allowance or similar payments as a result of the transactions contemplated by this Agreement (or upon an employment termination following such transactions); no Benefit Plan contains any provision or is subject to any law that would accelerate or vest any benefit as a result of the transactions this Agreement contemplates; no employee, officer, or director has been promised or paid any bonus or incentive compensation related to the transactions this Agreement contemplates. No payment made pursuant to any phantom stock award agreement described in Section 3.16(c) of the Disclosure Schedule would individually or collectively, be nondeductible under Code Section 280G.

(d)     Each Employee Benefit Plan has been maintained in all material respects, by its terms and in operation, in accordance with ERISA, the Code and other applicable domestic and foreign Law. Each Employee Benefit Plan intended to be qualified under Section 401(a) of the Code, and each trust intended to be exempt under Section 501(a) of the Code has received a favorable determination letter from the IRS that such Employee Benefit Plan is so qualified and, to the Company's knowledge, nothing has occurred that would cause the loss of such qualification. Each Employee Benefit Plan intended to be qualified under Section 401(a) of the Code has timely filed for GUST as such term is defined in Interim Revenue Bulleting 2002-24 (or is not required to file). Other than routine claims for benefits, there is no claim or proceeding pending or threatened, involving any Benefit Plan by any Person, or by the IRS, the United States Department of Labor or any other domestic or foreign Governmental Authority against such Benefit Plan or the Company or any Subsidiary of the Company which, would have a Material Adverse Effect.

(e)     Neither the Company nor any Subsidiary of the Company is obligated to provide health care or death benefits of any kind to its former employees, other than as required by Law.

(f)     Section 3.16(f) of the Disclosure Schedule lists each Multiemployer Plan. With respect to each Multiemployer Plan (i) neither the Company nor any Subsidiary has withdrawn, partially, withdrawn, or received any notice of any claim or demand for withdrawal liability or partial withdrawal liability; (ii) neither the Company nor any Subsidiary has received any notice that any such plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, or that any such plan is or may become insolvent; (iii) neither the Company nor any Subsidiary has failed to make any contributions; (iv) to knowledge of the Company, no such plan is a party to any pending merger or asset or liability transfer; (v) to the knowledge of the Company, there are no PBGC proceedings against or affecting any such plan, and (vi) neither the Company nor any Subsidiary has (or may have as a result of the transactions contemplated by this Agreement) any withdrawal liability by reason of the sale of assets pursuant to Section 4204 of ERISA. Section 3.16(f) of the Disclosure Schedule includes for each Multiemployer Plan, as of its last valuation date, the amount of potential withdrawal liability of the Company and any of its Subsidiaries, calculated according to the information made available pursuant to ERISA Section 4221(e), and identifies the specific obligor.

W05742

(g)    With respect to any Employee Welfare Benefit Plan maintained by the Company or any of its Subsidiaries, the Company and its Subsidiaries have complied with the provisions of Sections 4980B, 9801 and 9802 of the Code.

(h)    Neither Ulrich Kienitz nor Gunter Zech are entitled to any pension payments, bonuses or other benefits, except for those pension payments, bonuses and other benefits disclosed on Section 3.16(h) of the Disclosure Schedule. Neither Ulrich Kienitz nor Gunter Zech is entitled to any compensation payment with respect to the termination of each of their respective employment agreements that are in effect as of the date hereof, except if Raytek GmbH were to terminate such employment agreement without good cause.

### 3.17    Insurance.

Section 3.17 of the Disclosure Schedule sets forth an accurate list of all insurance policies carried by the Company and its Subsidiaries and workmen's compensation claims for the past three policy years. The Company has made available to Parent true, complete and correct copies of all such insurance policies, all of which are in full force and effect. All premiums payable under all such policies have been paid and the Company and each Subsidiary thereof is otherwise in material compliance with the terms of such policies. Such policies of insurance are of the type and in amounts customarily carried by Persons conducting businesses similar to the Business. To the knowledge of the Company, there have been no threatened terminations of, or material premium increases with respect to, any of such policies.

### 3.18    Intercompany Services.

Section 3.18 of the Disclosure Schedule sets forth a true and correct description of all material services provided within the last twelve (12) months to the Company and the Subsidiaries by their respective Affiliates (other than the Company and the Subsidiaries) and by the Company and the Subsidiaries to their respective Affiliates (other than the Company and the Subsidiaries), and the charges assessed for all services provided during such time. Except as disclosed in Sections 3.8 or 3.18 of the Disclosure Schedule, there are no agreements (oral or written) between the Company or any of its Subsidiaries, on the one hand, and any Affiliate thereof (other than Affiliates that are the Company or any of its Subsidiaries), on the other hand.

### 3.19    Taxes.

(a)    All Tax Returns relating to Income Taxes and all material Tax Returns relating to Other Taxes required to be filed by the Company or any of its Subsidiaries (or any other corporation merged into or consolidated with the Company or any of its Subsidiaries) on or before the Closing Date with respect to all Taxes have been or will be by the Closing Date, in all material respects, duly and accurately prepared, computed and timely filed by the Company and the Subsidiaries (or any other corporation merged into or consolidated with the Company or the Subsidiaries), taking into account all extensions granted or filed with respect to such due dates. All Income Taxes and all material Other Taxes required to be paid by the Company and the Subsidiaries (or any other corporation merged into or consolidated with the Company or the Subsidiaries), whether or not shown to be due on such Tax Returns, have been timely paid. The Company and the Subsidiaries have withheld and paid all material Taxes required by all

W05743

applicable laws to be withheld or paid in connection with any amounts paid or owing to any employee, creditor, independent contractor, Securityholder or other third party.

       (b)    The unpaid Taxes of the Company and the Subsidiaries (or any other corporation merged into or consolidated with the Company or the Subsidiaries) (i) did not, as of June 30, 2002, exceed the reserve for Tax liability (rather than the reserve for deferred Taxes established to reflect differences between book and Tax items) set forth or included on the June 30 Balance Sheet, and (ii) as of the Closing, will not exceed that reserve as adjusted for the passage of time through the Closing in accordance with GAAP and the past custom and practice of the Company and the Subsidiaries in filing Tax Returns.

       (c)    To the knowledge of the Company, there are no material known or proposed penalty, interest or deficiency assessments or pending audits relating to Taxes with respect to the Company and the Subsidiaries (or any other corporation merged into or consolidated with the Company or the Subsidiaries). There are no outstanding agreements or waivers extending the statutory period of limitation applicable to any Tax Return of the Company or any of its Subsidiaries.

       (d)    None of the Company or any of its Subsidiaries (i) has been a member of a group filing consolidated returns for federal income Tax purposes (except for the group of which the Company is the common parent), (ii) has any liability for the Taxes of any Person (other than the Company and its Subsidiaries) under Treasury Regulation section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferor or successor, by contract or otherwise, or (iii) is a party to or is bound by or has any obligation under any tax sharing, indemnification or similar agreement or arrangement.

       (e)    None of the Company or any of its Subsidiaries has filed a consent to have the provisions of Section 341(f) of the Code apply. None of the Company or any of its Subsidiaries is required to include in income any material adjustment pursuant to Section 481(a) of the Code (or similar provision of state or local law) by reason of a change in accounting method initiated prior to the Closing Date. There are no Liens for Taxes upon the assets or properties of the Company or any of its Subsidiaries except for statutory Liens for Taxes not yet due or payable.

       (f)    The Company has made available to Parent, upon Parent's request, true and complete copies of (i) all Federal and state Income Tax Returns of the Company and its Subsidiaries that have been filed for the preceding three (3) taxable years and (ii) any material audit report issued to the Company or Subsidiaries within the last three (3) years (or otherwise with respect to any material audit or proceeding in progress) relating to Federal or state income taxes of the Company or any Subsidiary.

       (g)    The Company and its Subsidiaries have not take any action in violation of those Gain Recognition Agreements (as such term is defined in Section 1.367(a)-8 of the Treasury Regulations) filed with respect to the capital stock of Beijing Raytek Photoelectric Technology Company LTD and Raytek Japan Kabushiki Kaisha on the Company's United States federal income Tax Returns for the tax years ended December 31, 2000 and December 31, 2001.

W05744

3.20     Undisclosed Liabilities.

There are no Liabilities of the Company or any Subsidiary except:

(a)     those reflected or otherwise reserved against in the Reference Balance Sheet in the amounts that have been established in accordance with GAAP as applied consistent with historical practice;

(b)     those arising subsequent to the date of the Reference Balance Sheet in the ordinary and usual course of business, consistent with past practice, none of which constitute or would constitute a violation or breach of any condition or covenant in this Agreement; and

(c)     executory obligations under the express terms of the Material Contracts disclosed in the Disclosure Schedule to this Agreement and executory obligations under the express terms of the contracts not required to be disclosed in the Disclosure Schedule to this Agreement (excluding any Liabilities or obligations arising out of any breach or violation by the Company or any of the Subsidiaries of the terms and conditions of any Contract).

3.21     Absence of Certain Changes; Conduct in the Ordinary Course.

Since December 31, 2001, except as disclosed in Section 3.21 of the Disclosure Schedule, the Company and each of its Subsidiaries have conducted the Business and owned and operated their assets and properties in the ordinary course consistent with past practice and there has not been any change, circumstance, condition, event, occurrence, damage, destruction, loss or development which has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Since December 31, 2001, except as disclosed in Section 3.21 of the Disclosure Schedule, the Company has not declared or paid any dividends or made any distribution to the Common Equityholders (and no Common Equityholder has a right to payment of a dividend) and no Common Equityholder has received any cash payment or distribution of property from the Company (other than salary, reimbursement of business expenses or in accordance with an employment contract).

3.22     Finder's Fee.

Except as set forth in Section 3.22 of the Disclosure Schedule, neither the Company nor any Subsidiary has incurred any Liability to any party for any brokerage or finder's fee or agent's commission, success fee, or the like, in connection with the transaction contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any Subsidiary, and the Company shall be solely responsible for all such fees and expenses.

3.23     Accounts Receivable.

Attached hereto as Section 3.23 of the Disclosure Schedule is an accurate and complete list of all Accounts Receivable (as hereafter defined) of the Company and its Subsidiaries. All accounts receivable of the Company and its Subsidiaries that are reflected on the books and records of the Company as of August 15, 2002 (with respect to the date of execution of this Agreement) and as of the Closing Date (with respect to the Closing Date) (collectively, in each case, as applicable, the "Accounts Receivable") represent or will represent on the Closing Date

W05745

(if not paid previously) valid obligations arising from sales actually made or services actually performed by the Company or its Subsidiaries in the ordinary course of business. The pricing and invoices for each of the products sold by the Company and the Subsidiaries represent the full amounts due in connection with the sale of such products and no payment or remuneration for such products is to be made to any Person other than the Company or its Subsidiary. The Accounts Receivable and any related reserves as shown on the books and records of the Company have been calculated in accordance with GAAP consistent with historical practice). There is no contest, claim, or right of set-off, other than those in the ordinary course of business and rebates and returns in the ordinary course of business, under any contract with any maker of an Accounts Receivable relating to the amount or validity of such Accounts Receivable.

3.24   Inventories.

All inventories of the Company and its Subsidiaries (net of the reserves for obsolete, slow moving and defective inventory shown in the Financial Statements and determined in the ordinary course of business consistent with past practice) consist of items of merchantable quality and, to the Company's knowledge, quantity usable or salable in the ordinary course of business, are salable at prevailing market prices that are not less than the book value amounts thereof or the price customarily charged by the Company or the applicable Subsidiary therefor, conform to the specifications established therefor, and have been manufactured in accordance with applicable regulatory requirements. The quantities of all inventories, materials, and supplies of the Company and each Subsidiary (net of the reserves for obsolete, slow moving and defective inventory shown in the Financial Statements and determined in the ordinary course of business consistent with past practice) are not obsolete, damaged, slow-moving, defective, or excessive (relative to the Company's historical levels). For purposes of this section, "Inventory" means all of the items of inventory and supplies of the Company and its Subsidiaries, including without limitation raw materials and supplies, work-in-process, finished goods, returned products and samples, equipment, parts, labels and packaging (including all rights and interests in goods in transit, consigned inventory, inventory sold on approval and rental inventory) and all returned products, samples and obsolete and nonsaleable inventory.

3.25   Suppliers and Customers.

(a)      Section 3.25 of the Disclosure Schedule sets forth (i) the ten (10) largest customers and sales representatives by gross purchases from the Company and its Subsidiaries during the last fiscal year (the "Significant Customers"), and (ii) the ten (10) largest vendors and suppliers by gross sales to the Company and its Subsidiaries during the last fiscal year, as well as all vendors and suppliers of the Company and its Subsidiaries who are the "sole source" of such supply, other than public utilities (collectively, the "Significant Vendors"). For purposes of this Section 3.25(a), "sole source" shall refer to a supplier who is the only source of a particular item used by the Company in its Business and with respect to which it would cost the Company at least Fifty Thousand Dollars ($50,000) if such supplier were not able to supply such item to the Company.

(b)      Except as disclosed on Section 3.25 of the Disclosure Schedule, since December 31, 2001, no Significant Customer or Significant Vendor has: (a) stopped or expressly stated in writing to the Company its intention to stop trading with or supplying the Company,

W05746

(b) materially reduced or expressly stated in writing to the Company its intention to materially reduce, its trading with or provision of goods or services to the Company, or any Subsidiary or (c) materially changed or expressly stated in writing to the Company its intention to change materially the terms and conditions on which it is prepared to trade with or supply the Company or any Subsidiary.  To the Company's knowledge, except as disclosed on Section 3.25 of the Disclosure Schedule, no Significant Customer or Significant Vendor has given the Company written notice or expressly stated to the Company that, as a result of the transactions contemplated by this Agreement, it will: (x) not trade with or supply the Company, or any Subsidiary of the Company, (y) reduce substantially its trading with or provision of goods or services to the Company or any Subsidiary of the Company, or (z) materially change the terms and conditions on which it is prepared to trade with or supply the Company or any Subsidiary of the Company.  The Company has no knowledge of any facts, conditions or events that would give rise to a material claim by the Company or any Subsidiary against any of its Significant Customers or Significant Suppliers or any material claim by a Significant Customer or Significant Supplier against the Company or any Subsidiary.

3.26    Books and Records.

The Company and each Subsidiary thereof has maintained books and records which, in reasonable detail, accurately and fairly reflect all material transactions entered into by the Company or such Subsidiary, or to which the Company or such Subsidiary is a party.  Neither the Company nor any Subsidiary has engaged in any transaction, maintained any bank account or used any corporate funds, except for transactions, bank accounts and funds which have been and are reflected in its normally maintained books and records.

3.27    Warranties: Products.

Section 3.27 of the Disclosure Schedule sets forth a summary of the material terms of all unexpired product warranties and guarantees given by the Company or a Subsidiary thereof to any customer.  Each of the products and services sold by the Company or a Subsidiary thereof meets, in all material respects, all standards for quality and workmanship prescribed by law or regulation, industry standard, contractual agreements and/or the product literature of the Company or such Subsidiary.  Except as described on Section 3.27 of the Disclosure Schedule, (i) no claims have been made or, to the Company's knowledge, are threatened under the product warranties of the Company or any Subsidiaries thereof, (ii) to the Company's knowledge, there are no statements, citations or decisions by any Governmental Authority or any product testing laboratory stating that any product of the Company or any of its Subsidiaries is unsafe or fails to meet any standards promulgated by such Governmental Authority or testing laboratory, (iii) there is no design or manufacturing defect in any model or type of product or product specification that is currently under warranty by the Company; and (iv) there have not been any mandatory or voluntary product recalls with respect to any products of the Company or any of its Subsidiaries and, to the Company's knowledge, there is no fact relating to any product of the Company or any of its Subsidiaries that would impose a duty on the Company or any of its Subsidiaries to recall any product or warn customers of a defect in any product .  The warranty reserves reflected on the Financial Statements have been computed in accordance with GAAP, consistently applied.  All product liability claims against the Company or any of its Subsidiaries involving amounts in excess of ten thousand dollars ($10,000) (or the equivalent value in the

W05747

applicable currency) that have occurred and for which express notice has been received by the Company or a Subsidiary thereof within the past two (2) years are listed on Section 3.27 of the Disclosure Schedule.

### 3.28    Bank Accounts.

Section 3.28 of the Disclosure Schedule sets forth a true and complete list of all bank accounts, safe deposit boxes and lock boxes of the Company and each Subsidiary.

### 3.29    Certain Business Practices.

To the extent applicable to the Company, the Subsidiaries and their respective officers, directors, employees and representatives, the Company, the Subsidiaries and their respective officers, directors, employees and representatives have complied with the U.S. Foreign Corrupt Practices Act or any similar such Law in any foreign jurisdiction. None of the Company, the Subsidiaries or any of their respective officers, directors, employees or representatives has, directly or indirectly, used funds or other assets (regardless of form or description of such payment) of the Company or any Subsidiary, or made any promise or undertaking in such regard, for any illegal payments to or for the benefit of any Person, to secure favorable treatment of a Contract or the Business or for the establishment or maintenance of a secret or unrecorded fund; and there have been no false or fictitious entries made in the books or records of the Company or any Subsidiary relating to any such illegal payment or secret or unrecorded fund.

### 3.30    Backlog.

Section 3.30 of the Disclosure Schedule lists all pending customer orders for the Company and its Subsidiaries on a consolidated basis as of the date set forth on Section 3.30 of the Disclosure Schedule. All such customer orders were entered into in the ordinary course of business. To the Company's knowledge, no such customer orders are at prices which, based on the past experience of the Company and current and anticipated costs, could result in a material loss to the Company and its Subsidiaries as a whole.

### 3.31    Invoices for MX and ST Products.

Section 3.31 of the Disclosure Schedule attaches a spreadsheet that sets forth a complete and accurate accounting of the Company's or its Subsidiaries' invoices (the "Invoices") reflecting sales of MX products manufactured in Germany and multipoint ST products sold in Germany to (a) unaffiliated third party customers and (b) intercompany sales to Subsidiaries (including sales or branch offices thereof). The spreadsheet includes a methodology (the "Methodology") for calculating an accrual, which is based on sales reflected by the Invoices, on the books of Raytek GmbH for possible infringement liability arising from the Newport Claims. The Methodology is consistent with the Company's and Subsidiaries' historical practice for taking into account accruals for potential infringement liability for ongoing sales of the MX products manufactured in Germany and multipoint ST products sold in Germany.

### 4.    REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB.

W05748

### 4.1    Due Organization.

Each of Parent and Acquisition Sub is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and each has all necessary corporate power and authority to enter into and perform its obligations under this Agreement and all other agreements, instruments and documents to be delivered hereunder.

### 4.2    Authority.

The execution, delivery and performance of this Agreement and all other agreements, instruments and documents to be delivered hereunder have been duly and validly authorized by the boards of directors of each of Parent and Acquisition Sub and Parent as the sole shareholder of Acquisition Sub. Each of Parent and Acquisition Sub has all requisite corporate and other power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by each of the Company and Parent and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Parent and Acquisition Sub. This Agreement has been duly executed and delivered by each of Parent and Acquisition Sub, and assuming due authorization and delivery by the Company, this Agreement constitutes a legal, valid and binding obligation of each of Parent and Acquisition Sub, enforceable against each of them in accordance with its terms, subject to general principles of equity and except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws of general application relating to creditors' rights.

### 4.3    Compliance with Law.

Each of Parent and Acquisition Sub has complied with and is not in violation of applicable Laws or Governmental Orders which would affect their respective abilities to perform their respective obligations hereunder. There is no Action pending, or to the knowledge of Parent and Acquisition Sub, threatened against Parent and Acquisition Sub, affecting their respective abilities to perform its obligations hereunder.

### 4.4    No Conflict.

The consummation of the transactions contemplated by this Agreement and the compliance by each of Parent and Acquisition Sub with all the terms and provisions of this Agreement and all other agreements, instruments and documents to be executed and delivered hereunder will not violate, conflict with or result in the breach of any term or provision of the charter documents, articles of incorporation or by-laws of either of Parent or Acquisition Sub or constitute a material default under or result in a violation of any existing indenture, contract, agreement, or other instrument to which either of Parent or Acquisition Sub is a party or by which it or any of its respective properties are bound, except in each case for any such matters or consequences which would not adversely affect the ability of Parent and Acquisition Sub to consummate the transactions contemplated by this Agreement.

W05749

### 4.5    Finder's Fee.

Neither Parent nor Acquisition Sub has paid, nor will become obligated to pay any fee or commission, to any broker or finder, in connection with the transactions contemplated by this Agreement.

### 4.6    Consents.

Except for the notification requirements of the HSR Act, no action, approval, consent or authorization, including but not limited to any action, approval, consent or authorization by, or any other order of, action by, filing with or notification to any governmental or quasi-governmental agency, commission, board, bureau or instrumentality, is or will be necessary to make this Agreement or any of the agreements or instruments to be executed, performed and delivered pursuant hereto a legal, valid and binding obligation of each of Parent and Acquisition Sub, subject to general principles of equity and except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws of general application relating to creditors' rights, or to consummate the transactions contemplated hereunder.

### 4.7    Financing.

Parent has, and at the Effective Time will have, sufficient funds available to pay the Per Share Merger Consideration for all outstanding shares of Common Stock and all shares of Common Stock that may be issued upon the exercise of outstanding options to purchase Common Stock.

### 5.    COVENANTS AND AGREEMENTS.

### 5.1    Conduct of Business Prior to Closing.

(a)    The Company covenants that until the Closing it will use its commercially reasonable efforts, and will cause its Subsidiaries to use their commercially reasonable efforts, to operate the Business, in a manner consistent with the past practice of the Business, to keep available the services of their officers and employees, to maintain and preserve intact the Business in all material respects and to maintain in all material respects the ordinary and customary relationships of the Business with its suppliers, customers, distributors and others having business relationships with it with a view toward preserving for Parent and Acquisition Sub, to and after the Closing Date, the Business, the Assets and the goodwill associated therewith. Without limiting the generality of Section 5.1 and until the Closing, the Company shall continue to operate and conduct the Business in the ordinary course consistent with past practice, and shall not, without the prior written approval of Parent (which approval shall not be unreasonably withheld, delayed or conditioned) or as otherwise contemplated by this Agreement and Section 5.1(a) of the Disclosure Schedule take any of the following actions:

(i)    with respect to the Company or any of its Subsidiaries, amend its charter documents, issue or agree to issue any additional shares of Common Stock of any class or series (other than shares of Common Stock issued upon the exercise of currently outstanding options) or issue or enter into or agree to issue or enter into any securities

W05750

convertible into or exercisable or exchangeable for shares of Common Stock, or issue any options, warrants or other rights to acquire any shares of Common Stock, or sell, transfer or otherwise dispose of or encumber any shares of Common Stock of any class or series or partnership interests of the Company or any of its Subsidiaries or declare, set aside, make or pay any dividend or other distribution in respect of its Common Stock (in cash or otherwise) or purchase or redeem shares of Common Stock (other than the repurchase of restricted Common Stock and cancellation of options to purchase Common Stock following termination of employment with or provision of services to the Company) or split, combine or reclassify any capital stock, or other ownership interests in, or other securities of the Company or any Subsidiary;

(ii)    sell, transfer or otherwise dispose of or encumber any of its properties or assets pertaining to the Business, other than (A) in the ordinary course of business consistent with past practice or (B) any properties or assets the value of which does not exceed in the aggregate fifty thousand dollars ($50,000);

(iii)    except as required by Law or contractual obligations and except for borrowings under any indebtedness reflected on Exhibit D hereto, (A) create, incur or assume any material debt (including obligations in respect of capital leases), except loans and advances among the Company and its Subsidiaries, (B) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for any material obligations of any Person other than any Subsidiary, (C) make any material loans, advances or capital contributions to or investments in any Person other than its Subsidiaries (except for loans or advances to employees made in the ordinary course of business consistent with past practices not exceeding fifty thousand dollars ($50,000) in the aggregate), or (D) incur or assume any Liability for borrowed money;

(iv)    (A)    grant any increase in the compensation of any officer or employee of the Company or its Subsidiaries, except for increases in the compensation of employees in the ordinary course of business consistent with past practice, (B) hire new employees other than in the ordinary course of business consistent with past practice, (C) enter into or amend any employment, severance, consulting or other compensation agreement with any existing or new director, officer or employee or (D) commit to any additional Employee Benefit Plans or Benefit Arrangements or amend in any respect or commit itself to amend in any material respect any of such Employee Benefit Plans or Benefit Arrangements;

(v)    cancel any material third party indebtedness owed to the Company or any Subsidiary;

(vi)    acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire any assets (other than inventory) which are material, individually or in the aggregate, to the Business taken as a whole; or

W05751

(vii)    make any capital expenditure not approved prior to the date of this Agreement, or enter into any commitment to make any capital expenditure other than in the ordinary course of business consistent with past practice;

(viii)    make any disposition of stock or assets of any entity that is material to the operations of the Company and its Subsidiaries, taken as a whole;

(ix)    merge or consolidate with any corporation or other entity, other than, with respect to the Company or any of its Subsidiaries, with the Company or another Subsidiary;

(x)    fail to maintain the Assets in reasonable and customary repair, order and condition and maintain insurance reasonably comparable to that in effect on the date of this Agreement;

(xi)    enter into any material transaction or commitment binding on the Business, other than in the ordinary course of business consistent with past practice;

(xii)    sell, lease, encumber, transfer or dispose of any assets, properties or rights, or acquire any assets, properties or rights, unless in the ordinary course of business consistent with past practice;

(xiii)    permit any material Asset to suffer any Encumbrance (other than Permitted Encumbrances) thereupon;

(xiv)    grant any license or sublicense of any rights under or with respect to any Intellectual Property unless in the ordinary course of business consistent with past practice;

(xv)    make any change in any accounting principle (except to comply with changes in accounting pronouncements of the Financial Accounting Standards Board or changes in applicable Laws or rules or regulations thereunder);

(xvi)    settle, release or forgive any claim or litigation or waive any right thereto which relates to the Business, except in the ordinary course of business consistent with past practice for amounts involving less than fifty thousand dollars ($50,000); or

(xvi)    agree to do any of the foregoing.

(b)    The Company covenants and agrees that, prior to the Closing, it shall, to the extent that it has knowledge of any of the following, promptly notify Parent of all events, circumstances, facts and occurrences arising subsequent to the date of this Agreement which could reasonably be expected to result in any breach of a representation or warranty or covenant of the Company in this Agreement.

W05752

5.2    <u>Access to Records and Properties</u>.

(a)    From the date hereof until the Closing Date or earlier termination of this Agreement, the Company will, and will cause each Subsidiary to:

(i)    provide Parent and Acquisition Sub and their officers, counsel and other representatives with reasonable access during normal business hours to the facilities of the Company and such Subsidiary, their principal personnel and representatives, including, without limitation, access to perform a Phase I and if necessary, a Phase II assessment of the Business in the sole discretion of Parent and Acquisition Sub, and such books and records pertaining to Company and such Subsidiary as Parent and Acquisition Sub may reasonably request, *provided* that Parent and Acquisition Sub agree that such access will give due regard to minimizing interference with the operations, activities or employees of Company and such Subsidiary and provided that such access and disclosure would not violate the terms of any agreement, which agreement shall be disclosed to Parent, to which the Company or any such Subsidiary is bound or any applicable Law;

(ii)    furnish to Parent and Acquisition Sub or their representatives such additional financial and operating data and other information relating to the Company and each Subsidiary as may be reasonably requested, to the extent that such access and disclosure would not violate the terms of any agreement, which agreement shall be disclosed to Parent, to which the Company or any such Subsidiary is bound or any applicable Law; and

(iii)    make reasonably available to Parent and Acquisition Sub for inspection and review all documents, or copies thereof, listed in the Disclosure Schedule, and all files, records and papers of any and all proceedings and matters listed in the Disclosure Schedules, except to the extent prohibited or restricted by Law or contract with a third party, which contract shall be disclosed to Parent.

5.3    <u>Consents</u>.

(a)    The parties hereto shall cooperate with one another in determining whether any action by or in respect of, or filing with, any Governmental Authority is required or reasonably appropriate, or any action, consent, approval or waiver from any party to any Material Contract is required or reasonably appropriate, in connection with the consummation of the transactions contemplated by this Agreement. Subject to the terms and conditions of this Agreement, in taking such actions or making any such filings, the parties hereto shall furnish information required in connection therewith and timely seek to obtain any such actions, consents, approvals or waivers.

(b)    Parent shall:

(i)    take promptly any of the following actions to the extent the parties deem reasonably necessary to eliminate any concerns on the part of any Governmental Authority with jurisdiction over the enforcement of any applicable antitrust, anti-competition or similar Laws ("<u>Government Antitrust Authority</u>") regarding the legality under any applicable antitrust, anti-competition or similar Law of Parent's acquisition of

45039526_5.DOC                    33

W05753

the Company: entering into negotiations, providing information, making proposals and entering into and performing agreements or submitting to Governmental Orders;

(ii)     use its commercially reasonable efforts to prevent the entry in a judicial or administrative proceeding brought under any antitrust, anti-competition or similar Law by any Government Antitrust Authority or any other Person of any Governmental Order that would make the consummation of the transactions contemplated by this Agreement unlawful or that would prevent or delay such consummation, including, without limitation, the actions described in Section 5.3(b)(i); and

(iii)     take promptly, in the event that such a Governmental Order has been issued in such a proceeding, any and all steps, including, without limitation, the appeal of such Governmental Order, the posting of a bond or the actions described in Section 5.3(b)(i), necessary to vacate, modify or suspend such Governmental Order so as to permit such consummation on a schedule as close as possible to that contemplated by this Agreement; and

(iv)     take promptly all actions and other things necessary to avoid or eliminate each and every impediment under any Antitrust Law, anti-competition or similar Law that may be asserted by any Government Antitrust Authority or any other party to the consummation of the transactions contemplated by this Agreement; *provided* that Parent and its Affiliates shall not be required to make any payment to any Person to induce such Person to consent to, or grant any waiver in connection with, the transactions contemplated by this Agreement.

(c)     Notwithstanding the foregoing provisions of Section 5.3(b), Parent shall not be required to divest, or to agree to divest, itself of any assets in order to comply with any Government Order issued by any Government Antitrust Authority or in order to obtain the consent to, or the approval of, the transactions contemplated by this Agreement by any such Government Antitrust Authority.

5.4     Public Announcements.

On and after the date hereof and through the Closing Date, the Company, Acquisition Sub and Parent shall consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and none of the parties shall issue any press release or make any public statement prior to obtaining the other parties' written approval, which approval shall not be unreasonably withheld, delayed or conditioned, except that no such approval shall be necessary to the extent disclosure may be required by Law. Notwithstanding anything to the contrary contained in the foregoing provisions of this Section 5.4, the parties hereto agree that no press release or other public statements with respect to this Agreement or the transactions contemplated hereby shall be made by any of the parties hereto prior to the Effective Time without the prior consent of the Company, Parent and the Representative or unless such press release is required by Law (provided that the party releasing such press release provide advance notice to the other parties regarding such release).

W05754

5.5    No Solicitation or Negotiation.

The Company agrees that between the date of this Agreement and the earlier of (i) the Closing and (ii) the termination of this Agreement, neither the Company, the Subsidiaries nor any of their respective Affiliates, officers, directors, representatives or agents will (a) directly or indirectly solicit, initiate, encourage or accept any other proposals or offers from any Person or disclose non-public information to any Person (i) relating to any merger, liquidation, recapitalization, consolidation or other business combination involving the Company or any of its Subsidiaries or acquisition of any capital stock or any material portion of the assets of the Company or any of its Subsidiaries except as permitted pursuant to this Agreement, or any combination of the foregoing (an "Acquisition Transaction") or (b) participate in any discussions, conversations, negotiations and other communications regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way, assist or participate in, facilitate or encourage any effort or attempt by any other Person seeking an Acquisition Transaction. The Company immediately shall cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any Person conducted heretofore with respect to any of the foregoing. The Company shall notify Parent promptly (but in no event later than two (2) business days) if any such proposal or offer, or any inquiry or other contact with any Person with respect thereto, is made and shall, in any such notice to Parent, indicate in reasonable detail the identity of the Person making such proposal, offer, inquiry or contact and the terms and conditions of such proposal, offer, inquiry or other contact; provided, the Company shall furnish to Parent a copy of such proposal, if it is in writing, or a written summary of any such proposal relating to an Acquisition Transaction if it is not in writing. The Company agrees not to, and to cause each Subsidiary not to, without the prior written consent of Parent, release any Person from, or waive any provision of, any confidentiality or standstill agreement to which the Company or any Subsidiary is a party. Without limiting the foregoing, any violation of the restrictions set forth in this Section 5.5 by any officer, director, affiliate, employee, agent, investment banker, attorney or other advisor or representative of the Company or any Subsidiary thereof shall be deemed to be a breach of this Section 5.5 by the Company.

5.6    Further Action.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use all commercially reasonable efforts to take, or cause to be taken, all actions, and to do or cause to be done and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to promptly consummate and make effective, the Merger and the other transactions contemplated by this Agreement, including: (i) the obtaining of all necessary actions or non-actions, waivers, consents and approvals from all Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Authorities, (ii) the obtaining of all necessary consents, approvals or waivers from third parties, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) the execution and delivery of any

W05755

additional instruments necessary to consummate the transactions contemplated by this Agreement. No party to this Agreement shall consent to any voluntary delay of the consummation of the Merger at the behest of any Governmental Authorities without the consent of the other parties to this Agreement, which consent shall not be unreasonably withheld, delayed or conditioned.

(b)    Each party shall use all commercially reasonable efforts to not take any action, or enter into any transaction, which would cause any of its representations or warranties contained in this Agreement to be untrue or result in a breach of any covenant made by it in this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Agreement, in connection with any filing or submission required or action to be taken by either Parent or the Company to effect the Merger and to consummate the other transactions contemplated hereby, the Company shall not, without Parent's prior written consent, commit to any divestiture transaction, and neither Parent nor any of its Affiliates shall be required to divest or hold separate or otherwise take or commit to take any action that limits its freedom of action with respect to, or its ability to retain, the Company or any of the businesses, product lines or assets of Parent or any of its Subsidiaries or that otherwise would have a Material Adverse Effect on Parent.

5.7    Indemnification.

From and after the Effective Time, Parent shall indemnify and hold harmless all present officers and directors of the Company and of its Subsidiaries to the same extent and in the same manner such persons are indemnified as of the date of this Agreement by the Company whether pursuant to the CGCL, the Company's articles of incorporation or bylaws for acts or omissions occurring at or prior to the Effective Time.

5.8    Benefit Plans.

After the Effective Time and until the later of December 31, 2002 or such time as reasonably required to effectuate the benefit plan transition, Parent shall or shall cause the Surviving Corporation to offer to those Persons employed by the Company or any Subsidiary and eligible to participate in the Benefit Plans maintained by the Company or any Subsidiary, immediately prior to the Effective Time ("Company Persons") and dependents thereof, participation, subject to the eligibility conditions thereof, in Parent's or the Surviving Corporation's employee benefit plans (excluding equity arrangements) that provide substantially equivalent benefits to those offered by the Company and the Subsidiaries immediately prior to the Effective Time (with all Company Persons and dependents thereof who were participating in the Company's health insurance plans being eligible to participate, without exclusions for pre-existing conditions, in the health insurance plans of Parent or the Surviving Corporation). For purposes of the foregoing, Parent and the Surviving Corporation shall recognize the past service of Company Persons for vesting and eligibility purposes (and not for accrual of benefits). The parties agree that nothing in this Agreement shall limit Parent's or Surviving Corporation's ability after the Effective Time to modify or terminate (i) the employment of any employee or (ii) any benefit plan, policy or program, except to the extent such modification or termination of any plan, policy or program affects only persons who are employees of the Company as of the

W05756

Closing Date or who are employees of the Company as of the date of such amendment or termination.

### 5.9    State Takeover Statutes.

The Company and its Board of Directors shall (i) take all actions necessary to ensure that no "fair price," "control share acquisition," "moratorium" or other anti-takeover statute, or similar Law, is or becomes applicable to this Agreement, any of the Related Documents, the Merger or any of the other transactions contemplated hereby or thereby, and (ii) if any "fair price," "control share acquisition," "moratorium" or other anti-takeover statute, or similar Law, is or becomes applicable to this Agreement, any of the Related Agreements, the Merger or any of the other transactions contemplated hereby or thereby, take all action necessary to ensure that the Merger and the other transactions contemplated hereby or thereby may be consummated as promptly as practicable on and subject to the terms contemplated hereby and thereby and otherwise to minimize the effect of such statute or Law on the Merger and the other transactions contemplated hereby and thereby.

### 5.10    Taxes.

(a)    At Parent's request, the Common Equityholders shall prepare, or cause to be prepared, with such assistance as may be necessary from Parent or the Company, an initial draft of, and Parent shall cause to be timely filed, all Income Tax Returns for the Company and its Subsidiaries for all periods (or portions thereof) ending on or before the Closing Date for which Tax Returns have not been filed as of the Closing Date (the "Pre-Closing Income Tax Returns"). Such Pre-Closing Income Tax Returns shall be prepared and filed in accordance with applicable law and in a manner consistent with past practices and shall be subject to review and approval by Parent, such approval not to be unreasonably withheld, delayed or conditioned. The Company shall prepare all Tax Returns for the Company and its Subsidiaries for all periods (or portions thereof) ending on or before the Closing Date for which Tax Returns have not been filed as of the Closing Date that are not described in the preceding sentence (the "Pre-Closing Other Tax Returns", together with the Pre-Closing Income Tax Returns, the "Pre-Closing Tax Returns").

(b)    At the Representative's request, any Pre-Closing Other Tax Return that relates to the periods (or portions thereof) ending on or before June 30, 2002 (the "Pre-June 30 Tax Period") shall be submitted to the Representative not later than fifteen (15) Business Days prior to the due date for filing of such Tax Return (or if such due date is within forty-five (45) days following the Closing Date, as promptly as practicable following the Closing Date). Any such Tax Returns requested by the Representative that relate to the Pre-June 30 Tax Period ("Pre-June 30 Tax Return") shall be accompanied with a statement showing the allocation of Taxes shown on such Tax Returns between the Pre-June 30 Tax Period and the remainder of the Tax period (the "Allocation Statement"). The Representative shall have the right to review all Pre-June 30 Tax Returns, all work papers and source data used to prepare any such Tax Return, and the Allocation Statement If the Representative, within ten (10) Business Days after delivery of any Pre-June 30 Tax Return and Allocation Statement, notifies Parent that it objects to any of the items in such Tax Return or Allocation Statement, the parties shall attempt in good faith to resolve the dispute and, if they are unable to do so, the disputed items shall be resolved (within a

W05757

reasonable time, taking into account the deadline for filing such Tax Return) by a nationally recognized independent accounting firm chosen by both the Parent and the Representative. Upon resolution of all such items, the relevant Tax Return shall be filed on that basis. The costs, fees and expenses of such accounting firm shall be borne equally by Parent and the Representative, on behalf of the Common Equityholders.

(c)     The Representative, on behalf of the Common Equityholders, shall cause to be timely paid to the Company on or before the due date of the Pre-Closing Tax Returns the amount of all unpaid Taxes (less an aggregate amount of One Million Five Hundred Ten Thousand Dollars ($1,510,000)) shown as due on the Pre-Closing Tax Returns to the extent that such Taxes are attributable to the Pre-June 30 Tax Period in accordance with Section 5.10(d) below; *provided, however,* that Parent shall be solely liable for any interest or penalties resulting from the failure to timely pay any Taxes relating to the Pre-June 30 Tax Period that are required to be paid after the Closing Date; *provided, further,* that the Common Equityholders shall be solely liable for any interest or penalties resulting from the failure to timely pay any Taxes relating to the Pre-June 30 Tax Period that are required to be paid after the Closing Date if such failure results from any nonfulfillment or breach of any covenant made by the Common Equityholders or the Representative in this Section 5.10; and *provided, further,* to the extent that there is any item attributable to Taxes for the Pre-June 30 Tax Period included in the calculation of Closing Shareholders' Equity that is not included in the reserve for unpaid Taxes on the June 30 Balance Sheet and that, as agreed by the parties or determined by KPMG or the Neutral Accountant, results in a payment by the Common Equityholders pursuant to Section 2.6(e) hereof, then the amount of such payment shall be deducted from any Taxes that the Common Equityholders are obligated to pay pursuant to this Section 5.10(c). Any tax payments made by the Company and its subsidiaries prior to Closing with respect to Pre-June 30 Tax Periods shall reduce Taxes attributable to the Pre-June 30 Tax Period.

(d)     For purposes of this Agreement, the Taxes of the Company and its Subsidiaries for the year during which the Closing occurs shall be allocated between the Pre-June 30 Tax Period and the remainder of the tax period by assuming that the taxable year consisted of two taxable years or periods, one which ended at the close of the day on June 30, 2002, and the other which began at the beginning of the day on July 1, 2002, and items of income, gain, deduction, loss or credit, and state and local apportionment factors of the Company and its Subsidiaries for the taxable years or periods shall be allocated between such two taxable years or periods on a "closing of the books basis" by assuming that the books of the Company and its Subsidiaries were closed at the close of the day on June 30, 2002; *provided, however,* that (i) exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation shall be apportioned ratably between such periods on a daily basis, (ii) periodic taxes such as real and personal property taxes shall be apportioned ratably between such periods on a daily basis, and (iii) taxes allocable to the Pre-June 30 Tax Period shall be determined without taking into account any election made by Parent or any Affiliate of Parent under Section 338 of the Code.

(e)     The Common Equityholders shall indemnify Parent for Taxes attributable to any Pre-June 30 Tax Period in accordance with the provisions of Article 9. Any refunds or credits of Taxes that are the liability of the Common Equityholders under Article 9 and are received by, or that are applied to reduce taxes payable by, the Parent or the Surviving

W05758

Corporation or its Subsidiaries shall be paid to the Common Equityholders within ten (10) Business Days after receipt or credit thereof.

(f)    Each of the parties shall provide the other party with such assistance as may reasonably be required in connection with the preparation of any Tax Returns, the conduct of any audit or other examination by any taxing authority or judicial or administrative proceedings relating to any liability for Taxes.

(g)    Parent shall not (and shall not cause or permit the Surviving Corporation or any other Subsidiary of Parent or the Surviving Corporation to) amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return of the Company or its Subsidiaries if such action could impact the Tax liability of the Common Equityholders for the Pre-June 30 Tax Period without the prior written consent of the Representative.

(h)    The parties agree that the payments of amounts pursuant to Section 2.5(b) and any other amounts properly allocable to the portion of the Closing Date after the Merger shall be treated as occurring at the beginning of the day following the Closing Date pursuant to Treasury Regulations Section 1.1502-76(b)(1)(ii)(B).    No deductions attributable to such payments will be included on the Tax Return filed by the Company for the period ending on the Closing Date.

5.11    No Improper Payment.

From and after the date hereof, the Company, agrees not to, and agrees to cause its Subsidiaries, and any of its or any Subsidiary's officers, shareholders, employees or representatives, not to directly or indirectly make any contributions, payments or gifts regardless of what form whether in money, property or services to or for the private or public use of any governmental official, employee or agent where the payment or the purpose of such contribution, payment or gift is illegal under the laws of the United States or the jurisdiction in which made or to secure favorable treatment for the Business or a Contract. The Company, agrees not to, and agrees to cause its Subsidiaries, any of its or any Subsidiary's officers, shareholders, employees or representatives, not to (i) establish or maintain a secret or unrecorded fund, (ii) make any false or artificial entries on its books and records, or (iii) make any payments to any Person with the intention or understanding that any part of such payment are to be used for any purpose other than that described in the documents supporting the payment. From and after the date hereof, each of the Company and its Subsidiaries shall comply in all material respects with the Foreign Corrupt Practices Act of 1977, codified as amended at 15 U.S.C. §§ 78m(b)(2), 78dd-1, 78dd-2, and 78ff(c).

5.12    Fees and Expenses.

Except as specifically set forth herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the party incurring such costs and expenses. At the Closing, Parent shall pay the Total Closing Payments to the parties entitled to receive such payments, as directed by the Company. Any Closing Expenses (including without

W05759

limitation, any such expenses that may become due after Closing) that the Company does not direct Parent to pay at the Closing shall be paid by the Common Equityholders, and shall not be paid out of the Escrow.

5.13    Additions to and Modification of Disclosure Schedule.

Concurrently with the execution and delivery of this Agreement, the Company has delivered a Disclosure Schedule that includes all of the information required by the relevant provisions of this Agreement. In addition, five (5) days prior to the Closing Date, the Company shall deliver to Parent supplemented and amended disclosure schedules, if necessary. If the Closing takes place, then such disclosure shall be deemed to constitute an exception to the related representations and warranties under Article 3.

5.14    Required Consents.

The Company shall use its reasonable best efforts to obtain the Required Consents set forth in Section 6.11 of the Disclosure Schedule.

5.15    Shareholder Notification.

As soon as practicable following the execution of this Agreement, the Company will prepare an information statement relating to the approval and adoption of this Agreement by the Common Equityholders. The Company shall supply Parent with copies of the final draft of the information statement (including all amendments or modifications thereof), and upon Parent's review and consent, which shall not be unreasonably withheld, delayed or conditioned, make the necessary mailings. As soon as practicable, but in any event within ten (10) days, after mailing the information statement to the Common Equityholders, the Common Equityholders shall vote to approve the Merger either by written consent or at a duly convened shareholder meeting. The information statement shall include the recommendation of the Company's Board of Directors.

5.16    Newport Claims.

Following the Closing Date, subject to Section 9.7, Parent shall cause the Surviving Corporation to use reasonable efforts (i) to negotiate and execute a settlement and release of the Newport Claims binding upon Omega Engineering, Inc., Newport Electronics, Inc., Newport Electronics GmbH and any exclusive licensees, successors or assigns or (ii) to pursue a dismissal of the Newport Claims in such forums where a Newport Claim is pending. In accordance with Section 9.7, Parent shall use its reasonable efforts to consult with the Representative during any negotiation, litigation or other proceedings involving the Newport Claims.

6.    CONDITIONS TO OBLIGATIONS OF PARENT AND ACQUISITION SUB

The obligations of Parent and Acquisition Sub to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment of each of the following conditions by the Company on or before the Closing Date, unless waived by Parent and Acquisition Sub:

W05760

### 6.1   Legality of Merger.

No action shall have been taken and no Law shall have been enacted by any Governmental Authority that makes the consummation of the Merger illegal.

### 6.2   Continuation and Truth of Representations and Warranties.

(a)   The representations and warranties of the Company contained in this Agreement that are qualified as to materiality or Material Adverse Effect shall be true and correct as of the date hereof and as of the Closing Date as if made on the Closing Date, and the representations and warranties of the Company contained in this Agreement that are not so qualified shall be true and correct in all material respects, in each such case, for (i) representations and warranties that speak as of a specific date or time which need only be true and correct as of such date or time, and (ii) changes expressly consented to in writing by Parent (which consent may be withheld in Parent's sole discretion).

(b)   The Company shall deliver a certificate of an appropriate officer thereof relating to such representations and warranties, as well as the covenants made herein by the Company, as provided in Section 6.3.

### 6.3   Fulfillment of Covenants.

The Company shall have performed, in all material respects, all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by it prior to the Closing Date.

### 6.4   Certified Resolutions.

Parent and Acquisition Sub shall have received a true and complete copy, certified by the Secretary or an Assistant Secretary of the Company, as applicable, of the resolutions duly and validly adopted by the Board of Directors and the Shareholders, evidencing its authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

### 6.5   Documents.

(a)   All documents and instruments of transfer delivered to Parent and Acquisition Sub at the Closing shall be in form and substance reasonably satisfactory to Parent and Acquisition Sub and their counsel, and shall be legally sufficient to consummate the Merger.

(b)   Parent and Acquisition Sub shall have received a copy of (i) the amended and restated articles of incorporation, as amended (or similar organizational documents), of the Company and each Subsidiary, as of a date reasonably prior to the Closing Date and accompanied by a certificate of the Secretary, Assistant Secretary or other authorized representative of each such entity, dated as of the Closing Date, stating that no amendments have been made to such articles of incorporation (or similar document) since such date, and (ii) the by-laws (or similar organizational documents) of the Company and of each Subsidiary, certified by the Secretary or Assistant Secretary of each such entity.

W05761

(c)    Parent shall have received from the Company (i) a properly executed certificate for purposes of satisfying the obligations of Parent and Acquisition Sub under treasury Regulation Section 1.1445-2(c)(3) and (ii) a form of notice to the IRS in accordance with the requirements of Treasury Regulation Section 1.897-2(h)(2), along with written authorization for Parent to deliver such notice form to the IRS on behalf of the Company.

6.6    Third-Party Consents and Approvals.

The Company shall have obtained and delivered to Parent and Acquisition Sub, in form and substance reasonably satisfactory to Parent and Acquisition Sub, all consents and approvals required under Material Contracts identified in Section 3.14(b) of the Disclosure Schedule.

6.7    Opinion of Counsel to the Company.

Parent and Acquisition Sub shall have been furnished with an opinion of Gibson, Dunn & Crutcher LLP, dated as of the Closing Date, covering the matters set forth on Exhibit E hereto.

6.8    Governmental Consents and Approvals.

The consents and approvals disclosed in Section 3.14(a) of the Disclosure Schedule shall have been obtained and the waiting periods under the HSR Act applicable to the Merger contemplated hereby shall have expired or otherwise been terminated.

6.9    No Material Adverse Effect.

Since the date of this Agreement, no event, circumstance or combination of events or circumstances shall have occurred, which, individually or in the aggregate, constitute, or have had, a Material Adverse Effect.

6.10    Noncompetition Agreements.

Parent shall have received executed Noncompetition Agreements, dated as of the date hereof from Clifton S. Warren, James Musbach, Peter King, Steven Mangelsen, and Stuart Schoenmann, in the forms attached as Exhibit A, and such Persons shall not have questioned the validity or enforceability of any such agreements.

6.11    Required Consents.

Prior to or at the Closing, the Company shall have delivered to Parent the Required Consents set forth in Section 6.11 of the Disclosure Schedule.

6.12    Raytek GmbH.

The Company shall have delivered to Parent written evidence, including any appropriate notarial deeds of share transfer, that the Company is the sole stockholder of all issued and outstanding capital stock of Raytek GmbH. The Company also shall have delivered a notarial deed of share transfer confirming the transfer of shares at an overall nominal value of DM 180,000 from Matthias Boeck to the Company.

W05762

### 6.13    Directors and Officers.

The directors and officers of the Company and its subsidiaries, as specified in Section 6.13 of the Disclosure Schedules, shall have submitted their resignations as of the Effective Time.

### 6.14    Closing Payments.

The Company shall have delivered to Parent pay-off letters from any party entitled to receive payment of a Closing Expenses stating the name of such party, the amount due and that no further payments are due at, or following, the Closing.

### 6.15    Phantom Unit Holders.

The Company shall have delivered to Parent documentation from each of the holders of phantom stock units acknowledging and agreeing that the payments in respect of the phantom stock units will be paid at or promptly following the Closing Date, despite the provisions of the plan governing the phantom stock units.

### 6.16    Kienitz Agreement.

Raytek GmbH shall have entered into a managing director employment agreement with Ulrich Kienitz that shall replace any other employment agreement or understanding of Ulrich Kienitz relating to Raytek GmbH and terminate any rights arising in connection with such agreement (or any attachments thereto) including, without limitation, any pension payments or bonus arrangements. Such agreement shall be in a form and substance satisfactory to Parent and provide for a standard non-compete obligation for the term of the managing director employment agreement and for the two years following its termination. Dr. Ulrich Kienitz shall have delivered to the Parent a letter, in form and substance satisfactory to Parent, stating that the bonus payment described in Section 3.16(h) of the Disclosure Schedule is as a bonus for prior services as an employee of Raytek GmbH.

### 6.17    Zech Agreement.

Raytek GmbH shall have entered into an agreement with Gunter Zech in form and substance satisfactory to Parent pursuant to which Zech agrees to waive any and all rights to pension payments or bonuses pursuant to his employment agreement and managing director relationship with Raytek GmbH including the employment agreement with Raytek GmbH dated May 26, 1992 and to amend section 8 of the same employment agreement to provide that the compensation payment provided in such section shall only be due in case of involuntary termination of the employment agreement by Raytek GmbH without good cause. Dr. Gunter Zech shall have delivered to the Parent a letter, in form and substance satisfactory to Parent, stating that the bonus payment described in Section 3.16(h) of the disclosure schedule is as a bonus for prior services as an employee of Raytek GmbH.

W05763

6.18   Other Documents.

Prior to or at the Closing, the Company shall have delivered to Parent such closing documents as shall be reasonably requested by Parent in form and substance reasonably acceptable to its counsel.

## 7.   CONDITIONS TO OBLIGATIONS OF THE COMPANY

The obligations of the Company to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, in all material respects, of each of the following conditions by Parent and Acquisition Sub on or before the Closing Date, unless waived by the Company:

7.1   Legality of Merger.

No action shall have been taken and no Law shall have been enacted by any Governmental Authority that makes the consummation of the Merger illegal.

7.2   Continuation and Truth of Representations and Warranties.

The representations and warranties of Parent contained in this Agreement that are qualified as to materiality or Material Adverse Effect shall be true and correct as of the date hereof and as of the Closing Date as if made on the Closing Date, and the representations and warranties of Parent contained in this Agreement that are not so qualified shall be true and correct in all material respects except, in each such case, for (i) representations and warranties that speak as of a specific date or time which need only be true and correct as of such date or time, and (ii) changes expressly consented to in writing by the Company (which consent may be withheld in the Company's sole discretion). Parent and Acquisition Sub shall each deliver a certificate of an appropriate officer thereof relating to the representations, warranties and covenants made herein by Parent and Acquisition Sub, as provided in Sections 7.2 and 7.3.

7.3   Fulfillment of Covenants.

Parent and Acquisition Sub shall have performed, in all material respects, all of their covenants, obligations and agreements contained in this Agreement to be performed and complied with by them prior to the Closing Date.

7.4   Certified Resolutions.

The Company shall have received true and complete copies of the resolutions duly and validly adopted by the Boards of Directors of Acquisition Sub and Parent, and by Parent as the sole shareholder of Acquisition Sub, certified by the Secretary or an Assistant Secretary of Acquisition Sub and Parent, respectively, evidencing their authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

W05764

### 7.5    Opinion of Counsel to Parent and Acquisition Sub.

The Company shall have been furnished with an opinion of counsel for Parent and Acquisition Sub, dated as of the Closing Date, covering the matters set forth on Exhibit F hereto.

### 7.6    Governmental Consents and Approvals.

The consents and approvals disclosed in Section 3.14(a) of the Disclosure Schedule shall have been obtained and the waiting periods under the HSR Act applicable to the Merger contemplated hereby shall have expired or otherwise been terminated.

### 7.7    Other Documents.

Prior to or at the Closing, Parent shall have delivered to the Company such closing documents as shall be reasonably requested by the Company in form and substance reasonably acceptable to its counsel.

### 8.    TERMINATION; EFFECT OF TERMINATION.

### 8.1    Termination.

Notwithstanding anything to the contrary set forth herein, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    By mutual written consent of Parent, the Company and Acquisition Sub.

(b)    Subject to Section 8.2 hereof, either Parent or Acquisition Sub, on the one hand, or the Company, on the other hand, if the transactions contemplated hereby are not consummated on or before October 6, 2002 (the "Termination Date"); provided, however, (i) that the right to terminate this Agreement under this Section 8.1(b) shall not be available to any party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date, and (ii) that if, upon the Termination Date the HSR Act waiting period shall not have expired or been terminated, any party hereto may extend the Termination Date for forty-five (45) days provided such extending party has met its obligations under Sections 5.3(a), (b) and (c) (as limited by Section 5.3(d)).

(c)    Subject to Section 8.2 hereof, either Parent or Acquisition Sub, on the one hand, or the Company, on the other hand, in the event that any Governmental Authority shall have issued a Governmental Order or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Governmental Order shall have become final and nonappealable.

(d)    By Parent or Acquisition Sub if: (i) an event or condition occurs that has resulted in a Material Adverse Effect, (ii) there is a breach or inaccuracy of any representation or warranty of the Company contained in this Agreement, and such misrepresentation or breach of warranty remains uncured thirty (30) days after written notice thereof to the Company and such breach would give Parent and Acquisition Sub grounds not to close under Section 6.2 hereof, or

W05765

(iii) the Company shall not have complied with any covenant or agreement to be complied with by it and contained in this Agreement, such non-compliance shall not have been cured within thirty (30) days after written notice thereof to the Company and such non-compliance would give Parent and Acquisition Sub grounds not to close under Section 6.3 hereof; *provided* that, if any thirty (30) day period described in this Section 8.1(d) commences within thirty (30) days before the then effective Termination Date provided under Section 8.1(b), then by notice to Parent and Acquisition Sub, the Company may (except in the case of any willful misrepresentation or breach by the Company) extend the then effective Termination Date provided under Section 8.1(b) by thirty (30) days to allow for a thirty (30) day cure period.

(e)    By the Company if: (i) there is a breach or inaccuracy of any representation or warranty of Parent or Acquisition Sub contained in this Agreement, and such misrepresentation or breach of warranty remains, in all material respects, uncured thirty (30) days after written notice thereof to Parent or Acquisition Sub, as the case may be, or (ii) Parent or Acquisition Sub shall not have complied, in all material respects, with any covenant or agreement to be complied with by it and contained in this Agreement and such breach shall not have been cured in all material respects within thirty (30) days after written notice thereof to Parent or Acquisition Sub, as the case may be; *provided* that, if any thirty (30) day period described in this Section 8.1(e) commences within thirty (30) days before the then effective Termination Date provided under Section 8.1(b), then by notice to the Company Parent and Acquisition Sub may (except in the case of willful misrepresentation or breach by Parent or Acquisition Sub) extend the then effective Termination Date provided under Section 8.1(b) by thirty (30) days to allow for a thirty (30) day cure period.

8.2    Effect of Termination.

(a)    If this Agreement is terminated pursuant to Section 8.1, this Agreement shall forthwith become void and of no further force and effect, except as provided in Sections 8.2(b) and (c), and none of the parties hereto (nor any of their respective Affiliates, directors, shareholders, officers, employees, agents, consultants, attorneys-in-fact or other representatives or any Affiliate, director, officer, shareholder, partner (limited or general), employees, agents, consultants, attorneys-in-fact or other representatives thereof) shall have any liability in respect of such termination; *provided, however,* that nothing in this Section 8.2(a) shall relieve either party from liability for any willful or intentional breach of this Agreement.

(b)    Except as otherwise specifically provided herein, the parties hereto shall bear their respective expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses of counsel and accountants.

(c)    If this Agreement is terminated pursuant to Section 8.1, the parties agree that all provisions of the Confidentiality Agreement shall remain in full force and effect and each party shall comply with its obligations thereunder and each of the Company, Parent and Acquisition Sub agrees that it shall be bound by the terms thereof as if it were a signatory thereto.

W05766

9. .    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; LIABILITY.

9.1    Survival of Representations and Warranties

All representations, warranties, covenants, and agreements set forth in this Agreement and Related Document or in any certificate of the Company provided at Closing shall survive the Closing Date and the consummation of the transactions contemplated hereby until 5:00 p.m., Pacific time, on March 31, 2004; *provided, however,* that (1) the representations and warranties in Sections 3.11 (environmental and safety and health matters) and 3.19 (taxes) shall survive until the date of its applicable statute of limitations or, if there is no applicable statute of limitations, five (5) years after the Closing Date, (2) the representations and warranties in Sections 3.15 (labor) and 3.16 (employee benefit plans) shall survive until the date which is the earlier of four (4) years from the date hereof or the applicable statue of limitations and (3) the representations and warranties in Sections 3.1 (corporate status), 3.2 (capitalization) and 3.3 (authority) shall survive until the date that is five (5) years from the date hereof (as applicable, the "Survival Period"). Notwithstanding the foregoing, with respect to (i) the representations and warranties contained in this Agreement and (ii) the covenants and agreements that by their terms contemplate compliance or performance before the Closing Date, no Person shall be entitled to recover for any Losses pursuant to this Agreement unless written notice of a claim therefor is delivered to the applicable party before the expiration of the Survival Period. For the avoidance of doubt, the indemnification obligations set forth in Sections 9.2(c) - (h) shall continue and survive indefinitely. All covenants and agreements that by their terms contemplate compliance or performance at or after the Closing Date shall survive the Closing until the earlier of the expiration of the applicable statute of limitations or the expiration of the Survival Period. The limitations set forth in this Section 9.1 shall not apply in the case of fraud.

9.2    Indemnification by the Common Equityholders.

By adopting and approving this Agreement and the Merger and by their acceptance of the Per Share Merger Consideration, the Common Equityholders agree that they shall be bound by the terms and provisions of this Section 9.2. Each Common Equityholder, severally and not jointly, shall indemnify the Parent and the Surviving Company, and each of the Parent's and the Surviving Corporation's respective officers, directors, shareholders, employees, agents, representatives, affiliates, successors, and assigns (collectively, the "Parent Parties") and hold each of them harmless from and against and pay on behalf of or reimburse such Parent Parties solely in respect of such Common Equityholder's Pro Rata Portion of any Loss which any such Parent Party may suffer, sustain, or become subject to, as a result of:

(a)    any misrepresentation, inaccuracy or the breach of any representation or warranty made by the Company or any Common Equityholder or the Representative contained in this Agreement, the Shareholder Agreement, the Escrow Agreement, or in any Exhibit, Schedule or certificate delivered by or on behalf of the Company at the Closing pursuant hereto or thereto;

(b)    any nonfulfillment or breach of any covenant or agreement made by the Company or any Common Equityholder or the Representative contained in this Agreement, the Shareholder Agreement, the Escrow Agreement or in any Exhibit, Schedule or certificate

W05767

delivered by the Company with respect thereto at the Closing in connection with the Closing to be performed by the Company;

(c)     the Newport Claims, subject to, limited by and as set forth in Section 9.7, below;

(d)     Taxes of the Company or any of its Subsidiaries with respect to the Pre-June 30 Tax Period, determined as provided in Section 5.10;

(e)     the acquisition of all issued and outstanding capital stock of Raytek GmbH not currently owned by the Company;

(f)     the termination of Kenzo Nishida;

(g)     solely from the acts and omissions of the Representative (other than Losses arising from claims brought by the Representative on behalf of the Shareholders after Closing in the Representative's capacity as agent for the Shareholders), including performance of covenants under this Agreement following the Closing; or

(h)     the Company's calculation of the Per Share Merger Consideration and of the amounts to be paid pursuant to Sections 2.5(b)(i) and (ii), but excluding any claims with respect to the calculation of the Merger Consideration and any adjustments thereto.

The Parent Parties' remedy for any indemnification of Losses hereunder may be satisfied by proceeding against one or more Common Equityholders, but in the case of any claim for any Loss, only in respect of such Common Equityholder's Pro Rata Portion of such Loss.

9.3     Limitations on Indemnification by the Common Equityholders.

The indemnification provided for in Section 9.2 above is subject to the following limitations:

(a)     The Common Equityholders will be liable to the Parent Parties with respect to claims referred to in Sections 9.2(a) and (b) only if a Parent Party gives the Representative written notice thereof on or before the expiration of the applicable Survival Period.

(b)     The aggregate amount of all payments made by any Common Equityholder in satisfaction of claims for indemnification pursuant to Sections 9.2(a) - (h) shall not exceed such Common Equityholder's Pro Rata Portion of fifteen percent (15%) of the Merger Consideration (the "Aggregate Cap"); provided, however, Losses arising in connection with: (i) any misrepresentation, breach, or inaccuracy of any representations or warranties made by the Company in Sections 3.2 (capitalization), 3.16(h) and 3.31 (invoices for MX and ST products) and (ii) any indemnity obligation pursuant to Sections 9.2(c)-(h) shall not be subject to the Aggregate Cap and shall be excluded from calculating the Aggregate Cap.

(c)     The Common Equityholders shall not be liable to indemnify any Parent Parties pursuant to Sections 9.2(a) - (h) unless and until the Parent Parties have collectively

W05768

suffered aggregate Losses by reason of such breaches or pursuant to such Sections in excess of an aggregate basket (the "Basket") equal to one and one-half percent (1.5%) of the Merger Consideration (at which point, subject to the other limitations herein, the Common Equityholders will be liable to the Parent Parties for their respective Pro Rata Portions of all Losses in excess of such Basket); *provided, however,* Losses arising in connection with (i) any misrepresentation, breach, or inaccuracy of any representations or warranties made by the Company in Sections 3.1 (corporate status), 3.2 (capitalization), 3.3 (authority), 3.7 (assets solely with respect to title, 3.11 (environmental), 3.16 (employee benefits), 3.19 (taxes), and 3.31 (invoices for MX and ST products), (ii) any indemnity obligation pursuant to Sections 9.2(c)-(h), and (iii) any payments required under Section 2.6(e) shall not be subject to the Basket, but also shall not be included in the calculation of the amount of the Basket.

(d)    Any payment made by a Common Equityholder to a Parent Party pursuant to Section 9.2 in respect of any indemnifiable event shall be net of any insurance proceeds recovered or recoverable by such Parent Party in respect of such claim. In the event that an insurance recovery is made by a Parent Party with respect to any Loss for which a Parent Party has previously been indemnified hereunder, then the Parent Parties shall promptly make a refund to the Common Equityholders in an amount equal to the lesser of (i) the amount of such insurance recovery (net of collection expenses), and (ii) the amount previously paid by the Common Equityholders as indemnification for such Loss.

(e)    If the Common Equityholders' indemnification obligation under this Section 9.3 arises in respect of any indemnifiable event (i) for which a Parent Party receives indemnification from the Common Equityholders and (ii) which results in any Tax benefit to such Parent Party for any taxable period (or portion thereof) beginning and ending after the Closing Date which would not, but for such indemnifiable event, be available, such Parent Party shall pay, or shall cause to be paid, to the Common Equityholders an amount equal to the actual Tax savings produced by such Tax benefit reduced by the amount of any Tax detriment to such Parent Party as a result of the receipt of such indemnification. Tax benefits and detriments shall be taken into account as and when actually realized. The amount of any such Tax saving for any taxable period shall be the amount of the reduction in Taxes payable to a Tax authority by such Parent Party with respect to such Tax period (net of any Tax detriment resulting from the receipt of the indemnity payment) as compared to the Taxes that would have been payable to a Tax authority by such Parent Party with respect to such Tax period in the absence of such Tax benefit.

Notwithstanding any implication to the contrary contained in this Agreement, so long as Parent delivers a written notice of a claim to the Representative no later than the expiration of the Survival Period, the Common Equityholders shall be required to indemnify the Parent Parties for all Losses which the Parent Parties may incur in respect of the matters which are the subject of such claim, regardless of when incurred. Notwithstanding any implication to the contrary contained in this Agreement, the limits on indemnification set forth in this Agreement shall not apply to claims for damages arising from fraud.

W05769

### 9.4 Indemnification by the Parent.

The Parent shall indemnify the Securityholders and hold the Securityholders and the Securityholders' respective officers, directors, shareholders, employees, agents, representatives, affiliates, successors, and assigns (collectively, the "Securityholder Parties") harmless from and against and pay on behalf of or reimburse such Securityholder Parties in respect of any Loss which such Securityholder Party may suffer, sustain, or become subject to, as a result of or relating to:

(a) Any misrepresentation, inaccuracy or the breach of any representation or warranty made by the Parent or Acquisition Sub contained in this Agreement, in any Related Documents, or in any Exhibit, Schedule or certificate delivered by or on behalf of the Parent or Acquisition Sub at the Closing pursuant hereto or thereto; and

(b) Any nonfulfillment or the breach of any covenant or agreement made by the Parent or Acquisition Sub contained in this Agreement, in any Related Documents, or in any Exhibit, Schedule or certificate delivered by the Parent or Acquisition Sub with respect thereto at the Closing in connection with the Closing.

### 9.5 Limitations on Indemnification by the Parent.

The indemnification provided for in Section 9.4 above is subject to the following limitations:

(a) The Parent will be liable to the Securityholder Parties with respect to claims referred to in Section 9.4(a) only if the Representative gives the Parent written notice prior to the expiration of the applicable Survival Period.

(b) Parent shall not be required to provide indemnification under this Section 9.5 until the total amount of Losses exceeds the Basket, and then only for the amount by which such Losses exceeds the Basket. The aggregate liability of Parent for Losses of any kind, whether in contract or otherwise and including any expense incurred in the defense of any claim that is the subject of this Agreement, shall be limited to the Aggregate Cap. Notwithstanding the foregoing, Losses arising in connection with the nonfulfillment or breach by Parent or Surviving Corporation following the closing of any covenant required to be performed by it under this Agreement or the Escrow Agreement shall be excluded from calculating the Aggregate Cap and shall not be subject to the Basket, and Losses arising in connection with any misrepresentation, breach, or inaccuracy of any representations or warranties made by the Company in Sections 4.1 (due organization) and 4.2 (authority) shall not be subject to the Basket, but also shall not be included in the calculation of the amount of the Basket.

(c) Any payment made by the Parent to a Securityholder Party pursuant to Section 9.4 in respect of any indemnifiable event shall be net of any insurance proceeds realized by and paid to such Securityholder Party in respect of such claim. Such Securityholder Party shall use its reasonable efforts to make insurance claims relating to any indemnifiable event for which it is seeking indemnification pursuant to Section 9.4; *provided* that such Securityholder Party shall not be obligated to make such an insurance claim if such Securityholder Party in its reasonable judgment believes the cost of pursuing such an insurance claim together with any

W05770

corresponding increase in insurance premiums or other chargebacks to such Securityholder Party, as the case may be, would exceed the value of the claim for which such Securityholder Party is seeking indemnification. In the event that an insurance recovery is made by a Securityholder Party with respect to any Loss for which a Securityholder Party has previously been indemnified hereunder, then such Securityholder Party shall promptly make a refund to Parent in an amount equal to the lesser of (i) the amount of such insurance recovery (net of collection expenses) and (ii) the amount previously paid by the Parent as indemnification for such Loss.

If the Parent's indemnification obligation under this Section 9.5 arises in respect of any indemnifiable event (A) for which a Securityholder Party receives indemnification from the Parent and (B) which results in any Tax benefit to such Securityholder Party for any taxable period which would not, but for such indemnifiable event, be available, such Securityholder Party shall pay, or shall cause to be paid, to the Parent an amount equal to the actual Tax savings produced by such Tax benefit reduced by the amount of any Tax detriment to such Securityholder Party as a result of the receipt of such indemnification. Tax benefits and detriments shall be taken into account as and when actually realized. The amount of any such Tax saving for any taxable period shall be the amount of the reduction in Taxes payable to a Tax authority by such Securityholder Party with respect to such Tax period (net of any Tax detriment resulting from the receipt of the indemnity payment) as compared to the Taxes that would have been payable to a Tax authority by such Securityholder Party with respect to such Tax period in the absence of such Tax benefit.

Notwithstanding any implication to the contrary contained in this Agreement, so long as the Representative delivers a written notice of a claim to the Parent no later than the expiration of the Survival Period, the Parent shall be required to indemnify the Securityholder Parties for all Losses which the Securityholder Parties may incur in respect of the matters which are the subject of such claim, regardless of when incurred. Notwithstanding any implication to the contrary contained in this Agreement, the limits on indemnification set forth in this Agreement shall not apply to claims for damages arising from fraud.

9.6    Procedures.

(a)    If a party hereto seeks indemnification under Section 9.2 or 9.4, such party (the "Indemnified Party") shall promptly give written notice to the other party (the "Indemnifying Party") after receiving written notice of any action, lawsuit, proceeding, investigation (including the commencement of a Tax audit or examination) or other claim against it (if by a third party) or discovering the liability, obligation, or facts giving rise to such claim for indemnification, describing the claim, the amount thereof (if known and quantifiable), and the basis thereof; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have prejudiced the Indemnifying Party. In that regard, if any action, lawsuit, proceeding, investigation (including the commencement of a Tax audit or examination), or other claim shall be brought or asserted by any third party which, if adversely determined, would entitle the Indemnified Party to indemnity pursuant to Section 9.2 or 9.4, the Indemnified Party shall promptly notify the Indemnifying Party of the same in writing, specifying in detail the basis of such claim and the facts pertaining thereto and the Indemnifying Party shall be entitled to

W05771

participate in the defense of such action, lawsuit, proceeding, investigation, or other claim giving rise to the Indemnified Party's claim for indemnification at its expense, and at its option (subject to the limitations set forth below) shall be entitled at any time to elect to control and appoint lead counsel of such defense with reputable counsel reasonably acceptable to the Indemnified Party; *provided* that, as a condition precedent to the Indemnifying Party's right to assume control of such defense, it must first agree in writing to be fully responsible for all Losses relating to such claims and to provide full indemnification to the Indemnified Party for all Losses relating to such claim; and *provided further* that the Indemnifying Party shall not have the right to assume control of such defense and, if the claim is one for which indemnification is due under this Agreement, shall pay the reasonable fees and expenses of reputable counsel retained by the Indemnified Party and reasonably acceptable to the Indemnifying Party, if the claim which the Indemnifying Party seeks to assume control (i) seeks non-monetary relief, *provided* that the Indemnified Party has determined in good faith that the grant of such non-monetary relief would be reasonably likely to have a significant adverse effect on the Indemnified Party, (ii) involves criminal allegations against an Indemnified Party, or (iii) involves a claim which, upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to vigorously prosecute or defend; *provided further* that the Indemnifying Party shall have one opportunity to elect to assume control of the defense of any such action, lawsuit, proceeding or investigation within thirty (30) days following its receipt of notice from the Indemnified Party. Notwithstanding the foregoing, the procedure with respect to indemnity claims relating to the Newport Claims shall be as set forth in Section 9.7, below.

(b)    If the Indemnifying Party is permitted to assume and control the defense and elects to do so, the Indemnified Party shall have the right to employ counsel separate from counsel employed by the Indemnifying Party in any such action and to participate in (but not control) the defense thereof, but the fees and expenses of such counsel employed by the Indemnified Party shall be at the expense of the Indemnified Party unless the employment thereof has been specifically authorized by the Indemnifying Party in writing.

(c)    If the Indemnifying Party shall control the defense of any such claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim or ceasing to defend such claim, if pursuant to or as a result of such settlement or cessation, injunction, or other equitable relief will be imposed against the Indemnified Party or if such settlement does not expressly unconditionally release the Indemnified Party from all liabilities and obligations with respect to such claim. If, in accordance with the provisions of Section 9.6(a), the Indemnified Party shall control the defense of any such claim, the Indemnified Party shall obtain the prior written consent of the Representative (which shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim that would result in monetary or similar damages for which the Indemnified Party would be entitled to indemnification hereunder.

(d)    Notwithstanding anything to the contrary contained herein, all claims for indemnification by a Parent Party (other than any claim related to Closing Expenses or the Common Equity Holders' obligation to pay the unpaid Taxes for the Pre-June 30 Tax Period in accordance with Section 5.10) shall be recovered initially from the Escrow Amount until such time as the Escrow has been terminated or the funds therein fully utilized or released. The

W05772

Common Equityholders shall only be liable for amounts in excess of the Escrow Amount (up to the Aggregate Cap) once the Escrow Amount has been fully utilized, subject to the limitations and exceptions set forth herein.

9.7     <u>Indemnification and Procedure With Respect to Newport Claims</u>.

(a)     (i)     By adopting and approving this Agreement and the Merger and by their acceptance of the Per Share Merger Consideration, the Common Equityholders agree that they shall be bound by the terms and provisions of this Section 9.7.    Each Common Equityholder, severally and not jointly, shall indemnify the Parent Parties and hold each of them harmless from and against and pay on behalf of or reimburse such Parent Parties solely in respect of such Common Equityholder's Pro Rata Portion of any Losses awarded by a court or arising in connection with a court proceeding, including, without limitation, all legal fees and expenses incurred in connection with, or arising out of such Loss, on any and all of the Newport Claims or the portion of any Losses, including, without limitation, all legal fees and expenses incurred in connection with or arising out of one or more settlements of the Newport Claims in the manner provided in Section 9.7(a)(ii) and (iii); *provided, however,* that for purposes of this Section 9.7, in connection with any settlement of the Newport Claims the value of any non-monetary consideration that is provided by the Surviving Corporation or any Parent Party shall not be included in the determination of the amount of any Loss;

(ii)     With respect to any Losses awarded by a court, or arising in connection with a court proceeding, the Common Equityholder's indemnification obligations shall be for the entire amount of such Loss; *provided, however,* if such Loss is attributable to an award or order by a German Governmental Authority, the Common Equityholders' indemnification obligations shall be reduced by an amount that equals five percent (5%) of the actual sales revenue collected by the Surviving Corporation (net of returns and allowances) on the sale of the MX products manufactured in Germany and multipoint ST products sold in Germany, as such products have been invoiced in accordance with the Methodology described in Section 3.31, between the Effective Time and the date of the entry of the German Governmental Authority's award or order; *provided, further,* to the extent such award or order provides for an ongoing, royalty paying license and covenant not to sue or release for future conduct (a "Newport License") for the Surviving Corporation to make, have made, use and sell products that incorporate proprietary rights that are the subject of the Newport Claims (whether the Newport License is in addition to or in lieu of a lump sum payment or other damage award), the Common Equityholders' indemnification obligation with respect to such Newport License shall be for an amount equal to the total net present value of the amount of royalty payments owed on future sales revenues arising in connection with the Newport License and to the extent that the Newport License includes the sale of MX products manufactured in Germany and multipoint ST products sold in Germany, the Common Equityholders' indemnification obligation shall be reduced by an amount that equals the net present value of up to five percent (5%) of future sales revenues that are projected to arise under the Newport License (net of projected returns and allowances) attributable solely to the sale of the MX products manufactured in Germany and multipoint ST products sold in Germany, as such products have been invoiced in accordance with the Methodology described in Section 3.31, in Germany following the date of the award or order providing for the Newport License. If a German Governmental Authority orders or awards damages to the plaintiffs in the Newport Claims based upon a royalty rate or methodology for

W05773

calculating royalties that is different from the Methodology previously used by the Company, the reduction in the Common Equityholder's indemnification obligations described above shall continue to be for an amount that is calculated using the Methodology; and

(iii)     With respect to any Losses that are agreed to as part of, or arise in connection with a settlement (other than pursuant to an award or order of a Governmental Authority covered by Section 9.7(a)(ii)) of any or all of the Newport Claims, the Common Equityholder's indemnification obligation shall be for the entire amount of such Loss; *provided, however*, if the settlement incorporates the Newport Claims pending in Germany and is predicated upon a lump sum payment (which may or may not include royalty payments with respect to past sales), regardless of whether such settlement includes a Newport License, the Common Equityholders' indemnification obligations shall be reduced by an amount that equals five percent (5%) of the actual sales revenues collected by the Surviving Corporation (net of returns and allowances) on the sale of the MX products manufactured in Germany and multipoint ST products sold in Germany, as such products have been invoiced in accordance with the Methodology described in Section 3.31, between the Effective Time and the effective date of the settlement; *provided, further*, to the extent such settlement provides for a Newport License (whether the Newport License is in addition to or in lieu of a lump sum payment or other damage award), the Common Equityholders' indemnification obligation with respect to such Newport License shall be for an amount equal to the total net present value of the amount of royalty payments owed on future sales revenues arising in connection with the Newport License and to the extent that the Newport License includes the sale of MX products manufactured in Germany and multipoint ST products sold in Germany, the Common Equityholders' indemnification obligation shall be reduced by an amount that equals the net present value of up to five percent (5%) of future sales revenue projected to arise under the Newport License (net of projected returns or allowances) attributable solely to the sale of the MX products manufactured in Germany and multipoint ST products sold in Germany, as such products have been invoiced in accordance with the Methodology in Section 3.31, in Germany following the effective date of the settlement. If the settlement is based upon a royalty rate or methodology for calculating royalties that is different from the Methodology previously used by the Company, the reduction in the Common Equityholder's indemnification obligations described above shall continue to be for an amount that is calculated using the Methodology.

(b)     (i)     The Parent Parties shall be entitled to control the defense of any and all Newport Claims. The Common Equityholders, through the Representative, shall be entitled to participate in the defense of any and all of the Newport Claims including the appointment, at their own expense, of its own litigation counsel. In the event that the Parent Parties determine that they do not wish to continue control of the defense of Newport Claims, the Parent Parties shall inform the Representative by written notice of their decisions to relinquish control. If the Common Equityholders desire to assume control of the defense of the Newport Claims, the Representative shall, within thirty (30) days of the delivery of notice to it by the Parent Parties, notify the Parent Parties in writing that it, on behalf of the Common Equityholders, will assume control of such defense. Upon the Representative's written notice to the Parent Parties that the Representative desires to assume control of the defense of the Newport Claims, the Parent Parties shall be entitled to participate in the defense of any and all of the

W05774

Newport Claims including the appointment of its own litigation counsel at the expense of the Common Equityholders.

(ii)    The Parent Parties and their counsel shall endeavor to inform the Representative of material events arising in connection with the defense or potential resolution of the Newport Claims, including the course of any settlement negotiations, and consult with the Representative regarding such negotiations and proceedings.    If the Parent Parties relinquish control of the defense pursuant to Section 9.7(b)(i) and the Representative elects to assume control of the defense, the Representative and its counsel shall endeavor to inform the Parent Parties of material events arising in connection with the defense or potential resolution of the Newport Claims, including the course of any settlement negotiations, and consult with the Parent Parties regarding such negotiations and proceedings.    Any reference to a right of consultation in Section 5.16 or this Section 9.7(b)(ii) is intended by the parties hereto to be limited to the obligation of each party to inform, orally or in writing, such other party of the specific matter to which the other party may have a right to be consulted and to provide such other party reasonable opportunity to communicate its views with respect to the specific matter.    The reference to consultation is not intended by the parties to create additional rights of the parties.

(iii)    The Parent Parties shall not enter into any settlement of any Newport Claims without consulting with the Representative and gaining the Representative's approval, on behalf of the Common Equityholders, to such settlement, such approval not to be unreasonably withheld, delayed or conditioned; *provided, however*, that in determining whether to approve such settlement, the Representative shall solely consider the continuing commercial interests of the Surviving Corporation acting in good faith, not the interests of the Common Equityholders.    In determining the commercial interests of the Surviving Corporation, the following shall be considered:  (A) the outcome and timing of the Newport Claims is uncertain and it is in the continuing commercial interests of the Surviving Corporation to promptly resolve the Newport Claims in order to eliminate the ongoing market risk and uncertainty and the value of eliminating litigation uncertainty; (B) the continued costs of litigation (including expenses incurred and reasonably expected to be incurred by all parties involved the Newport Claims), market acceptance of patent designs that are intended to replace the patents and designs at issue in the Newport Claims, projected costs for developing alternative patents and designs to the patents and designs that are at issue in the Newport Claims, and risks and future royalty payments;  (C) the Company's prior settlement negotiations with plaintiffs in the Newport Claims; and (D) any risk that could reasonably lead to the cessation of manufacturing or selling the MX and multipoint ST products (and undertaking any such risk shall not be in the continuing commercial interests of the Surviving Corporation).

(c)    The Parent Parties shall forward to the Representative all invoices and bills relating to legal costs and expenses incurred in connection with, or arising out of, the Newport Claims, and the Representative shall approve such bill or invoice for payment, or the Common Equityholders shall pay such bill or invoice within thirty (30) days following receipt from the Parent Parties.

W05775

9.8    Tax Treatment.

Amounts paid to or on behalf of the Common Equityholders or the Company as indemnification shall be treated as adjustments to the Merger Consideration for Tax purposes.

9.9    Assignment of Claims.

If a Parent Party receives any payment from any Common Equityholder in respect of any Losses pursuant to Section 9.3 and the Parent Party could have recovered all or a part of such Losses from a third party (a "Potential Contributor") based on the underlying claim asserted against the Common Equityholder(s), the Parent Party shall assign, on a non-recourse basis and without any representation or warranty, such of its rights to proceed against the Potential Contributor as are necessary to permit the Common Equityholder(s) to recover from the Potential Contributor the amount of such payment. Any payment received in respect of such claim shall be distributed, (i) first to the Parent Party in the amount of any deductible or similar amount required to be paid by the Parent Party prior to the Common Equityholder(s) being required to make any payment to the Parent Party, (ii) second to such Common Equityholder(s) in an amount equal to the aggregate payments made to the Parent Party, in respect of such claim, plus costs and expenses incurred in investigating, defending or otherwise incurred in connection with addressing such claim and (iii) the balance, if any, to the Parent Party.

9.10    Appointment of the Representative.

(a)    In order to efficiently administer the defense and/or settlement of any claims for indemnity by a Parent Party pursuant to Article 9 hereof, Clifton Warren (the "Representative") is hereby appointed to serve as the representative of the Common Equityholders. The Representative shall have full power and authority to make, on behalf of the Common Equityholders, all decisions relating to the defense and/or settlement of any claims for which any Parent Party may claim to be entitled to indemnity pursuant to Article 9 hereof and otherwise to act on behalf of the Common Equityholders in all respects with respect to this Agreement, including, without limitation, the amendment or termination thereof. An amount equal to Four Hundred Thousand Dollars ($400,000) (the "Representative Fund") shall be deducted from the Merger Consideration prior to distribution of the Per Share Consideration to be used by the Representative, as necessary, to cover expenses (including without limitation, attorneys' fees) incurred by the Representative in connection with his obligations under this Agreement and the Related Documents. All decisions and actions by the Representative shall be binding upon all of the Common Equityholders, and no Common Equityholder shall have the right to object to, dissent from, protest or otherwise contest the same. Notwithstanding the foregoing, the consent of Raytop (in addition to the Representative) shall be required prior to (i) any amendment or termination of this Agreement, (ii) the acknowledgement by the Representative of any Losses incurred by any of the Parent Parties under Section 9.2 (whether or not below the amount of the Basket or in excess of the Aggregate Cap) or the agreement or other acknowledgment by the Representative that the Common Equityholders are obligated to indemnify any Parent Parties with respect to any such Losses, and (iii) the release of any funds from the Escrow to be paid to any Parent Parties. The Representative undertakes to seek to obtain any required consent of Raytop required under this Section 9.10, and the Parent Parties

W05776

shall not have any obligation to communicate directly with Raytop in the process of obtaining any consent under this Section 9.10.

(b)    Neither Parent, Acquisition Sub nor the Surviving Corporation shall have the right to object to, protest or otherwise contest any matter related to the procedures for action being taken by the Representative as between the Representative and the Common Equityholders. Parent, Acquisition Sub and the Surviving Corporation hereby waive only claims for monetary damages they may have or assert, including those that may arise in the future, against Representative, and any Affiliates of Representative, that relate to the Representative's role as such.

(c)    Each Common Equityholder that accepts payment of consideration in respect of the Merger as contemplated herein shall be deemed, by such acceptance of payment, or by their respective execution of the Letter of Transmittal, or by the approval of this Agreement by the holders of a majority of the outstanding Common Stock of the Company, as the case may be, to have agreed that (i) the provision of this Section 9.10 are independent and severable, are irrevocable and coupled with an interest and shall be enforceable notwithstanding any rights or remedies any Common Equityholder may have in connection with the transactions contemplated by this Agreement, (ii) the remedy at law for any breach of the provisions of this Section 9.10 would be inadequate, (iii) any Common Equityholder shall be entitled to temporary and permanent injunctive relief without the necessity of proving damages if such Common Equityholder brings an action to enforce the provisions of this Section 9.10, and (iv) the provisions of Section 9.2 and this Section 9.10 shall be binding upon the Common Equityholders and the successors and assigns of each Common Equityholder.

(d)    In addition, each Common Equityholder that accepts payment of consideration in respect of the Merger as contemplated herein shall be deemed, by such acceptance of payment, or by their respective execution of the Letter of Transmittal, or by the approval of this Agreement by the holders of a majority of the outstanding Common Stock of the Company, as the case may be, to have waived any claims they may have or assert, including those that may arise in the future, against the Representative, and any of its or his Affiliates, for any action or inaction taken or not taken by such Representative in connection therewith.

(e)    In addition, each Common Equityholder that accepts payment of consideration in respect of the Merger as contemplated herein shall be deemed, by such acceptance of payment, or by their respective execution of the Letter of Transmittal, or by the approval of this Agreement by the holders of a majority of the outstanding Common Stock of the Company, as the case may be, to have acknowledged and agreed that neither they nor any of their respective Affiliates will have any claims or rights to contribution or indemnity from the Company or any of its Subsidiaries with respect to any amounts paid by any of them pursuant to this Article 9.

(f)    Any notice or communication delivered by Parent, Acquisition Sub or the Surviving Corporation to the Representative shall, as between Parent, Acquisition Sub and the Surviving Corporation, on the one hand, and the Common Equityholders, on the other, be deemed to have been delivered to all Common Equityholders. Parent, Acquisition Sub and the Surviving Corporation shall be entitled to rely exclusively upon any communication or writings

W05777

given or executed by the Representative in connection with any claims for indemnity and shall not be liable in any manner whatsoever for any action taken or not taken in reliance upon the actions taken or not taken or communications or writings given or executed by the Representative. Parent, Acquisition Sub and the Surviving Corporation shall be entitled to disregard any notices or communications given or made by the Common Equityholders in connection with any claims for indemnity unless given or made through the Representative.

9.11    Common Equityholders Acknowledgment.

By adopting and approving this Agreement and the Merger and by their acceptance of the Per Share Merger Consideration the Common Equityholders agree that they shall be bound by the terms and provisions of this Section 9 relating to the indemnification obligations of the Common Equityholders.

9.12    Materiality.

Notwithstanding anything to the contrary herein, for the purposes of the indemnity in Section 9.2, each representation, warranty, covenant and agreement made by the Company in this Agreement or the Related Documents is made without any qualifications or limitations as materiality (including without limitation any qualifications or limitations made by reference to a Material Adverse Effect ) and the word "materiality" shall be deemed deleted from any such representation, warranty covenant or agreement.

9.13    Exclusivity.

The remedies set forth in this Section 9 and Section 2.6 are exclusive and shall be construed so as to restrict and otherwise exclude any other remedies that may be available to the Indemnified Parties under any other agreement, pursuant to statutory or common law or otherwise; provided, however, the foregoing indemnification provisions are in addition to, and not in derogation of, any statutory, equitable, or common law remedy any party hereto may have for fraud. From and after the Closing Date, each Common Equityholder waives any right of contribution, indemnification or other similar right against the Company or any Subsidiary arising out of the Company's representation, warranties, covenants and agreements contained herein and agrees that any claim of Parent and/or the Surviving Corporation and its officers, directors, employees and agents or the Company or any Subsidiary hereunder, whether for indemnification or otherwise, may be asserted directly and fully against the Common Equityholders without the need for any claim against or joinder of the Company or any Subsidiary.

10.    MISCELLANEOUS

10.1    Assignability.

This Agreement shall not be assignable by either party without the express written consent of the other except for assignments to subsidiaries or Affiliates of the Parent, *provided* that any such assignment or assignments shall not relieve the assigning party of any obligation or liability under this Agreement.

45039526_5.DOC                     58

W05778

10.2    Binding Effect.

This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the successors and permitted assigns of the parties hereto.

10.3    Notices.

All notices or other communications required or permitted to be given hereunder shall be (as elected by the party giving such notice): (i) personally delivered against receipt to the party to whom it is to be given with copies to all others listed, (ii) sent by telex, facsimile, or other wire transmission, (iii) transmitted by postage prepaid certified or registered mail, return receipt requested, or (iv) deposited with a reputable overnight courier, as follows:

     (a)    If to the Company prior to Closing:

          Raytek Corporation
          1201 Shaffer Road
          P.O. Box 1820
          Santa Cruz, CA  95061-1820
          Telecopier: (831) 458-1497
          Attn: Clifton Warren

          with a copy to:

          Gibson, Dunn & Crutcher LLP
          1530 Page Mill Road
          Palo Alto, California 94304
          Telecopier: (650) 849-5050
          Attn: Gregory T. Davidson, Esq.

     (b)    If to the Representative:

          Clifton Warren
          911 Third Street
          Santa Cruz, California 95060

          with a copy to:

          Gibson, Dunn & Crutcher LLP
          1530 Page Mill Road
          Palo Alto, California 94304
          Telecopier: (650) 849-5050
          Attn: Gregory T. Davidson, Esq.

W05779

(c)    If to Parent or Acquisition Sub:
       c/o Danaher Corporation
       2099 Pennsylvania Avenue, N.W.
       12th Floor
       Washington, D.C. 20006
       Telecopier: (202) 419-7668
       Attn: Paul Burgon, Director of Corporate Development

       and

       Fluke Corporation
       P.O. Box 9090
       Everett, WA 98206-9090
       Telecopier: (425) 446-4804
       Attn: James Lico, President

       with a copy to:

       Wilmer, Cutler & Pickering
       2445 M Street, N.W.
       Washington, D.C. 20037
       Telecopier: (202) 663-6363
       Attn: Mark A. Dewire, Esq.

All notices and other communications shall be deemed to have been given (i) when received if given in person, (ii) on the date of electronic confirmation of receipt if sent by telex, facsimile, or other wire transmission, (iii) five (5) days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, or (iv) one (1) day after being deposited with a reputable overnight courier. Any party hereto may change its address for purposes hereof by notice to all other parties.

    10.4    Counterparts.

    This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute and be the same instrument.

    10.5    Disclosure Schedule and Exhibits.

    The Disclosure Schedule and all Exhibits attached hereto are incorporated herein and expressly made a part of this Agreement as though completely set forth herein. All references to this Agreement herein or in the Disclosure Schedule or any Exhibits shall be deemed to refer to this entire Agreement, including the Disclosure Schedule and all Exhibits. Any item included in one Section of the Disclosure Schedule shall be deemed included on each other Section of the Disclosure Schedule.

W05780

10.6    Governing Law and Forum.

This Agreement will be governed by, and all disputes, claims or controversies (including without limitation, all disputes and claims arising under Article 9) relating to, arising out of, or in connection with this Agreement, including any question regarding its formation, existence, validity, enforceability, performance, interpretation, breach, or termination, shall be resolved in accordance with the laws of California without regard to its conflict of laws rules. In the event that a dispute, claim or controversy relating to, arising out of, or in connection with this Agreement is not arbitrable pursuant to Section 10.13 of this Agreement, such dispute, claim or controversy shall be subject to the exclusive jurisdiction of the California courts and no others. The parties hereby consent to the jurisdiction of the above designated courts and to the service of process by registered mail, return receipt requested, or by any other manner provided by the laws of California.

10.7    Headings.

The headings and subheadings hereof are inserted for convenience of reference only and shall not affect the interpretation of this Agreement.

10.8    Amendment.

This Agreement may be amended only in a writing signed by all parties hereto.

10.9    Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the Merger and, except for the Confidentiality Agreement, the Transmittal Agreement, Shareholders Agreement, Guaranty and the Escrow Agreement, all of which survive the execution hereof, supersedes all previous agreements, understandings or discussions with respect to the subject matter hereof. Other than as specifically set forth herein, in the Transmittal Agreement, no representations or warranties as to the Company, the Business or otherwise have been made to Parent or Acquisition Sub by the Company or any of its Affiliates, directors, officers, shareholders, employees, agents, consultants, attorneys-in-fact or other representatives.

10.10    Waivers.

Any waiver of rights hereunder must be set forth in writing. A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive either party's rights at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

10.11    Third-Party Rights.

The provisions of this Agreement are intended for the sole benefit of the Company, Parent and Acquisition Sub and, where the context so indicates, their respective subsidiaries and Affiliates, and shall not inure to the benefit of any other entity or Person (other than permitted assigns of the parties hereto) or employee either as a third party beneficiary or otherwise.

W05781

### 10.12  Severability.

If and to the extent that any court of competent jurisdiction holds any provisions (or any part thereof) of this Agreement to be invalid or unenforceable, such holding shall in no way affect the validity of the remainder of this Agreement.

### 10.13  Arbitration.

Except as set forth in Section 2.6 above, any dispute, claim or controversy arising out of, in connection with or relating to this Agreement (including without limitation, all disputes and claims arising under Article 9), including any question regarding its formation, existence, validity, enforceability, performance, interpretation, breach or termination, shall be finally resolved by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules. There shall be three neutral and independent arbitrators. Within fifteen (15) days after the commencement of arbitration, each party shall select one person to act as arbitrator and the two selected shall select a third arbitrator within ten (10) days of their appointment. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the AAA. The place of the arbitration shall be Los Angeles, California. The parties agree that the arbitration shall be conducted expeditiously; to that end, if reasonable, the parties intend for a final award to be issued within 120 days from the date of the filing of written demand to arbitrate, and in no event more than 365 days from the date of the filing of the written demand to arbitrate. The final award shall be reasoned and in writing, and shall be final, conclusive and binding. Judgment on any award rendered by the arbitrators may be entered in any court of competent jurisdiction. The arbitrators shall allocate the costs and expenses of the arbitrators and administrative fees of the arbitration among the parties as the arbitrators determines to be appropriate under the circumstances. Except as provided in the preceding sentence, each party to the arbitration shall bear its own costs and expenses.

### 10.14  Knowledge.

Whenever used in this Agreement, "to the knowledge" of the Company shall be the actual knowledge of the individuals set forth on Exhibit G hereto after due inquiry.

## 11.  DEFINITIONS.

11.1  Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"Action" means any claim, action, proceeding, investigation, inquiry or suit, by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. With respect to the Company and the Subsidiaries, Affiliates of the Company and its Subsidiaries shall mean its and their Affiliates prior to the Effective Time.

W05782

"Aggregate Phantom Unit Payment" means the aggregate amounts payable in accordance with Section 2.5(b).

"Agreement" or "this Agreement" means this Agreement and Plan of Merger, dated as of August 22, 2002, by and among the Company, Parent and Acquisition Sub (including the Exhibits hereto and the Disclosure Schedule) and all amendments hereto made in accordance with the provisions set forth in Section 10.8.

"Agreement of Merger" means the certificate of merger or certificate of ownership or certificate of ownership and merger to be filed with the Secretary of State of the State of California, in such form as is required by, and executed in accordance with, the relevant provisions of the CGCL.

"Benefit Arrangement" means any material benefit arrangement covering any current or former shareholder, officer, director, employee, consultant or agent of the Company or any Subsidiary of the Company and the beneficiaries of any of them, that is not an Employee Benefit Plan, including, without limitation, (a) each employment or consulting agreement, (b) each arrangement providing for insurance coverage or workers' compensation benefits, (c) each incentive bonus or deferred bonus arrangement, (d) each arrangement providing termination allowance, severance, continuation pay, indemnification or similar benefits, (e) each equity compensation plan, (f) each deferred compensation plan and (g) each compensation policy and practice maintained by the Company or any Subsidiary of the Company.

"Benefit Plan" means an Employee Benefit Plan or Benefit Arrangement, whether of an individual or collective nature, including any employment arrangement or custom that arises from a consistent business practice.

"Business" means the manufacture and distribution of noncontact infrared temperature sensors or imagers as conducted by the Company and the Subsidiaries as of the Closing Date.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in San Francisco, California.

"CGCL" means the California General Corporation Law as in effect at the Closing Date.

"Closing Expenses" means all fees (including without limitation, success fees) and expenses payable by the Company, specifically in connection with the negotiation, documentation and consummation of this Agreement and the Merger, that are unpaid as of the Closing or that have been paid subsequent to June 30, 2002, including without limitation, fees payable to (a) Greif & Co., (b) Gibson, Dunn & Crutcher LLP and any other attorneys, and (c) KPMG LLP and any other accountants.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Equityholders" means the Persons who, on the Closing Date, own or hold shares of Common Stock and/or options to purchase shares of Common Stock.

"Common Stock" means the Common Stock, no par value, of the Company.

W05783

"Confidentiality Agreement" means the letter agreement dated as of December 18, 2001 between Greif & Co., as agent for the Company, and Parent.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two (2) or more Persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Disclosure Schedule" means the Disclosure Schedule agreed to by the parties and incorporated as a part of this Agreement.

"Employee Benefit Plan" has the meaning given in ERISA Section 3(3), together with plans or arrangements that would be so defined if they were not (i) otherwise exempt from ERISA by that or another section, (ii) maintained outside the United States, or (iii) individually negotiated or applicable only to one person.

"Employee Pension Benefit Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA.

"Employee Welfare Benefit Plan" means any employee benefit plan as defined in Section 3(1) of ERISA, that is sponsored or contributed to by the Company or any Subsidiary thereof covering employees or former employees of the Company or any Subsidiary of the Company.

"Encumbrance" means any lien (statutory or otherwise), mortgage, deed of trust, pledge, hypothecation, assignment, charge, security interest, option to purchase, easement, restrictive covenant, right of first refusal, preemptive right, conversion, put, call or other claim or right, restriction on transfer, preferential arrangement of any kind or nature whatsoever (including without limitation restriction on the transfer of assets) encroachment, conditional sale or other title retention agreement, or any other encumbrance, whether voluntarily incurred or arising by operation of law.

"Environmental Law" means any applicable Law in effect of the Closing Date relating to: (a) the protection of human health or the environment or (b) the treatment, release, storage, disposal, handling or transportation of any Hazardous Substance.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"EPO Proceeding" means the proceeding in the European Patent Office, file number T 832/00-342, initiated by Raytek GmbH with respect to patent application no.: 94 301 275.7/publication No.: 0 644 408.

"Fully Diluted Shares" means the number of shares of the Common Stock outstanding immediately prior to the Effective Time plus the number of shares of Common Stock issuable upon the exercise of all then outstanding stock options to purchase shares of the Common Stock, whether or not vested or currently exercisable, it being agreed that at least two (2) Business Days

W05784

prior to the Closing Date the Company will provide to Parent the number, and a summary of, the Fully Diluted Shares.

"GAAP" means United States generally accepted accounting principles and practices as in effect from time to time and applied consistently throughout the periods involved.

"Governmental Authority" shall have the meaning set forth in Section 3.14.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Guaranty" shall have the meaning set forth in the recitals.

"Hazardous Substance" means any solid waste, hazardous waste or hazardous substance.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Income Tax" means any federal, state, local or foreign income Tax (or franchise or excise tax based on income), including a Tax assessed on a corporation by reference to its income, gains or profits.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money or with respect to advances of any kind to such Person, (b) all obligations (contingent, issued, assumed or otherwise) of such Person for the deferred purchase price of assets, property or services other than trade payables incurred in the ordinary course of business, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (e) all obligations of such Person as lessee under leases that have been, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (g) all obligations of others secured by any Encumbrance on property or assets owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (h) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof), (i) all letters of credit issued for the account of such Person, and (j) all guarantees (and other contractual or express arrangements having the economic effect of a guarantee) by such Person of any indebtedness of any other Person.

"Intellectual Property" means (i) all U.S. and foreign patent applications and patents, patent rights, patent or invention disclosures, provisional patent applications and all related continuation, continuation-in-part, divisional, reissue, re-examination, utility model, certificate of invention and design patents, statutory invention registrations and applications for registrations (the "Patents"); (ii) all registered and unregistered trademarks, trademark registrations, trademark rights and renewals thereof, trade names, trade name rights, servicemarks, servicemark rights,

W05785

servicemark registrations and renewals thereof, trade dress, logos and all applications to register the same (the "Trademarks"); (iii) all registered and unregistered copyrights, renewals thereof, including common law rights and all national and foreign registrations and applications (the "Copyrights"); (iv) computer software, computer programs, computer systems, modules, specifications and related data and databases and related source codes (the "Software"); (v) all Internet domain names ("Domain Names") and Internet web-sites and the content thereof ("Internet Sites"); (vi) all licenses, sublicenses and agreements pursuant to which the Company has acquired rights in or to any of the Trademarks, Patents, Copyrights, Software, Domain Names, Internet Sites or Proprietary Rights ("Licenses-In"); (vii) all licenses, sublicenses and agreements pursuant to which the Company has licensed or transferred any rights to any of the Trademarks, Patents, Copyrights, Software, Domain Names or Proprietary Rights ("Licenses-Out"); (viii) all Proprietary Rights (including in each case of (i) through (vii) above, all copies and embodiments thereof, in electronic, written or other media) and (ix) mask works and registrations and applications for registration thereof. As used herein, the term "Proprietary Rights" means all categories of trade secrets and confidential technical and business information, know-how, including inventions, invention disclosures (whether reduced to practice or not and whether patentable or not), inventor rights, reports, quality records, engineering notebooks, models, designs, manufacturing and production processes and techniques, research and development information, drawings, specifications, component lists, formulae, plans, proposals, technical data, copyrightable works, financial, customer and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information, and all other confidential and proprietary information and customer and supplier lists.

"IRS" means the Internal Revenue Service of the United States.

"June 30 Balance Sheet" shall mean the unaudited balance sheet of the Company as of June 30, 2002.

"Law" means any Governmental Order or any law, statute, ordinance, rule or regulation of any Governmental Authority, or any binding agreement with any Governmental Authority.

"Leased Real Property" means the real property leased, or operated pursuant to a hereditary building right with respect to Raytek GmbH, by the Company or any Subsidiary, as tenant, together with, to the extent leased by the Company or any Subsidiary, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Company or any Subsidiary attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities, losses, claims, costs, expenses and damages, either accrued, absolute, contingent, mature, unmature or otherwise and whether known or unknown, direct or indirect, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, including without limitation, those arising under any Law, Action or Governmental Order and those arising under any contract or permit.

"Loss" means, with respect to any Person, any damage, Liability, demand, claim, action, cause of action, cost, royalty, damage, deficiency, Tax, penalty, fine or other loss or expense,

W05786

whether or not arising out of a third party claim, including all interest, penalties, reasonable attorneys' fees and expenses and all amounts paid or incurred in connection with any action, demand, proceeding, investigation or claim by any third party (including any Governmental Authority or any department, agency or political subdivision thereof) against or affecting such Person and the investigation, defense or settlement of any of the foregoing; *provided* that "Losses" shall not include (a) consequential, incidental, exemplary, punitive damages of such Person, or damages of such Person calculated by application of a multiplier greater than one (1) to the extent such calculation results in more than the actual damages incurred by such Person, (b) lost profits or (c) any item included in the calculation of Closing Shareholders Equity that, as agreed by the parties or determined by KPMG or the Neutral Accountant, results in a payment by the Common Equityholders pursuant to Section 2.6(e) hereof; *provided, however, that* "Losses" shall include any of such damages described in clauses (a) or (b) above incurred by a third party which an Indemnified Party is obligated to pay to such third party.

"Material Adverse Effect" means any event, circumstance, change in, or effect on the Business, the Company or any Subsidiary that, individually or in the aggregate with any other circumstances, events, changes in or effects on the Business, the Company or any Subsidiary, is, or could reasonably be expected to be, materially adverse to the business, operations, assets or Liabilities, results of operations or the financial condition of the Company and the Subsidiaries taken as a whole.

"Merger Consideration" means Seventy-Six Million Three Hundred Fifty-Two Thousand Dollars ($76,352,000) in cash (payable in accordance with Section 2.5).

"Multiemployer Plan" means a multiemployer plan, as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Multiple Employer Plan" means any Employee Benefit Plan sponsored by more than one employer, within the meaning of Sections 4063 or 4064 of ERISA or Section 413(c) of the Code.

"Newport Claims" means those claims raised by Omega Engineering, Inc., Newport Electronics, Inc., and/or Newport Electronics GmbH in the actions *Omega Engineering, Inc. v. Cole-Parmer Instruments Co.*, Dist. of Conn. Civ. Action No. 3:98CV2052 JCH; *Raytek Corporation v. Newport Electronics, Inc.*, Dist. of Conn. Civ. Action No. 3:98CV2276 JCH; *Omega Engineering, Inc. v. Raytek Corporation, Cole-Parmer Instrument Co. and Davis Instruments Manufacturing Co.*, Civ. Action No. 3:98-CV-733, for infringement of U.S. Pat. No. 5,727,880, for which Raytek was granted summary judgment of non-infringement and is now consolidated on appeal with 3:98-CV-2052 JCH and 3:98-CV-2276 JCH; *Omega Engineering, Inc. v. Cole-Parmer Instruments Co.*, Fed. Cir. Docket No. 02-1478; *Omega Engineering, Inc. v. Raytek Corporation*, Fed. Cir. Docket No. 01-1546; *Newport Electronics, GmbH v. Raytek GmbH*, presently pending before the High Court of Germany, docket no. X ZR 197/01; the EPO Proceeding, and any future claim arising from a claim of infringement by the Raytek MX or ST multipoint laser sighting products of a patent or comparable right that claims priority, directly or indirectly, from U.S. patent application serial number 121,916 (now U.S. patent no.5,368,392) in any other jurisdiction.

W05787

"Other Closing Payments" means (a) bonus payments due to two employees of Raytek GmbH as described in Section 3.15 of the Disclosure Schedule, (b) payment of the Representative Fund and (c) other payments to third parties as may be specified by the Company at the Closing.

"Other Tax" means any Tax other than an Income Tax.

"Owned Real Property" means the real property owned by the Company or any Subsidiary, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Company or any Subsidiary attached or appurtenant thereto or used in connection therewith, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Permit" means any permit, franchise, variance, exemption, Government Orders, authorization or other license or approval issued or granted by any Governmental Authority.

"Permitted Encumbrances" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced: (a) liens for taxes, assessments and governmental charges or levies not yet due and payable for which adequate reserves are maintained on the financial statements of the Company and the Subsidiaries as of the Closing Date in conformity with GAAP consistently applied; (b) liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than sixty (60) days or which are being contested in good faith by appropriate proceedings (and for which adequate reserves are maintained on the financial statements of the Company and the Subsidiaries as of the Closing Date in conformity with GAAP consistently applied); and (c) minor survey exceptions, reciprocal easement agreements and other customary encumbrances on title to real property that (i) were not incurred in connection with any Indebtedness, (ii) do not render title to the property encumbered thereby unmarketable and (iii) do not, individually or in the aggregate, materially adversely affect the value or use of such property for its current and anticipated purposes.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity.

"Pro Rata Portion" means, with respect to any Common Equityholder, the quotient of (a) the sum of (i) all shares of Common Stock owned by such Common Equityholder as of the Closing and (ii) all shares of Common Stock with respect to which such Common Equityholder holds an option to purchase as of the Closing (whether or not vested) divided by (b) the Fully Diluted Shares.

"Real Property" means, collectively, the Leased Real Property and the Owned Real Property.

"Related Documents" means the Shareholders Agreement, the Escrow Agreement and the Transmittal Agreement.

W05788

"Remediation" means (a) any "remedial action," "response" or "removal," as those terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (b) any "corrective action" as that term is defined in the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., or (c) any similar action required under any Environmental Law to investigate, eliminate or reduce the threat to human health or the Environment posed by any Hazardous Substance.

"Securityholder" means any holder of a certificate representing shares of Common Stock or any holder of any option to purchase Common Stock (whether or not such option is vested).

"Stock Option Plan" means the Company's 1997 Incentive Stock Option Plan, as amended from time to time.

"Subsidiaries" means any and all corporations, partnerships, joint ventures, associations and other entities controlled by the Company directly or indirectly through one or more intermediaries. The Subsidiaries are listed in Section 3.2(b) of the Disclosure Schedule.

"Tax" or "Taxes" means (i) any and all taxes (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Authority or taxing authority, including without limitation: taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, unemployment compensation, withholding stamp, transfer, value added, or gains taxes; license and fees; and customs duties, tariffs, and similar charges; and (ii) any liability of the Company for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated or consolidated group.

"Tax Returns" means all returns, declarations, reports, information returns and statements required to be filed by or with respect to the Company in respect of any Taxes, including, without limitation, (i) any consolidated federal income Tax return in which the Company is included and (ii) any state, local or foreign income Tax returns filed on a consolidated, combined or unitary basis (for purposes of determining tax liability) in which the Company is included.

"Total Closing Payments" means the sum of (a) the Aggregate Phantom Unit Payment, (b) the Closing Expenses and (c) Other Closing Payments.

11.2    Index of Other Defined Terms.

In addition to these terms defined above, the following terms shall have the respective meanings given thereto in the Sections indicated below:

W05789

| Defined Term | Section | Defined Term | Section |
|---|---|---|---|
| AAA | 10.13 | Effective Time | 2.3 |
| Accounts Receivable | 3.23 | Employee Benefit Plan | 11.1 |
| Acquisition Sub | Preamble | Employee Pension Benefit Plan | 11.1 |
| Acquisition Transaction | 5.5 | Employment Agreements | 3.15(a) |
| Action | 11.1 | Encumbrance | 11.1 |
| Additional Escrow Amount | 2.5(f) | Environmental Law | 11.1 |
| Affiliate | 11.1 | EPO Decision | 2.5(f) |
| Aggregate Cap | 9.3(b) | EPO Proceeding | 11.1 |
| Agreement or this Agreement | 11.1 | ERISA | 11.1 |
| Agreement of Merger | 11.1 | Escrow | 2.5(f) |
| Allocation Statement | 5.10(b) | Escrow Agent | 2.5(f) |
| Assets | 3.7 | Escrow Amount | 2.5(f) |
| Baseline Shareholders' Equity | 2.6(e) | Financial Statements | 3.5(a) |
| Basket | 9.3(c) | Fully Diluted Shares | 11.1 |
| Benefit Arrangement | 11.1 | GAAP | 11.1 |
| Benefit Plan | 11.1 | General Escrow Amount | 2.5(f) |
| Business | 11.1 | Government Antitrust Authority | 5.3(b)(i) |
| Business Day | 11.1 | Governmental Authority | 3.14(a) |
| CGCL | 11.1 | Governmental Order | 11.1 |
| Closing | 1 | Hazardous Substance | 11.1 |
| Closing Date | 1 | HSR Act | 11.1 |
| Closing Date Balance Sheet | 2.6(a) | Indebtedness | 11.1 |
| Closing Expenses | 11.1 | Indemnified Party | 9.6(a) |
| Closing Shareholders' Equity | 2.6(a) | Indemnifying Party | 9.6(a) |
| Code | 11.1 | Intellectual Property | 11.1 |
| Common Equityholders | 11.1 | Internet Sites | 11.1 |
| Company | Preamble | Inventory | 3.24 |
| Company's Intellectual Property | 3.9(a) | Invoices | 3.31 |
| Company's Listed Intellectual Property | 3.9(b) | IRS | 11.1 |
|  |  | June 30 Balance Sheet | 11.1 |
| Company Persons | 5.8 | KPMG | 2.6(c) |
| Common Stock | 11.1 | Law | 11.1 |
| Confidentiality Agreement | 11.1 | Leased Real Property | 11.1 |
| Control | 11.1 | Liabilities | 11.1 |
| Copyrights | 11.1 | Licenses-In | 11.1 |
| Disclosure Schedule | 11.1 | Licenses-Out | 11.1 |
| Dissenting Shareholders | 2.7 | Loss or Losses | 11.1 |
| Domain Names | 11.1 | Material Adverse Effect | 11.1 |

W05790

| Defined Term | Section | Defined Term | Section |
|---|---|---|---|
| Material Contracts | 3.8 | Pro Rata Portion | 11.1 |
| Material Permits | 3.12 | Proprietary Rights | 11.1 |
| Merger | Recitals | Real Property | 11.1 |
| Merger Consideration | 11.1 | Reference Balance Sheet | 3.5(a) |
| Methodology | 3.31 | Remediation | 11.1 |
| Multiemployer Plan | 11.1 | Representative | Preamble |
| Multiple Employer Plan | 11.1 | | and 9.10(a) |
| Net Equity | 2.6 | Representative Fund | 9.9 |
| Neutral Accountant | 2.6(d) | Required Consents | 3.14(c) |
| Newport License | 9.7(a) | Securityholder | 11.1 |
| Noncompetition Agreements | Recitals | Securityholder Parties | 9.4 |
| Owned Real Property | 11.1 | Shareholders | 3.3 |
| Other Closing Payments | 11.1 | Shareholders Agreement | Recitals |
| Other Tax | 11.1 | Shareholders' Equity | 2.6(a) |
| Parent | Preamble | Significant Customers | 3.25 |
| Parent Parties | 2.8(a) | Significant Vendors | 3.25 |
| Patents | 11.1 | Software | 11.1 |
| Paying Agent | 2.8(a) | Statement of Closing Shareholders' | |
| Potential Contributor | 9.9 | Equity | 2.6(a) |
| Per Share Merger Consideration | 2.5(a) | Stock Option Plan | 11.1 |
| Permit | 11.1 | Subsidiaries | 11.1 |
| Permitted Encumbrances | 11.1 | Survival Period | 9.1 |
| Person | 11.1 | Surviving Corporation | 2.2 |
| Pre-Closing Income Tax Returns | 5.10(a) | Tax or Taxes | 11.1 |
| Pre-Closing Income Tax Returns | 5.10(a) | Termination Date | 8.1(b) |
| Pre-Closing Tax Return | 5.10(a) | Total Closing Payments | 11.1 |
| Pre-June 30 Tax Period | 5.10(b) | Transmittal Agreement | 2.8(b) |
| Pre-June 30 Tax Return | 5.10(b) | | |

11.3    Construction.  The defined terms used in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Articles, Sections and Exhibits shall be deemed to be references to Articles and Sections of, and Exhibits to, this Agreement unless the context shall otherwise require.  All Disclosure Schedules, Exhibits and Annexes attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Exhibit or Annex shall have the meaning ascribed to such term in this Agreement.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by

W05791

GAAP. Whenever any payment hereunder is to be paid in "cash," payment shall be made in the legal tender of the United States and the method for payment shall be by wire transfer of immediately available funds. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise expressly provided herein, any contract, instrument or statute defined or referred to herein or in any contract or instrument that is referred to herein means such contract, instrument or statute as from time to time amended, modified or supplemented, including (in the case of contracts or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. This Agreement shall be deemed to have been drafted by each party hereto and this Agreement shall not be construed against any party as a principal draftsperson.

W05792

IN WITNESS WHEREOF, the duly authorized officers or representatives of the parties hereto have duly executed this Agreement and Plan of Merger on the date first written above.

THE COMPANY

RAYTEK CORPORATION,
a California corporation

By: _Clifton Warren_ _____
Name:  Clifton Warren
Title:  Chief Executive Officer

PARENT

FLUKE ELECTRONICS CORPORATION ,
a Delaware  corporation

By: _____
Name:
Title:

ACQUISITION SUB

RAYTEK ACQUISITION CORP. ,
a Delaware corporation

By: _____
Name:
Title:

REPRESENTATIVE

_Clifton Warren_ _____
Name:  Clifton Warren

RAYTOP, INC.,
a California  corporation

By: _____
Name:
Title:

45039324_5                      73

W05793

IN WITNESS WHEREOF, the duly authorized officers or representatives of the parties hereto have duly executed this Agreement and Plan of Merger on the date first written above.

**THE COMPANY**

**RAYTEK CORPORATION,**
a California corporation

By:_____
Name: Clifton Warren
Title: Chief Executive Officer

**PARENT**

**FLUKE ELECTRONICS CORPORATION,**
a Delaware corporation

By:_____
Name: Christopher C. McMahon
Title: Secretary

**ACQUISITION SUB**

**RAYTEK ACQUISITION CORP.,**
a Delaware corporation

By:_____
Name: Christopher C. McMahon
Title: CFO and Secretary

**REPRESENTATIVE**

_____
Name: Clifton Warren

**RAYTOP, INC.,**
a California corporation

By:_____
Name:
Title:

W05794

IN WITNESS WHEREOF, the duly authorized officers or representatives of the parties hereto have duly executed this Agreement and Plan of Merger on the date first written above.

THE COMPANY

RAYTEK CORPORATION,
a California corporation

By:_____
Name:  Clifton Warren
Title:  Chief Executive Officer

PARENT

FLUKE ELECTRONICS CORPORATION,
a Delaware corporation

By:_____
Name:
Title:

ACQUISITION SUB

RAYTEK ACQUISITION CORP.,
a Delaware corporation

By:_____
Name:
Title:

REPRESENTATIVE

_____
Name:  Clifton Warren

RAYTOP, INC.,
a California corporation

By:_____
Name:  Hans Grundner
Title:

GESAMT SEITEN 01

W05795

# Exhibit 2

# TRANSMITTAL AGREEMENT

### To Surrender Shares of Common Stock to
### Purchase Common Stock (each, a "Security")

of

# RAYTEK CORPORATION

THIS TRANSMITTAL AGREEMENT SHOULD BE COMPLETED, SIGNED AND SENT TO THE PAYING AGENT AT THE ADDRESS SET FORTH BELOW. DELIVERY OF THIS TRANSMITTAL AGREEMENT TO AN ADDRESS OTHER THAN AS SET FORTH BELOW DOES NOT CONSTITUTE A VALID DELIVERY.

**Paying Agent**
**SunTrust Bank, Atlanta**
**Stock Transfer Department**
**58 Edgewood Avenue, Room 225**
**Atlanta, GA 30303**
**Telephone: 1-800-568-3476**
**Telecopier: 404-865-5371**

| SCHEDULE OF OWNERSHIP OF SECURITIES SURRENDERED | | |
|---|---|---|
| **Common Stock** | | |
| Name(s) and Home Address(es) of Registered Holder(s) (Please fill in, if blank, exactly as name(s) appear(s) on the Certificate(s)) | Share Certificate Number(s) | Number and Class of Shares Represented by Certificate(s) |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Total Shares of Common Stock Owned and Surrendered: |  |

**THE INSTRUCTIONS ACCOMPANYING THIS TRANSMITTAL AGREEMENT
SHOULD BE READ CAREFULLY BEFORE THIS
TRANSMITTAL AGREEMENT IS COMPLETED.**

---

**YOU MUST SIGN THIS TRANSMITTAL AGREEMENT IN THE
APPROPRIATE SPACE BELOW.**

Ladies and Gentlemen:

The undersigned acknowledges and agrees that it is entering into this Transmittal Agreement (the *"Transmittal Agreement"*) with the Company and its agents in connection with the transactions set forth in the Agreement and Plan of Merger, dated as of August ____, 2002 (the *"Merger Agreement"*), by and among Raytek Corporation, a California corporation (the *"Company"*), Fluke Electronics Corporation, a Delaware corporation (*"Parent"*), and Raytek Acquisition Corp., a California corporation (*"Acquisition Sub"*), Clifton Warren, as Securityholder Representative and with respect to the indemnification obligations set forth in the Merger Agreement, and Raytop, Inc., a California corporation, solely with respect to the indemnification obligations set forth in the Merger Agreement, a copy of which has been received by the undersigned. The undersigned hereby also acknowledges that the undersigned is fully aware of the contents of the Merger Agreement and the undersigned further agrees that the provisions of this Transmittal Agreement shall be binding upon the undersigned and the successors and assigns of the undersigned. The undersigned hereby further acknowledges that pursuant to the Merger Agreement, the Company will be canceling all Securities, as defined below, at the Effective Time of the merger of Acquisition Sub into the Company (the *"Merger"*). Capitalized terms used herein but not otherwise defined will have the meanings ascribed to such terms in the Merger Agreement.

Subject to the terms and conditions of the Merger Agreement and this Transmittal Agreement, the undersigned hereby surrenders to the Company the certificates described above in the Schedule of Ownership, the originals of which are held by the Company, representing shares of the Company's common stock, no par value (the *"Common Stock"* or the *"Securities"*), and the undersigned hereby authorizes the Company to deliver its, his or her certificates on behalf of the undersigned to Parent or to any paying agent designated by the Company or Parent, as appropriate.

Certificates of Common Stock described above in the Schedule of Ownership shall be referred to as the *"Certificates."* Holders of Certificates surrendered hereby are referred to collectively as *"Securityholders"* and individually as a *"Securityholder."* Subject to the terms and conditions of the Merger Agreement and this Transmittal Agreement, the undersigned hereby further surrenders to the Company, and otherwise waives, all benefits and rights that may inure to holders of the Securities surrendered.

Subject to the terms and conditions of the Merger Agreement and this Transmittal Agreement, the undersigned is entitled to receive for each share of Common Stock duly surrendered, an amount in cash, without interest, equal to the Per Share Merger Consideration (collectively, the *"Merger Consideration"*).

Subject to, and effective upon, payment for the Securities surrendered herewith, in accordance with the terms and subject to the conditions of the Merger Agreement and this Transmittal Agreement, the undersigned hereby assigns and transfers to, or upon the order of, the Company, all right, title and interest in and to all of the Securities that are being surrendered hereby.

No authority herein conferred or agreed to be conferred shall be affected by, and all such authority shall survive, the death or incapacity of the undersigned. All obligations of the undersigned hereunder shall be binding upon the heirs, personal representatives, successors and assigns and trustees in bankruptcy or other legal representatives of the undersigned. The surrender of the Securities is irrevocable but will not be effective until the Effective Time.

The undersigned hereby represents and warrants to the Company and its successors and assigns that the undersigned has full power and authority to surrender, sell, assign and transfer the Securities surrendered hereby and to waive any benefits and rights that may inure to holders of the Securities surrendered and that, when the same are paid for by the Parent and Acquisition Sub in accordance with the Merger Agreement and this Transmittal Agreement, the Company or the Parent, or their respective successors or assigns will acquire good, marketable and unencumbered title thereto, free and clear of all liens, restrictions, charges, security interests, pledges, voting agreements, encumbrances and commitments of any kind and nature, and that the Securities surrendered will not be subject to any adverse claim. The undersigned, upon request, will execute and deliver any additional documents, agreements, instruments and/or certificates reasonably deemed by Parent or the Company, or their respective successors or assigns, to be necessary, advisable or desirable to complete the surrender of the Securities and effectuate the intent of this Transmittal Agreement.

The undersigned hereby, on behalf of itself, himself or herself and its, his or her successors and assigns, acknowledges the terms and conditions of the indemnification obligations set forth in Article 9 of the Merger Agreement and the terms and conditions of the Escrow Agreement relating to any release of the funds in the Escrow and the undersigned agrees to and shall be bound by all such terms and conditions, including, without limitation, the appointment of Clifton Warren as its, his or her representative for the purposes of (a) the administration of the defense and/or settlement of any claims for indemnification under such Article 9, (b) the administration and settlement of the escrow fund contemplated by the Merger Agreement and the Escrow Agreement (c) the administration of the Newport Claims, including any settlement of such claims, and (d) any payment because of a shareholders' equity adjustment pursuant to Section 2.6 of the Merger Agreement. The undersigned hereby, on behalf of itself, himself or herself and its, his or her successors and assigns, further acknowledges and agrees that the above-described indemnification obligations, if and when asserted by any person or entity for whose benefit such indemnification has been provided, could require the undersigned to return all or a portion of the proceeds he, she or it receives in connection with the consummation of the Merger and specifically acknowledges and agrees to these provisions. The undersigned further agrees that he, she or it shall act in connection with the matters covered by this Agreement solely through the Securityholder Representative (as defined below). The undersigned expressly acknowledges and agrees that he, she or it hereby waives any right or authority to act on his, her or its own behalf in connection with the matters covered by this Agreement. The acts of the Securityholder Representative pursuant to this Agreement, the Merger Agreement and the Escrow Agreement shall be binding upon the undersigned.

2

The undersigned hereby acknowledges that, pursuant to the Merger Agreement, the Parent Parties' remedy for any indemnification of Losses may be satisfied by proceeding against one or more Common Equityholders, but in the case of any claim for any Loss, only in respect of such Common Equityholder's Pro Rata Portion of such Loss. In order to provide for just and equitable contribution in circumstances where the Parent Parties do not pursue claims against all Common Equityholders, the undersigned agrees that, all Losses of any other Common Equityholder of the Company under the Merger Agreement shall be shared by the undersigned up to an amount equal to the undersigned's Pro Rata Portion of the aggregate amount of such Losses incurred by such other Common Equityholder. Accordingly, the undersigned hereby agrees to pay to such other Common Equityholder its Pro Rata Portion of any Loss incurred by such Common Equityholder in respect of such Common Equityholder's obligations under the Merger Agreement. Any contribution made by any Common Equityholder to any other Common Equityholder in connection with a claim under the Merger Agreement shall not be a defense to any claim for indemnification by any Parent Party or give rise to any claim against any of the Parent Parties under the Merger Agreement or this Agreement. This paragraph shall not amend or modify or be construed in connection with any claim under Article 9 of the Merger Agreement. Each Common Equityholder who brings a claim under this paragraph shall indemnify and hold the Parent Parties harmless against all Losses incurred by any Parent Party in connection with a claim brought by any Common Equityholder against any other Common Equityholder. The undersigned further agrees that the provisions of this paragraph shall inure to the benefit of the other Common Equityholders as third party beneficiaries.

The undersigned hereby agrees that immediately upon the closing of the Merger, Four Hundred Thousand Dollars ($400,000) of the cash consideration otherwise payable to the Common Equityholders of the Company shall be delivered by the Paying Agent to Clifton Warren, in his capacity as the representative of the Common Equityholders (the "Securityholder Representative"), and the Securityholder Representative will hold such funds (the "Representative Fund") as trustee for the Common Equityholders for payment of the fees and expenses of the Securityholder Representative in performance of his duties as a Securityholder Representative hereunder and pursuant to the Merger Agreement and the Escrow Agreement, including, but not limited to, payments for the services and expenses of attorneys, accountants and other professional advisors and consultants engaged by the Securityholder Representative, in his sole discretion, to assist in contesting, prosecuting and/or otherwise resolving claims under the indemnification provisions of the Merger Agreement and matters relating to the Newport Claims.

The Securityholder Representative shall maintain the Representative Fund in an account invested in insured, national banks' or savings banks' savings accounts, money market accounts or certificates of deposit. The interest earned, if any, on such accounts shall be used to pay the Securityholder Representative's fees and expenses so the taxable income therefrom shall be reported only by the Securityholder Representative and not by the Common Equityholders.

Upon the termination of the Escrow, the Pro Rata Portion of any funds remaining in the Representative Fund shall be disbursed to each Common Equityholder.

The undersigned hereby, on behalf of itself, himself or herself and its, his or her successors and assigns, acknowledges the terms and conditions of the arbitration provisions set forth in Section 10.13 of the Merger Agreement and agrees that all disputes between or among the undersigned,

3

or its, his or her successors or assigns, and any party to the Merger Agreement arising out of the Merger Agreement, this Transmittal Agreement and the transactions contemplated thereby and hereby shall be governed by such Section 10.13 and the other provisions of Article 10 of the Merger Agreement.

   The undersigned hereby represents and warrants that the Schedule of Ownership above correctly and completely sets forth all the Securities held by the undersigned being surrendered hereunder and that, except as set forth therein, the undersigned (1) does not hold or beneficially own any other shares of Common Stock of the Company or any of its Subsidiaries or any options, warrants, rights or convertible securities exercisable for or convertible into shares of Common Stock of the Company or any of its Subsidiaries, (2) does not hold or beneficially own any other class of equity securities of the Company or any of its Subsidiaries, (3) does not have the right to acquire any shares of Common Stock or other securities of the Company or any of its Subsidiaries, including, without limitation, any derivative or convertible securities, or any options, warrants or other rights to acquire shares of capital stock of or equity interests in the Company or any of the Subsidiaries, or (4) does not hold, own or have the right to acquire any interest in any similar securities or contractual obligations the value of which is derived from the value of an equity interest in the Company or any of the Subsidiaries, or securities convertible into or exchangeable for capital stock of or equity interests in, or similar securities or contractual obligations of, the Company or any of the Subsidiaries.

   The undersigned understands that surrender of the Securities is not valid until receipt by the paying agent of this Transmittal Agreement, or a facsimile thereof, duly completed and manually signed, together with all accompanying evidences of authority, in form reasonably satisfactory to the Parent.

   The undersigned hereby instructs the paying agent and the Company to, and its agents, successors or assigns to, unless otherwise indicated herein under "Special Payment Instructions," please issue the check for the Merger Consideration in the name(s) of the registered holder(s) appearing under "Schedule of Ownership," and, similarly to, unless otherwise indicated under "Special Delivery Instructions," please mail the check for the Merger Consideration to the address(es) of the registered holder(s) appearing under "Schedule of Ownership." In the event that both the "Special Payment Instructions" and the "Special Delivery Instructions" are completed, the undersigned hereby instructs the paying agent and the Company to, and its agents, successors or assigns to please issue the check for the Merger Consideration in the name(s) of, and deliver such check to, the Person(s) so indicated.

   The undersigned understands and agrees that payment of the Merger Consideration for the surrendered Securities will be made as promptly as practicable (though in any event no later than three (3) business days) after receipt by the paying agent of this Transmittal Agreement, the Certificates evidencing the shares of Common Stock and all other necessary documents in form reasonably satisfactory to the Parent, but in no event earlier than the Closing Date.

   The undersigned recognizes, acknowledges and agrees that the Merger is subject to various conditions and the Surviving Corporation may not be required to accept the surrender of any of the Securities surrendered hereby.

The undersigned agrees that this Transmittal Agreement and the provisions hereof shall be assignable by the Company and shall be binding upon, inure to the benefit of, and be enforceable by, the Company and the Parent and their respective successors and assigns.

The provisions of Sections 10.4, 10.9, 10.10, 10.12 and 10.13 of the Merger Agreement are hereby incorporated by reference herein and made a part hereof; *provided, however,* that after incorporation herein, all references to "Agreement" in such sections of the Merger Agreement shall mean this Transmittal Agreement and the agreements referenced in Section 10.9 shall include the Transmittal Agreement.

**[Signatures Appear on Next Page]**

IN WITNESS WHEREOF, the undersigned has executed and delivered, or caused its duly authorized officer or representative to execute and deliver, this Transmittal Agreement as of the Effective Time.

---

## IMPORTANT
## SECURITYHOLDERS: SIGN HERE

X: _____

X: _____

**Signature(s) of Holder(s)**

Dated: _____, 2002

(Must be signed by the registered holder(s) exactly as name(s) appear(s) on the Certificates, or on a security position listing or by person(s) authorized to become registered holder(s) by Certificates and documents transmitted herewith. If signature is by trustees, executors, administrators, guardians, attorneys-in-fact, agents, officers of corporations or others acting in a fiduciary or representative capacity, please provide the following information. See Instruction 4.)

Name(s):_____

_____
                    (Please Type or Print)

Capacity (Full Title):_____
                    (See Instruction 4)

Address(es):_____

_____
                    (Include Zip Code)

_____
                        Country

Area Code and Telephone Number: _____

Taxpayer Identification or Social Security Number(s):_____

---

Acknowledged and Accepted by:

**RAYTEK CORPORATION**


By:_____

Name:_____

Title:_____

**SPECIAL PAYMENT INSTRUCTIONS**
(See Instructions 1, 4, 5 and 6)

To be completed ONLY if the check for surrendered
Securities is to be issued in the name of and sent to
someone other than the undersigned.


Issue check to:

Name:_____
            (Please Type or Print)

Address:_____

_____
                              (Zip Code)
_____
                 Country
_____
  (Tax Identification or Social Security No.)

**SPECIAL PAYMENT INSTRUCTIONS**
(See Instructions 1, 4, 5 and 6)

To be completed ONLY if payment is to be made by
wire transfer instead of by check.


Wire transfer funds to (Please Type or Print):

Bank:_____

ABA Number:_____

For credit to Account of:_____

Account Number:_____

Ref (if any):_____

NOTE: SIGNATURES MUST BE PROVIDED BELOW.

PLEASE READ CAREFULLY THE BELOW INSTRUCTIONS

Forming Part of the Terms and Conditions of a Valid Surrender of Securities

**1.     Guarantee of Signatures.**  No signature guarantee is required on this Transmittal Agreement if this Transmittal Agreement is signed by the registered holder(s) of the Securities surrendered herewith.

**2.     Requirement of Surrender.**  For a Securityholder to validly surrender Securities, a properly completed and duly executed Transmittal Agreement (or a manually signed facsimile thereof), with any other required documents must be received by the paying agent at its address set forth above.  Surrender may be made by registered mail, hand delivery, or overnight courier.  **Please return the executed Transmittal Agreement AS SOON AS POSSIBLE.**

**THE METHOD OF DELIVERY OF THIS TRANSMITTAL AGREEMENT AND ANY OTHER REQUIRED DOCUMENTS, IS AT THE OPTION AND SOLE RISK OF THE SURRENDERING SECURITYHOLDER AND THE DELIVERY WILL BE DEEMED MADE ONLY WHEN ACTUALLY RECEIVED BY THE PAYING AGENT. IF DELIVERY IS BY MAIL, REGISTERED MAIL WITH RETURN RECEIPT REQUESTED, PROPERLY INSURED, IS RECOMMENDED.**

**3.     Inadequate Space.**  If the space provided herein under "Schedule of Ownership of Securities Surrendered" is inadequate, the Certificate numbers, the number of Securities evidenced by such Certificate and the number of Securities surrendered should be listed on a separate signed schedule and attached hereto.

**4.     Signatures on this Transmittal Agreement, Instruments of Transfer and Endorsements.**  If this Transmittal Agreement is signed by the registered holder(s) of the Securities surrendered hereby, the signature(s) must correspond exactly with the name(s) as written on the face of the Certificate(s) without alteration, enlargement or any change whatsoever.

If any of the Securities surrendered hereby are owned of record by two or more joint owners, all such owners must sign this Transmittal Agreement.  If any of the surrendered Securities are registered in different names on several Certificates, it will be necessary to complete, sign and submit as many separate Transmittal Agreements as there are different registrations of Certificates.

If this Transmittal Agreement or any Certificates, or instruments of transfer are signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person should

so indicate when signing, and proper evidence satisfactory to the Company of such person's authority to so act must be submitted.

5.    **Transfer Taxes.**  Except as set forth in this Instruction 5, the Parent or the paying agent will pay or cause to be paid any transfer taxes with respect to the surrender of Securities to it or its order.  If, however, payment of the Merger Consideration is to made to any person other than the registered holder(s), or if surrendered Certificates are registered in the name of any person other than the person(s) signing this Transmittal Agreement, the amount of any transfer taxes (whether imposed on the registered holder(s) or such person) payable on account of the transfer to such person will be deducted from the Merger Consideration unless satisfactory evidence of the payment of such taxes or exemption therefrom is submitted to the Company.

**EXCEPT AS PROVIDED IN THIS INSTRUCTION 5, IT WILL NOT BE NECESSARY FOR TRANSFER TAX STAMPS TO BE AFFIXED TO THE CERTIFICATE(S) LISTED IN THIS TRANSMITTAL AGREEMENT.**

6.    **Special Payment and Delivery Instructions.**  If the payment check is to be issued in the name of a person other than the signer of this Transmittal Agreement or if the payment check or wire transfer payment is to be sent to someone other than the signer of this Transmittal Agreement or to an address other than that shown above, the appropriate boxes on this Transmittal Agreement should be completed.

7.    **Requests for Assistance or Additional Copies.**  Questions and requests for assistance may be directed to SunTrust Bank, Stock Transfer Department, 58 Edgewood Avenue, Room 225, Atlanta, GA  30303; telephone:  1-800-568-3476; telecopier:  404-865-5371.

8.    **Questions of Validity; Waiver.**  All questions as to the validity, form and acceptances of Certificates surrendered will be determined by the Parent, which determination shall be final and binding.  The Parent reserves the right to waive any irregularities or defects in the surrender of any Certificate, and the Parent's interpretations of the terms and conditions of the Merger Agreement and the Letter of Transmittal (including these instructions) shall be final and binding.  Any irregularities in connection with the surrender of Certificates must be cured within such time as the Parent shall determine unless waived.  A surrender will not be deemed to have been made until all irregularities and defects have been cured or waived.

**IMPORTANT: THIS TRANSMITTAL AGREEMENT OR A MANUALLY SIGNED FACSIMILE THEREOF (TOGETHER WITH CERTIFICATES FOR THE SURRENDERED SECURITIES AND ALL OTHER REQUIRED DOCUMENTS) MUST BE RECEIVED BY THE COMPANY IN CARE OF SUNTRUST BANK, AS PAYING AGENT, BEFORE PAYMENT FOR YOUR SECURITIES CAN OR WILL BE MADE.**